E-FILED
Monday, 24 June, 2013 10:55:57 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

Darnell Fonder, individually and on behalf of a putative class,

*Plaintiff*,

*-vs-*

Sheriff of Kankakee County, Kankakee County,

*Defendants*.

No. 2:12-cv-2115-MPM-DGB

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff, by counsel, moves the Court to order that this case may proceed as a class action pursuant to Rule 23(b)(3) for:

> All persons held in the custody of the Sheriff of Kankakee County from April 20, 2010 to the date of entry of judgment who, following a warrantless arrest, were strip searched in advance of a judicial determination of probable cause.

### I. The Challenged Policy

Defendant Sheriff assigns to the general jail population at the Jerome Combs Detention Center (hereinafter "JCDC") all persons who arrive at the JCDC following a warrantless arrest, even when those persons are awaiting a judicial determination of probable cause. (Downey Dep. 5:10-18, 6:9-10, Plaintiff's Exhibit 1, attached.)

The Sheriff's written policies mandate the strip search of all persons assigned to the general jail population, without regard to whether or not a judicial official had found that there is probable cause to detain. (Policy and Procedure Manual, Section 901, par. 28(C)(4), attached as Exhibit 2 at 6.)

The Sheriff's written policies provide that a strip search begins with the complete removal of clothing, followed by a visual examination of all areas of the detainee's body. (Policy and Procedure Manual, Section 315, par. C(5), attached as Exhibit 3 at 3.) The written policy requires the searching officer to visually examine the anal area of each detainee. *Id.*, par. C(11)(l), Exhibit 3 at 4. For male detainees, the written policy requires a careful examination of the crotch area and, for uncircumcised detainees, an examination of the area under the foreskin. *Id.*, par. C(11)(f), Exhibit 3 at 4. For female detainees, the written policy requires the detainee to spread the skin in her vaginal area and to then squat. *Id.*, par. C(12)(b), Exhibit 3 at 5.

## II. Application of the Strip-Search Policy to Plaintiff

Plaintiff was arrested on April 24, 2010. (Fonder Dep. 20:18-20, Plaintiff's Exhibit 5 at 20.) The officers, who did not have a warrant, believed that plaintiff had committed a domestic battery. (Fonder Dep. 8:23-9:2, Plaintiff's Exhibit 5 at 8-9.)

Domestic battery is one of the offenses for which Illinois law requires an appearance before a judge for the setting of bond.[1] Police departments in Kankakee County do not have detention facilities. (Downey Dep. 6:22-24, Plaintiff's Exhibit 1 at 6.) Thus, all persons arrested in Kankakee County who must appear before a judge before being permitted to post bond will be held in general population at the JCDC.[2] (Downey Dep. 6:18-21, Plaintiff's Exhibit 1 at 6.)

In accordance with this policy, plaintiff was processed into the general population at the JCDC. (Fonder Dep. 151:16-20, Plaintiff's Exhibit 5 at 151.) A correctional officer ordered plaintiff to remove his clothes. (Fonder Dep. 170:22-171:1, Plaintiff's Exhibit 5 at 170-71.) Plaintiff complied with this order; the officer then told plaintiff to "open my mouth; my ears; tongue, lift my testicles; oh, spread my butt cheeks, lift my feet up; move my feet around." (Fonder Dep. 171:12-14, Plaintiff's Exhibit 5 at 171.) Plaintiff was given a jump suit after the search and directed to a housing unit. (Fonder Dep. 181:15-182:6, Plaintiff's Exhibit 5 at 181-82.)

---

[1] Other offenses include all felonies and the misdemeanor of violation of an order of protection. Defendants' Response to Request to Admit par. 13, Plaintiff's Exhibit 4 at 3-4.

[2] Persons who come into the jail for an offense for which bond can be posted pursuant to the bail schedule of Illinois Supreme Court Rules 526-28 are not placed into the general jail population until they have had an opportunity to post bond. (Downey Dep. 8:22-9:20, Plaintiff's Exhibit 1 at 8-9; Downey Dep. 10:1-8, Plaintiff's Exhibit 1 at 10.)

Plaintiff remained at the JCDC for nearly two days (Fonder Dep. 188:18-20, Plaintiff's Exhibit 5 at 188), until he was released without the filing of any charges "pending further investigation." (Fonder Dep. 92:19-24.)

## III. Plaintiff's Legal Claim

Plaintiff contends that the Sheriff's policy requiring the strip search of arrestees in advance of a judicial determination of probable cause contravenes the Fourth Amendment. This is the issue identified by Justice Alito in his concurring opinion in *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1524-25 (2012):

> [T]he Court does not hold that it is always reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population. Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate. In some cases, the charges are dropped. In others, arrestees are released either on their own recognizance or on minimal bail. In the end, few are sentenced to incarceration. For these persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible. …
>
> ****
>
> The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer. The lead opinion explicitly reserves judgment on that question. See *ante*, at 1522-1523. In light of that limitation, I join the opinion of the Court in full.

## IV. Plaintiff's "Right to Have a Class Certified"

Rule 23 of the Federal Rules of Civil Procedure permits a litigant to "bring his [or her] claim as a class if he [or she] wishes." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 1438 (2010). Upon showing that the case satisfies the requirements of Rule 23, "the Federal Rules of Civil Procedure give the proposed class representative the right to have a class certified." *United States Parole Commission v. Geraghty*, 445 U.S. 388, 403 (1980). While Rule 23(b) begins that "[a] class action *may* be maintained if Rule 23(a) is satisfied," the permissive "*may*" refers to the plaintiff, rather than to the court: "The discretion suggested by Rule 23's 'may' is discretion residing in the plaintiff." *Shady Grove,* 130 S.Ct. at 1438.

Rule 23 "empowers a federal court 'to certify a class in each and every case' where the Rule's criteria are met." *Shady Grove,* 130 S.Ct. at 1438. Moreover, Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id.* at 1437. Plaintiff shows below that this case satisfies each criteria of Rule 23(a) and Rule 23(b)(3).

## V.   The Common Contention Capable of Classwide Resolution

In *Wal-Mart Stores, Inc. v. Duke*, 131 S.Ct. 2541 (2011), the Court held that Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that the proposed class must present a "common contention" that is "of such a nature that is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. The Seventh Circuit analyzed *Wal-Mart* in *McReynolds v. Merrill Lynch*, 672 F.3d 482 (7th Cir. 2012), and held that when a plaintiff's challenge is to policy decisions "by top management," the case presents "issues common to the entire class and [is] therefore appropriate for class-wide determination." *Id.* at 489. The constitutionality of the Sheriff's strip search policy is precisely the type of issue "appropriate for class-wide determination."

## VI.   The Proposed Class Satisfies Rule 23(a) and (b)(3)

A party seeking to maintain a case as a class action must show that the proposed class satisfies each of the requirements of Rule 23(a) and that the proposed class satisfies one of the subsections of Rule 23(b). *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). This case satisfies each of these requirements.

### A. Numerosity

Rule 23(a)(1) requires that the proposed class must be "so numerous that joinder of all members is impracticable." Plaintiff is not required "to specify the exact number of persons in the class," *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989), but must provide a reasonable estimate of the number of class members. *Miller v. Spring Valley Properties*, 202 F.R.D. 244, 247 (C.D.Ill. 2001). This rule is illustrated in *Phipps v. Sheriff of Cook County*, 249 F.R.D. 298 (N.D.Ill. 2008). There, the plaintiff had identified 12 class members. Id. at 300. The Court concluded that this evidence supported the "sensible estimate" that the class would consist of more than fifty persons and thereby satisfied the numerosity requirement of Rule 23(a)(1). *Id.*

The general rule is that a class of 40 satisfies the numerosity requirement of Rule 23(a)(1). *George v. Kraft Foods Global*, 270 F.R.D. 355, 365 (N.D.Ill. 2010). In this case, defendants agree that the proposed class consists of more than 100 persons. (Request to Admit, par. 8, Plaintiff's Exhibit 4 at 3.) The proposed class therefore satisfies the numerosity requirement of Rule 23(a).

### B. Commonality

The common question presented for the class is whether the Sheriff's policy requiring the strip search of arrestees in advance of a judicial determination of probable cause contravenes the Fourth Amendment. There is no factual variation in this claim, which satisfies the commonality requirement of Rule 23(a). *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008).

### C. Typicality

The class claim arises from the same strip search policy that is applied to all persons entering the jail. This claim thus meets the typicality requirement of Rule 23(a):

> A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory. Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large.
>
> *Oshana v. Coca-Cola Co.*, 472 F.3d506, 514 (7th Cir.2006).

### D. Adequacy of Representation

Plaintiff is represented by competent counsel and he will "fairly and adequately protect the interests of the class," as required by Rule 23(a)(4). Plaintiff's attorney was admitted to practice in 1972; his work in class

action litigation includes *United States Parole Commission v. Geraghty*, 445 U.S. 388 (1980) (class action challenging federal parole guidelines); *Doe v. Calumet City*, 128 F.R.D. 93 (N.D.Ill. 1989) (class action challenging strip search practice of Calumet City police department); *Calvin v. Sheriff of Will County*, 405 F.Supp.2d 933 (N.D.Ill. 2005) (class action challenging strip search practice at Will County Jail). Plaintiff's attorney has also argued nearly 150 federal appeals, including five cases in the United States Supreme Court.[3]

### E. Rule 23(b)(3): Predominance and Superiority

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner v. Northshore University Health Systems*, 669 F.3d 802, 815 (7th Cir. 2012), quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011). To prove the class strip search claim, plaintiff will show that the Sheriff applies his written policy to strip search detainees in advance of a judicial determination of probable cause. Plaintiff will also show that this practice is unreasonable. Whether the Sheriff applies his written policy and, if so, whether that policy is constitutionally unreasonable, will not

[3] In addition to *Geraghty*, Flaxman argued *Browder v. Director, Department of Corrections*, 434 U.S. 257 (1978); *Jaffee v. Redmond*, 518 U.S. 1 (1996); *Ricci v. Arlington Heights, cert dismissed as improvidently granted*, 523 U.S. 613 (1998), and *Wallace v. Kato*, 549 U.S. 384 (2007).

require "evidence that varies from member to member." *Messner*, 669 F.3d at 815. It is therefore not surprising that courts have routinely certified classes under Rule 23(b)(3) challenging strip search policies.[4] As the district court stated in *Streeter* v. *Sheriff of Cook County*, 256 F.R.D. 609, 614 (N.D. Ill. 2009): "When a proposed class challenges a uniform policy, the validity of that policy tends to be the predominant issue in the litigation."

In addition to satisfying the predominance prong of Rule 23(b)(3), a class action is superior to other methods for adjudicating the claims of the members of the proposed class. As the district court stated in *Raymundo v. Winnebago County*, No. 3:07-cv-50087, N.D.Ill., June 10, 2009 (attached as Exhibit 8):

> The court also finds that plaintiff has shown that a class action is the superior method for pursuing these claims. Plaintiff's constitutional challenge to the Jail's uniform policy of strip-searching those arrested on court orders is the primary legal issue in this case. The judicial economy from consolidation of the separate claims is large because plaintiff has shown that the class is most likely more than 100 people, and thus, even if only a modest portion of these potential claims were filed, the court would be forced to resolve the identical issue regarding

[4] *Young v. County of Cook*, 616 F.Supp. 856 (N.D.Ill. 2009) (decision on liability); *Smith v. Dearborn County, Indiana*, 244 F.R.D. 512 (S.D.Ind. 2007); *Bullock v. Sheahan*, 225 F.R.D. 227, 229 (N.D.Ill. 2004); *Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607 (W.D.Wis. 2005); *Calvin v. Sheriff of Will County*, 2004 W.L. 1125922 (N.D.Ill. 2004) (attached as Exhibit 6); *Baggett v. Ashe*, 2013 WL 2302102 (D.Mass. 2013) (attached as Exhibit 7).

> the common policy multiple times. See *Young*, 2007 WL 1238920, at *8. Moreover, as the damages for each class member are likely to be relatively small, certifying this class allows for the vindication of the rights of people who individually would be without effective strength to bring a suit. *See Blihovde*, 219 F.R.D. at 622; *see also Amchem*, 521 U.S. at 617 (holding that in regard to Rule 23(b)(3) "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"). As such, plaintiff has satisfied the requirements of Rule 23(b)(3).
>
> *Raymundo v. Winnebago County*, No. 3:07-cv-50087, N.D.Ill., Mem.Op., June 10, 2009 at 4, attached as Exhibit 8 at 4.

The legality of the strip search policy should be resolved in "one fell swoop," *Mejdrich v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003). Plaintiff's challenge to the strip search policy should be allowed to proceed as a class action.[5]

---

[5] Plaintiff's counsel recently filed another case, also involving the strip search policy. *Dietz v. Kankakee County*, 2:13-02143, C.D.Ill. Plaintiff does not oppose the consolidation of *Dietz* with this case.

## VII. Conclusion

For the reasons above stated, plaintiff requests that the Court order that this case proceed as a class action pursuant to Rule 23(b)(3) for:

> All persons held in the custody of the Sheriff of Kankakee County from April 20, 2010 to the date of entry of judgment who, following a warrantless arrest, were strip searched in advance of a judicial determination of probable cause.

Respectfully submitted,

/s/ Kenneth N. Flaxman

Kenneth N. Flaxman
ARDC 830399
200 S Michigan Ave, Ste 201
Chicago, IL 60604
(312) 427-3200
*attorney for plaintiff*

**Exhibit 1**

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| DARNELL FONDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 CV 2115 |
| -vs- | ) | |
| | ) | |
| SHERIFF OF KANKAKEE COUNTY, KANKAKEE COUNTY, CITY OF KANKAKEE, and KANKAKEE POLICE OFFICERS TRUDEAU AND WAGNER, | ) | |
| | ) | |
| Defendants | ) | |

The deposition of MICHAEL DOWNEY, called by the plaintiff for examination, pursuant to notice and pursuant to Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before DIANA DEBRA SABO, Certified Shorthand Reporter and Notary Public within and for the County of Will and State of Illinois, at 3000 South Justice Way, Kankakee, Illinois, on the 26 day of March, 2013.

A P P E A R A N C E S:

LAW OFFICES OF KENNETH N. FLAXMAN, P.C., by
MR. KENNETH N. FLAXMAN,
200 South Michigan Avenue
Suite 201
Chicago, Illinois 60604
(312) 427-3200

Appeared on behalf of the Plaintiff;

HERVAS, CONDON & BERSANI, P.C., by
MR. MICHAEL W. CONDON,
333 Pierce Road
Suite 195
Itasca, Illinois 60143-3156
(630) 773-4774

Appeared on behalf of the Defendants.

Also Present:

Mr. Darnell Fonder

* * * * * * * * * * *

2:12-cv-02115-MPM-DGB # 43 Page 16 of 270

DARNELL FONDER v. KANKAKEE POLICE OFFICERS

3

WITNESS: Page

MICHAEL DOWNEY

Examination by Mr. Flaxman 4-13

* * * * * * * * * * *

EXHIBITS:

(No exhibits marked.)

* * * * * * * * * *

ADVANTAGE REPORTING SERVICE
(800)-347-3124

Plaintiff's Exhibit 1 Page 3

(Witness sworn.)

WHEREUPON:

MICHAEL DOWNEY

called as a witness herein, after having been first duly sworn, was examined upon oral interrogatories and testified as follows:

E X A M I N A T I O N

BY MR. FLAXMAN

Q. State your name and spell your last name for us, please.

A. Yes, it's Michael Downey, D-O-W-N-E-Y.

Q. And Mr. Downey, I understand that you have been designated by the sheriff -- are you the sheriff?

A. No.

Q. Okay. You've been designated by the sheriff to answer questions about the reason or reasons for assigning to the general jail populations at the Jerome Combs Detention Center persons being detained following an arrest without a warrant who are awaiting a judicial determination for probable cause; is that correct?

A. That's what I understand too, yes.

Q. Do you know about that?

A. Yes.

Q. Okay. What's your position with the jail?

A. I'm the jail administrator. The chief of corrections is my official title.

Q. How long have you been chief of corrections?

A. Eighteen years.

Q. All right. Well, are persons who are being detained following an arrest without a warrant who are awaiting a judicial determination for probable cause assigned to the general jail population at the J.C.D.C.?

A. They are assigned to a particular housing unit depending on a number of things. But yes, they are brought back into the jail into a housing unit.

Q. So am I correct that there's no holding area for people who are waiting to see the judge for the first time?

A. There are holding cells in the intake area, but they are not used to hold somebody there for an extended period of time.

Q. By extended period of time what do you mean?
A. More than a day.
Q. So if somebody's being held overnight, does that mean they're not held in one of the holding cells?
A. If somebody's being held overnight, if they are -- well, if they are not going to -- if there is not a bond assigned to them, then they are going to be brought back to a housing unit.
Q. And why is that?
A. Oh, because jails typically aren't designed to hold new arrests in a particular area.
I don't believe there's too many jails in this state that have the ability to hold new arrests in one area without bringing them to a housing unit.
Q. Am I correct that the J.C.D.C. holds people who are arrested by police departments who are awaiting an appearance before a judge?
A. Yes.
Q. And police departments in Kankakee County don't have their own detention facilities?
A. They do not.

Q. Is there any other reason why -- well, is there -- when the J.C.D.C. was constructed, was there a separate pod set aside for intake prisoners?

A. There is a -- it's -- I believe you're referring to what we consider E pod, which is our classification area.

Q. And was that originally used for intake of prisoners with detainees?

A. That was a housing unit within the facility.

Q. Well, in 2005 would persons who entered the jail awaiting their initial appearance before a judge be taken to E pod?

A. Some.

Q. And where would the others go?

A. Depending on where there was a bed available.

Because, see, in a direct supervision facility if we know -- and unfortunately, there's a lot of repeat arrests. So our correction staff is very familiar with a number of those detainees that are coming in and out of jail.

So we don't necessarily have to bring them to intake to be able to classify them. That's what we use that intake area for is to be to classify them.

If an inmate comes in, we don't know -- if we don't know him, we don't know how he's going to react to being incarcerated.

But there's a large number of persons who come into our jail who we do know how they're going to respond in custody and so they're easier to house.

Q. Do you have any idea of the number of people who come into the J.C.D.C. awaiting a judicial determination for probable cause each day?

A. The only number that I know off the top of my head is about the number of people that we process in about a year, but that's everybody. That's just not the ones that are staying. Those are the ones that are coming in posting bonds as well and that's about 8500 a year.

Q. So when someone comes in where they have been arrested on an offense for which bond can be posted without seeing a judge, are they placed in

the general jail population awaiting a posting of bond?

A. No, no.

Q. Well --

A. Timing-wise we give them every opportunity possible to post bond. We allow them to make phone calls and not from an inmate pay phone. We allow them to make phone calls from our booking telephone which is the same phone our officers use. They are free calls so that they can get the bond brought in so that they can bond out.

If they tell us my bond's coming in two hours, they'll sit in -- waiting in the intake area in the waiting area until that bond gets there.

If they're there and the bond doesn't show, doesn't show, doesn't show, we have to make a determination as to where we are going to house that individual.

Q. Now, there are people who come into the jail who can't post bond until they see the judge; is that right?

A. Correct.

Q. And are those persons processed, immediately processed into the general jail population?

A. They are processed as every inmate is. In other words, the fingerprint, the picture, the demographic information that we obtain during the booking process; and then we house them as soon as we possibly can as soon as time allows.

Q. Is there a judge sitting every day of the week for bond setting?

A. Monday through Friday, yes.

Q. There's no holiday?

A. We have holiday court, yes.

Q. Saturday and Sunday?

A. Normally Saturday. I believe that on holiday weekends where Monday is a holiday we have holiday court on Saturday and Monday.

Q. So if someone comes in on a Sunday morning on an offense which requires an appearance before a judge to set bond, am I correct that that person will be put into the general jail population?

A. Yes.

Q. And if somebody comes in on a Sunday --

Monday morning at 2:00 a.m., would they -- would they be placed in the general population or await to go to jail in the morning -- go to court in the morning?

A. They would be placed in the general population or they would be placed in the jail. They would be housed in the jail, and they would -- and we have no control over when they call into court. They could go to court at 1:30 that afternoon or they could wait and hold them over until the next day at 1:30.

Q. Well, having decided which people come into the jail who require -- who have to see a judge for the setting of bond, get placed in the general jail population or get held in a detention -- in a cell before the general jail population?

A. I don't think I understand.

MR. CONDON: I'll object to the form.

BY MR. FLAXMAN:

Q. Okay. Well, is everybody who comes into the jail who has to see a judge for the setting of bond placed into the general jail population before they see the judge?

A. They are placed in some housing unit within the jail.

Q. Well, are there housing units that are different than the general jail population?

A. Yes.

Q. And what are those?

A. Well, there's our max area. There's segregation. There's discipline. There's -- we have what's called an H pod which is for those that come in that have some medical issues that maybe they can't function in a general population area; so they are with other inmates who may have a crutch with them or may have their arm in a cast or just they can still function. They don't need medical treatment, but it's difficult for them to function in general population or what you would call general population.

Q. Other than what you have said, is there any other reason for assigning to the general jail population at the J.C.D.C. people who enter the jail following an arrest without a warrant who are awaiting a judicial determination for probable cause?

A. Is there any other reason?

Q. Right. Other than what you have told us so far today.

A. Well, I mean, I think there's a number of reasons. No. 1, you know, the facility itself in -- as the case with majority of the facilities, they're not set up to have a pretrial or pre-judge appearance area. They are set up to -- because we follow the Illinois County Jail Standards, they are brought in, they are processed, they are showered, and they are put in a housing unit and they see a judge within that 48 hours.

Q. Okay. Any other -- anything -- any other reason?

A. None that I can think of.

MR. FLAXMAN: Thank you.

MR. CONDON: We'll waive.

AND FURTHER DEPONENT SAITH NAUGHT.

**Exhibit 2**

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

**Policy:**

It shall be the policy of the Jerome Combs Detention Center (JCDC) to process arrestees without unnecessary delay ensuring the legal rights of Inmate's are met and their confinement is within the scope of the law.

**Procedure:**

Arrival of new arrestee.

1. Jerome Combs Detention Center staff will not be responsible for an arrestee until after all necessary paperwork has been filled out by the arresting agency, a supervisor has signed to accept the arrestee and an initial medical screening and pat search are conducted.
2. Arrestees inside the vehicle sallyport are the responsibility of the arresting agency..
3. Facility staff will provide aid to the arresting agency if a request for additional assistance is made.
4. The Property Officer will meet the arresting agency and new arrestee in the law enforcement lobby.
5. The arresting agency will begin filling out the Arrest Sheet.
6. The Property Officer will complete the Intake Acceptance Questionnaire.

   A. If the Supervisor/Property Officer determines that medical attention is requested or needed by the arrestee then the arresting agency may transport the arrestee to a medical center for treatment or Corrections can call an ambulance at the request of the arresting officer.

      1) If the arresting officer is from the Kankakee County Sheriff's Department, the arrestee may be accepted and transported for medical treatment by the Corrections Division

   B. Upon return the Property Officer will complete a new Intake Acceptance Questionnaire.

   C. The arrestee will not be accepted without discharge paperwork from the hospital.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

7. If the Property Officer is told that the arrestee is a juvenile (under 17 years of age) then the following procedures apply:

   A. The Property Officer must verify that the arresting agency has already contacted Juvenile Probation.

   B. If Juvenile Probation has not been contacted the arresting officer must do so immediately.

   C. The pat search and property inventory will then be conducted as outlined below.

   D. The Supervisor and the booking officer will sign the arrest sheet and verify no medical problems and accept the juvenile.

   E. The booking officer will then book the Juvenile under the "Juvenile" Tab in New World just as booking an adult Inmate.

      1) The juvenile will **not** be placed on the booking count, or placed on the population board.

   F. The juvenile will then be placed in the juvenile holding cell.

      1) If a juvenile of the opposite sex is already housed in the juvenile cell then the shift supervisor will determine where to house the juvenile.
         a) Options will include Transport Cell(s) and Pass Through Cell(s)

   G. Booking will be responsible for performing fifteen-minute security checks on the juvenile(s) and documenting on a Security Check Sheet.

8. The Property Officer will then pat/frisk search the arrestee as defined in the policy "Pat and Strip Searches".

9. Strip searches as defined in the policy "Pat/Strip Searches" when requested by the arresting officer will be done at this time.

10. All personal property will be placed in a property bin and a written list of that property signed by the arrestee and the Property Officer performing the search.

    A. All loose property will be secured by the Guardian Property Machine which is located in the DUI room in the Law Enforcement Lobby.

11. Written property lists of arrestees that are non-compliant or combative will have the word "refused" written on the inmate signature line.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

12. Any tobacco products or incendiary devices (matches, lighters, etc.) will be placed in the tobacco contraband box in booking.

    A. Non disposable lighters will be kept in the inmate's personal property.

13. Any illegal substances, weapons, or other devices that could jeopardize the safety and security of the facility will not be accepted and must be turned over to the arresting agency.

14. Bulk property will be at the supervisors discretions whether or not it enters the building to be logged in to property. (Example: Large Bags, Tool Boxes, Suitcases, Etc.)

15. The officer discovering the contraband must complete a written report of the incident.

16. All over the counter medication will be placed in the arrestee's personal property.

17. All prescription medication with the exception of asthma inhalers will be sealed and forwarded to the medical department with the medical screening.

18. Arrestees will be allowed to keep asthma inhalers with them at all times after it has been searched.

19. Prescription medication will not be dispensed to arrestees until after authorization has been granted by a member of the medical staff.

20. All U.S. Currency will counted in front of the inmate and then will be placed in a commissary envelope and dropped in the booking safe.

21. Completed Arrest Sheets and necessary confinement paperwork will be turned over to the Booking Officer via the paper pass through.

22. The Booking Officer and the Supervisor will review all confinement paperwork to determine all necessary information is provided.

    A. Arrest Sheets should be filled out completely.

        1) During extenuating circumstances (combative or uncooperative arrestees) the following information **MUST** be filled out on the arrest sheet:
            a) Name
            b) Charge (Misdemeanor or Felony specified)
            c) Arresting agency
            d) Date, time and place of arrest
            e) Arresting officer name and badge number (printed legibly)
            f) Transporting officer name (when applicable)

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

g) Towing Information
h) Possible co-defendants or victims
i) Any known medical problems

2) Warrant paperwork should contain the following information.
   a) Warrant Number
   b) Charge
   c) Case Number
   d) Bond Amount
   e) Date of Issue
   f) Agency Issuing Warrant
   g) Special Instructions

3) Review all traffic citations for the following information
   a) Violation
   b) Court Date
   c) Court Room
   d) Court Time

23. Once the Property Officer completes the pat search and property inventory the Booking Officer and the Supervisor will sign the properly completed paperwork and provide the arresting officer with a copy of the arrest sheet.

    A. Incomplete paperwork will be returned to the arresting officer for correction.

24. The arrestee will then pass through the metal detector.

    A. If the metal detector activates the inmate will be pat searched again and pass through the detector again.

    B. This process will be repeated until a successful pass through the metal detector is completed or the reason for activation is determined.

25. The Property Officer will then escort the arrestee into the Booking area.

26. The Property Officer will then turn over the arrestee to the Booking Officer for processing or place the inmate in a holding area to await processing.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

27. The Booking Officer will then complete the following:

   A. Place all confinement paperwork in a manila folder and write the arrestee's name on the tab.

   B. Check for possible additional warrants in LEADS and RMS.

   C. Verify all necessary information with the arrestee.

   D. Ensure that the arrestee understands (his/her) pending charge(s) and current bond amount(s).

   E. Enter all necessary information into the computerized booking system.

      1) Personal information
      2) Medical Screening
      3) List of pending charges

   F. Stamp the arrestee's active booking folder with the booking folder stamp and fill in all applicable fields.

   G. Outstanding warrants or holds from other agencies will be indicated in writing on the front cover of the active booking folder.

   H. Record the arrestee's required information into the Daily Activity Log.

   I. Record the arrestee's required information into the computer blotter.

   J. Place the arrestee's name on the population board in the appropriate color tag.

   K. Photograph and fingerprint the arrestee.

      1) A printed copy of the photograph will be placed in the arrestee's active booking folder.

      2) Fingerprint sheets will be divided and placed in the arrestee's active booking folder and the appropriate arresting agency's tray.

   L. Allow the arrestee access to the inmate telephone.

   M. Advise the Property Officer that the arrestee has been processed.

28. Determine whether the arrestee is posting bond.

   A. Arrestees posting bond will be allowed to wait in booking in either Open Waiting or a Holding Cell.

      1) Bond procedures will be handled in accordance with the policy "Inmate Bond".

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

B. The Booking Officer will contact the outside agency for pickup arrangements if the arrestee is only in custody due to their warrant/hold and is unable to post bond.

C. Arrestees not posting bond will be:

1) Issued an identification band

2) A Management Card will be made by the Booking Officer

3) Issued an Inmate Rulebook

4) Strip-searched

a) Showered

b) Issued the personal property storage bin that corresponds with the arrestee's assigned property bag(s) number

c) Issued a facility uniform, undergarments and linen.

d) Required to place all clothing into the personal property bag.

(1) Additional property that will not fit into the personal property bag will be marked with the inmate's name and I.D. number and placed in the bulk inmate property storage room.

5) The Property Officer will then escort to him/her to their assigned housing unit.

6) The Property Officer will then place all of the arrestee's U.S.C. in the commissary/bond safe and record the following information into the commissary logbook:

a) Inmate name
b) Inmate Global Jacket Number (Master ID)
c) Amount of U.S.C.
(1) At least $5.00 of U.S.C. shall require verification by another officer.

d) Badge number of officer dropping money in the safe.

29. Arrival of combative and non-compliant arrestee.

A. The Property Officer will conduct a pat/frisk search of combative arrestees. Additional staff will assist when necessary.

B. Once the search is complete a pair of Kankakee County handcuffs will be placed on the arrestee and double locked.

C. The arresting officer's handcuffs will then be removed.

D. The arrestee will then be escorted into one of the Pass-Through cells.

E. The Property Officer will then explain to the arrestee that once he/she is cooperative and willing to comply with facility staff the handcuffs will be removed and a proper pat/frisk search will be conducted.

F. The Property Officer will then complete an inventory of all personal property collected from the arrestee and obtain the signature of another staff member for verification.

G. The personal property will then be placed into a temporary property storage bag/bin.

H. All staff involved will write a statement concerning the incident.

I. Booking will be responsible for the fifteen-minute checks on the Pass-Through Cell documented on a Security Check Sheet.

J. Once the handcuffs are removed and the arrestee is removed from the Pass-Through Cell normal booking procedure will resume.

30. <u>Arrival of an inmate sentenced to imprisonment.</u>

A. Master Control will notify the Booking Office when an inmate has reported for imprisonment.

B. The Property Officer will meet the inmate in the public lobby and verify with booking that he/she has been sentenced or is currently serving an interrupted sentence.

1) If a copy of the mittimus is not available then the courthouse should be contacted to obtain a copy. In the event that the courthouse is closed obtain as much information as possible and process the inmate. Advise the shift supervisor so that the next shift can be briefed and the mittimus obtained.

C. The Property Officer will handcuff the inmate and escort him/her to the Law Enforcement Lobby to perform a pat/frisk search and inventory all personal property.

D. The inmate will then be escorted into booking and the normal booking process will resume.

E. If the inmate appears to be under the influence of drugs or alcohol the Property Officer will write a report and have a police officer summoned to the facility to perform a breathalyzer test. The results of the test will be placed in the inmate's active booking file and a copy sent to the Chief of Corrections. The inmate will remain in the booking area until he/she is sober.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 901-Intake and Admission

31. This Policy shall be reviewed annually and updated as needed.

**Documentation:**

All documentation related to the booking process will be filed in the inmate's Arrest Record file. Upon the inmate's release or transfer, the Arrest Record file will be forwarded to the Administration Division for inclusion in the person's Individual Record File.

**Approved by: Sheriff Timothy Bukowski and Chief of Corrections Michael Downey**

**Effective Date: May 1, 2006**

**Review Dates:** ____________

**ACA:** 4-ALDF-2A-19, 20, 21, 22, 23, 24, 25, 26

**Illinois Compiled Statutes:**

**Revision Dates:** ____________

**ICJS:** 701.40

# Exhibit 3

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 315-Pat/Strip Searches

### Policy:

It shall be the policy of the Jerome Combs Detention Center (JCDC) to search Inmates in order to provide a safer living and working environment for Inmates and staff.

### Definitions:

1. **Arrestee:** Any person accused of a crime that has just entered the facility.
2. **Frisk/Pat Search:** A hands on search of the person's body outside the subjects clothing, including but not limited to, pockets, waist band, collar, and private areas.
3. **Contraband:** Any item or article inside the facility that is not issued by the facility purchased from the commissary or approved for issue by the Chief of Corrections or his designee.
4. **Strip Search:** Having an Arrestee removes all of his/her clothing in order to perform a visual inspection of the genitals, buttocks, anus, female breasts and undergarments.
5. **Body Cavity Search:** The intrusion of the anal cavity or vaginal area either manually or by instrument inspection in the search for contraband. No search of any body cavity, other than the mouth, shall be conducted by a medically trained person under sanitary conditions as defined in section 701.140 of ICJS. A body cavity search warrant must be obtained in order for a body cavity search to be performed.
6. **Outerwear:** Any item worn by an arrestee or inmate that is in addition to a shirt, pants/shorts and socks.

### Procedure:

1. Frisk/Pat Search:

   A. Each newly arrived inmate/arrestee will be frisk searched immediately after arrival. The search will be conducted as follows:

      1) Pat down pockets of outerwear and all clothing to check for the presence of possible weapons.

      2) If no weapons are found instruct the inmate/arrestee to remove all outerwear and to place the contents of his/her pockets on the counter.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 315-Pat/Strip Searches

3) All outerwear will be searched separately after completing the search of the inmate/arrestee.

4) Instruct the inmate/arrestee to stand with his/her feet at least shoulder width apart.

5) Inspect the back and palms of the inmates/arrestee's hands while the fingers are spread.

6) Instruct the inmate/arrestee to place his/her hands on the wall above the level of the head.

7) Search the inmate/arrestee's hair. If he/she is wearing a wig, tell the inmate/arrestee to remove it and search it separately.

8) Mentally divide the inmate/arrestee's body in half lengthwise. Search one side at a time, slightly overlapping the centerline.

9) Using the crushing method, search each of the following areas in this order:

   a) Upper Body:

      (1) Collar and neck (Bend the material before crushing to detect razor blades).
      (2) Armpit area and arm from shoulder to fingertips.
      (3) Left upper body and torso.
      (4) Right upper body and torso.
      (5) Check between waist and waistband
      (6) Closely check pockets and pocket flaps, seams, buttons, and buttonholes.

   b) Lower body:

      (1) Closely check the trouser fly and zipper, pockets, and seams.
      (2) Direct the inmate/arrestee to lift his/her foot back toward you.
      (3) Fold down the sock and check between sock and leg.
      (4) Hold the inmate/arrestee's ankle with one hand and check heel and sole of the foot.
      (5) If you suspect the presence of contraband, remove the sock and search it separately.
      (6) Check between the toes.
      (7) Grasp each shoe by the toe, and smack the heel of the shoes together to shake loose any potential contraband.
      (8) Look inside each shoe for any contraband.

      (9) Remove and inspect any loose insoles from shoes.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 315-Pat/Strip Searches

B. The steps for searching a female inmate/arrestee are the same as for a male, except for the following procedures:

a) When searching the upper body, ensure you check:

(1) The middle of her bra (between the cups).
(2) Around and under the breasts.
(3) Below the bra.
(4) Between the body and the back-strap.

b) When searching the lower body of a female wearing a skirt, check all folds or pleats in the skirt.

C. Strip Searches:

1) The search will be conducted in accordance with all Federal, State, and Kankakee County Rules and Regulations.

2) Will only be conducted after a written request is made by the arresting officer and verified by theofficer conducting the strip search.

3) Will be performed on an arrestee by officers of the same sex only.

4) When required, a strip search will follow a pat/frisk search and be conducted in an enclosed area that ensures privacy and dignity of the inmate/arrestee. The inmate/arrestee shall not be exposed to the view of others not involved in the process.

5) Instruct the inmate/arrestee to remove all clothing in the following order:

a) Shirt
b) Pants/Shorts
c) Socks
d) Undergarments (Underwear and Bra)

6) The assisting officer will conduct a thorough search all clothing as the inmate/arrestee disrobes.

7) Once unclothed, direct the inmate/arrestee to stand up straight, face you with feet spread at least shoulder width apart, and arms extended outward from the side at shoulder level with palms up.

8) Instruct the inmate /arrestee to bend slightly forward so that you can watch him/her search the top of the head.

9) Instruct the inmate/arrestee to run their fingers through the hair.

10) When wigs or hairpieces are worn, have the arrestee remove them. (Objects can be hidden underneath or within the hairpiece).

11) Visually examine all areas of his/her body in the following order:

a) Direct the inmate/arrestee to tilt his head slightly at an angle to the point where you can examine the rest of his head by looking in the nose, mouth, and ears. If the inmate/arrestee wears removable dentures, tell him to remove them.

b) Look carefully at the inmate/arrestee's arms, starting with the fingertips and between the fingers.

c) Tell the inmate/arrestee to rotate his/her arms outward slightly so that special attention may be given to the bend of the arms and elbows.

d) Check the armpit area by having the inmate/arrestee lift the arms.

e) Look at the front of the inmate/arrestee from the neck to the waist.

f) Look carefully at the crotch area, penis first (if the inmate/arrestee is uncircumcised, have him hold back the skin). Have the inmate/arrestee raise the penis and scrotum so that you can see underneath.

g) Look at the front of both legs.

h) Tell the inmate/arrestee to rock backward slightly. Look carefully at the toes and between the toes.

i) Have the inmate/arrestee turn around.

j) Look at the neck area and behind the ears.

k) Look at the back of the neck to the waist.

l) Look at the buttocks, and then visually examine the anal area. (If anything is detected, have the inmate/arrestee remove it.

(1) If he refuses, keep him/her under constant observation until medical personnel can perform a body cavity search.

m) Instruct the inmate to stand up.

n) Look at the rear of the legs, paying special attention to the bend of the knees.

# Jerome Combs Detention Center

## Policy and Procedure Manual
## 315-Pat/Strip Searches

o) Have the inmate/arrestee lift one foot at a time to examine the soles of his feet.

p) Anything unusual or questionable, such as signs of disease or infections, needle marks, contraband, cuts, tattoos, etc., will be noted and recorded in the appropriate section of the inmate/arrestee's booking file.

q) If at anytime contraband is found on or around the Inmate, secure the contraband and follow the rules of evidence and turn the contraband over to the arresting agency personnel.

12) Strip search a female using the same steps as for a male, with the following exceptions or additions:

a) Have her lift her breasts so you can look underneath, if the area cannot easily be seen.

b) Tell her to spread the skin in the vaginal area so that you can visually check the area, and then have her squat with her feet at least shoulder width apart. This will allow any item of weight or size to fall out.

c) If the inmate is menstruating, instruct her to remove the sanitary napkin or tampon. Make sure that you have a replacement available.

13) This policy shall be reviewed annually and updated as needed.

**Approved by: Sheriff Timothy Bukowski and Chief of Corrections Michael Downey**

**Effective Date: May 1, 2006** | **Review Dates:** ____________

**ACA:** 4-ALDF-2C-01, 03, 04, 05

**Illinois Compiled Statutes:** | **Revision Dates:** ____________

**ICJS:** 701.40(b), (f)

**Exhibit 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| DARNELL FONDER, individually and on behalf of a putative class, Plaintiff, v. SHERIFF OF KANKAKEE COUNTY, KANKAKEE COUNTY, CITY OF KANKAKEE, and KANKAKEE POLICE OFFICERS TRUDEAU and WAGNER, Defendants. | ) | Case No. 12 cv 2115<br>Judge Michael P. McCuskey<br>Magistrate Judge David G. Bernthal |

**DEFENDANT SHERIFF OF KANKAKEE COUNTY'S**
**RESPONSE TO PLAINTIFF'S REQUEST TO ADMIT**

NOW COMES Defendant, SHERIFF OF KANKAKEE COUNTY, by and through their attorneys, MICHAEL W. CONDON and YORDANA SAWYER of HERVAS, CONDON & BERSANI, P.C., and for his Response to Plaintiff's Request to Admit, Defendant states as follows:

1. For the period of April 22, 2010 to November 31 [sic], 2012, the official policy of the Sheriff of Kankakee County about intake and admission procedures to the Jerome Combs Detention Center has been contained in "901-Intake and Admission" of the Policy and Procedure Manual of the Jerome Combs Detention Center, produced as JCDC 00001-JCDC00008.

**RESPONSE:** Defendant Sheriff admits that the written policy about intake and admission procedures to the Jerome Combs Detention Center is contained in "901-Intake and Admission," produced as JCDC 00001-JCDC 00008, but denies that said policy has been the practice followed by the Sheriff's Department.

2. For the period of April 22, 2010 to November 31 [sic], 2012, the official policy of the Sheriff of Kankakee County about pat-strip searches at the Jerome Combs Detention Center

has been contained in "315-Pat/Strip Searches" of the Policy and Procedure Manual of the Jerome Combs Detention Center, provided as JCDC 00068-JCDC 00072.

**RESPONSE:** Defendant Sheriff admits that the written policy about pat-strip searches at the Jerome Combs Detention Center is contained in "315-Pat/Strip Searches," produced as JCDC 00068-JCDC00072, but denies that said policy has been the practice followed by the Sheriff's Department.

3. For the period of April 22, 2010 to November 31 [sic], 2012, more than 40 persons entered the JCDC following an arrest without a warrant in advance of a judicial determination of probable cause to arrest.

**RESPONSE:** Defendant Sheriff admits the allegations contained in Request No. 3.

4. Each of the persons described in contention 3 was subjected to the official policy referred to in contention 1 above.

**RESPONSE:** Defendant Sheriff denies the allegations contained in Request No. 4.

5. Each of the persons described in contention 3 was subjected to the official policy referred to in contention 2 above.

**RESPONSE:** Defendant Sheriff denies the allegations contained in Request No. 5.

6. For the period of April 22, 2010 to November 31 [sic], 2012, more than 60 persons entered the JCDC following an arrest without a warrant in advance of a judicial determination of probable cause to arrest.

**RESPONSE:** Defendant Sheriff admits the allegations contained in Request No. 6.

7. Each of the persons described in contention 6 was subjected to the official policy referred to in contention 1 above.

**RESPONSE:** Defendant Sheriff denies the allegations contained in Request No. 7.

8. Each of the persons described in contention 6 was subjected to the official policy referred to in contention 2 above.

**RESPONSE:** Defendant Sheriff denies the allegations contained in Request No. 8.

9. For the period of April 22, 2010 to November 31 [sic], 2012, more than 100 persons entered the JCDC following an arrest without a warrant in advance of a judicial determination of probable cause to arrest.

**RESPONSE:** Defendant Sheriff admits the allegations contained in Request No. 9.

10. Each of the persons described in contention 9 was subjected to the official policy referred to in contention 1 above.

**RESPONSE:** Defendant Sheriff denies the allegations contained in Request No. 10.

11. Each of the persons described in contention 9 was subjected to the official policy referred to in contention 2 above.

**RESPONSE:** Defendant Sheriff denies the allegations contained in Request No. 11.

12. For the period of April 22, 2010 to November 31 [sic], 2012, Illinois law required that a judge set bail for persons arrested without a warrant in felony cases.

**RESPONSE:** Defendant Sheriff admits the allegations contained in Request No. 12.

13. For the period of April 22, 2010 to November 31 [sic], 2012, Illinois law required that a judge set bail for persons arrested without a warrant for the offense of domestic battery (720 ILCS 5/12-3.2), a violation of an order of protection (720 ILCS 5-12-30), or any similar violation of a local ordinance.

**RESPONSE:** Defendant Sheriff objects to the pharse "any similar violation of a local ordinance" as vague and ambiguous. Notwithstanding this objection, Defendant Sheriff admits that from the period of April 22, 2010, to November 30, 2012,

Illinois law required that a judge set bail for persons arrested without a warrant for the offense of domestic battery (720 ILCS 5/12-3.2) or a violation of an order of protection (720 ILCS 5-12-30).

Respectfully submitted,

YORDANA SAWYER, *one of the attorneys for Defendant Sheriff of Kankakee County*

MICHAEL W. CONDON
YORDANA SAWYER
HERVAS, CONDON & BERSANI, P.C.
333 W. Pierce Road, Suite 195
Itasca, IL 60143-3156
630-773-4774

**Exhibit 5**

2:12-cv-02115-MPM-DGB # 43 Page 48 of 270

DARNELL FONDER v. KANKAKEE POLICE OFFICERS

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

DARNELL FONDER,

Plaintiff,

-vs-

KANKAKEE POLICE OFFICERS TRUDEAU and WAGNER,

Defendants.

DARNELL FONDER, individually and on behalf of a putative class,

Plaintiff,

vs

SHERIFF OF KANKAKEE COUNTY, KANKAKEE COUNTY, CITY OF KANKAKEE, and KANKAKEE POLICE OFFICERS TRUDEAU and WAGNER,

Defendants.

Nos. 13-CV-02045 and 12 CV 2115

ADVANTAGE REPORTING SERVICE
(800)-347-3124

Plaintiff's Exhibit 5 Page 1

The deposition of DARNELL MAURICE FONDER, called by the defendants for examination, pursuant to notice and pursuant to Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before DIANA DEBRA SABO, Certified Shorthand Reporter and Notary Public within and for the County of Will and State of Illinois, at 3000 South Justice Way, Kankakee, Illinois, on the 26 day of March, 2013.

2:12-cv-02115-MPM-DGB # 43 Page 50 of 270

DARNELL FONDER v. KANKAKEE POLICE OFFICERS

3

A P P E A R A N C E S:

LAW OFFICES OF KENNETH N. FLAXMAN, P.C., by
MR. KENNETH N. FLAXMAN,
200 South Michigan Avenue
Suite 201
Chicago, Illinois 60604
(312) 427-3200

Appeared on behalf of the Plaintiff;

HERVAS, CONDON & BERSANI, P.C., by
MR. MICHAEL D. BERSANI,
MR. MICHAEL W. CONDON,
333 Pierce Road
Suite 195
Itasca, Illinois 60143-3156
(630) 773-4774

Appeared on behalf of the Defendants.

*   *   *   *   *   *   *   *   *   *   *

ADVANTAGE REPORTING SERVICE
(800)-347-3124

Plaintiff's Exhibit 5 Page 3

WITNESS: Page

DARNELL MAURICE FONDER

Case No. 13-CV-02045

Examination by Mr. Bersani 7-129

Examination by Mr. Flaxman 129-130

Examination by Mr. Bersani 130-131

Case No. 12 CV 2115

Examination by Mr. Condon 132-199

Examination by Mr. Flaxman 200-205

Examination by Mr. Condon 205-207

* * * * * * * * * * *

EXHIBITS:

(All exhibits marked attached.)

Fonder Deposition Exhibit Nos. 1 & 2 5

Fonder Deposition Exhibit No. 3 93

Fonder Deposition Exhibit Nos. 4 & 5 94

Fonder Deposition Exhibit No. 6 140

* * * * * * * * * *

(Fonder Deposition Exhibit Nos. 1 and 2 for Identification were so marked.)

(Witness sworn.)

MR. BERSANI: Please state your name and spell it for the court reporter.

THE WITNESS: Darnell Maurice Fonder, D-A-R-N-E-L-L; M-A-U-R-I-C-E; F-O-N-D-E-R.

MR. BERSANI: Let the record reflect that this is the deposition of plaintiff, Darnell Fonder, in Case No. -- what was my case number -- 13 CV 2045, Darnell Fonder versus Kankakee Police Officers Trudeau and Wagner.

Mr. Fonder, my name is Mike Bersani, and I represent Sergeant Wayne Trudeau and Officer Rod Wagner, City of Kankakee police officers, in a lawsuit that you have filed against them.

I'm going to ask you some questions about your lawsuit, and it's important that you keep your answers loud, keep your answers in verbal words so nobody misunderstands what you are saying. Okay?

THE WITNESS: Okay.

MR. BERSANI: It's important that you tell me that if you don't understand a question, I'll be happy to rephrase it or repeat it. Just let me know that. Okay?

THE WITNESS: Okay.

MR. BERSANI: And if, at any time, you want to take a break, confer with your attorney, that would be fine as well. If you need to take a bathroom break or stretch your legs, that's perfectly okay. Just let us know that. The only thing I ask is that your complete -- if I have got a question pending or if my partner has a question pending for you, that you complete that answer and then we can take a break at that point. Okay?

THE WITNESS: Okay.

MR. BERSANI: Do you have any questions before we start?

THE WITNESS: No, sir.

MR. BERSANI: Are you on any type of medication at all that would affect your ability to give truthful and accurate answers here today?

THE WITNESS: No.

MR. BERSANI: Do you suffer from any type of medical condition that would prevent you from

giving truthful and accurate answers here today?

THE WITNESS: No.

WHEREUPON:

DARNELL FONDER

called as a witness herein, after having been first duly sworn, was examined upon oral interrogatories and testified as follows:

E X A M I N A T I O N

BY MR. BERSANI

Q. So as I said earlier, I'm here to talk about your lawsuit against the City of Kankakee police officers, Trudeau and Wagner, and it concerns an arrest that took place on April 24, 2010; is that right?

A. Yes.

Q. And that arrest was based upon a report of a Crystal Davis that you had slapped her in the face the day previously; correct?

A. No.

Q. The arrest was not based upon that?

A. No, I didn't slap her in the face.

Q. I understand that.

You deny that you slapped her in the face; correct?

A. Correct.

Q. But the arrest was based upon her report to the police that you had slapped her in the face, correct, to your knowledge?

MR. FLAXMAN: Object. Well, you're asking him to testify about what somebody motivated somebody else.

MR. BERSANI: No, I'm asking what his understanding of what the arrest was based upon.

BY MR. BERSANI:

Q. So it's your understanding that the arrest was based upon Crystal's report to the police that you had slapped her in the face; correct?

A. No. The -- I was arrested due to she came to get my child, and I refused to come downstairs to give her my child.

Q. Right. And she claimed that you had hit her in the face; correct?

A. I believe so.

Q. So based on your understanding, you were arrested because she had complained to the police

that you had struck her in the face; correct?

A. Correct.

Q. Okay. Let me ask you some background questions about yourself --

A. Okay.

Q. -- before we talk about that actual event. Okay?

A. Okay.

Q. I have marked Exhibit No. 1. That's right in front of you, and this is Plaintiff's Answers to Interrogatories of Defendant, City of Kankakee, Trudeau and Wagner. And these were questions that we had given your lawyer, and he gave them to you, I assume, and you have provided answers to these questions; correct?

A. Correct.

Q. And if you go to page 7, that's your signature; correct?

A. Correct.

Q. Now, you've had a chance to review these again before -- right immediately before today's deposition; correct?

A. Yes.

Q. And at the time you signed these on page

7, you had reviewed the answers that you had given; correct?

A. Correct.

Q. And they were accurate and true to the best of your recollection and knowledge; correct?

A. Yes, at that time.

Q. At that time. Okay. So that's fine.

So today having reviewed them prior to today's deposition, are they accurate and truthful, to the best of your recollection and knowledge?

A. At the time this -- the answers are correct, but over the time some of the information has changed within here.

Q. Okay. All right. Well, let's talk about the things in this document that have changed that you want to change right now. Tell me the first thing you want to change.

A. The first would be my address. My address is different.

Q. Okay. Your current address?

A. Yes.

Q. What is your current address?

A. It's 431 South Indiana Avenue, Apartment

2-S.

Q. "S" as in Sam?

A. Yes.

Q. Okay. And in Kankakee; correct?

A. Yes.

Q. Okay. What's the next thing that you want to change about your Interrogatory Answers, please.

A. Question -- page 4, Question No. 11 it is Land Lake [verbatim] College at Vandalia.

Q. Land Lake, L-A-N-D, L-A-K-E?

A. Yes.

Q. One word or two?

A. Two.

Q. Okay.

A. And I received my auto body tech certificate there.

Q. Okay. And before you go on, when did you receive that certificate? Do you recall?

A. In 2009.

Q. Okay. Is there anything else that you want to change with regard to your Interrogatory Answers?

(There was a short interruption.)

THE WITNESS: That's about it.

BY MR. BERSANI:

Q. That's it? So everything else in your Answers to Interrogatories is correct and accurate, to the best of your knowledge and recollection; correct?

A. Correct.

Q. Okay. All right. Do you go by a nickname?

A. Peanut.

Q. Peanut? Why do they call you Peanut?

A. That's the name my mother gave me when I was little.

Q. Okay. All right. Is that something your friends and relatives call you?

A. Yes.

Q. Okay. Okay. So you say you currently live at 431 South Indiana Avenue; correct?

A. Correct.

Q. And how long have you lived at that address?

A. Since the first of the year, January the

1 of 2013.

Q. Okay. And do you live there with anyone?

A. Yes.

Q. Who do you live with?

A. Ricca Jordan, Ricca, R-I-C-C-A; Jordan, J-O-R-D-A-N.

Q. Okay. And who is Ricca Jordan?

A. My girlfriend.

Q. Okay. All right. And has Ricca lived with you at that address continuously since January 1?

A. Yes.

Q. All right. Do you have plans to marry Ricca?

A. Thought about it.

Q. Okay. All right. But you haven't proposed or anything yet; right?

A. No, no.

Q. Give it a little bit of time.

How old are you?

A. Thirty.

Q. Okay. And did you live at the 360 South Chicago Avenue address prior to the Indiana address?

A. Yes.

Q. Okay. And how long did you live at that address?

A. For about three months.

Q. And who did you live there with?

A. My sister, Angela Fonder.

Q. Is that Angela's home?

A. Yes.

Q. So you moved in with her for a period of time?

A. Yes.

Q. Okay. And does anyone else live at that address?

A. Just her and her children.

Q. Okay. And prior to that looks like you lived at 674 North Dearborn?

A. Yes.

Q. And who did you live there with?

A. With Ricca as well.

Q. Continuously for that period of time?

A. Yes.

Q. From June to October of 2012?

A. Actually, I stayed on 674 North Dearborn from March to May of 2012.

Q. Okay. So March of 2012 to May of 2012?
A. Yes.
Q. Okay. So where did you live between Dearborn and Chicago Avenue?
A. After I moved from Dearborn -- after I moved from Dearborn, I moved to Chicago.
Q. Oh, okay. Okay. And do you have any children?
A. Yes.
Q. One child?
A. Three.
Q. Three children?
A. Yes.
Q. Okay. All right. Do you have any children with Ricca?
A. No.
Q. Okay. All right. I'll get into your family in a second.
And so then prior to living at -- on Dearborn, then, were you incarcerated; is that correct?
A. Yes.
Q. And where were you incarcerated?
A. In Jerome Combs Detention Center.

Q. And was that from May of 2010 through February 2012?

A. Yes.

Q. Did you spend any time at Stateville at all during that time period or was it all here at J.C.D.C.?

A. All here at J.C.D.C.

On February I went to Stateville, but I left the same day.

Q. Okay. You were sentenced in February of 2012?

A. Yes.

Q. And then got a sentence time served; is that right?

A. Yes.

Q. Okay. So you never really spend much -- any time at all at Stateville then?

A. Correct.

Q. So you were discharged on what? Probation?

A. No.

Q. Or parole rather. I'm sorry.

A. Yes.

Q. Parole as of February 2012?

A. Yes.

Q. Are you still on parole today?

A. No.

Q. How long was your parole period?

A. A year.

Q. Okay. So you have successfully completed your parole?

A. Yes.

Q. And then prior to being incarcerated at J.C.D.C. prior to May of 2010, you lived at 530 South Fourth Street?

A. Yes.

Q. And 530 South Fourth Street -- is that the address of the incident -- of the place where the incident took place that's the subject of your lawsuit?

A. Yes.

Q. Okay. And who did you live with at 530 South Fourth Street?

A. Me and Crystal Davis, the mother of my child, my daughter, my youngest daughter. We stayed there and we separated, and I was dating Dominique there while I was there.

Q. Did Dominique move in with you at that

address at some point?

A. No, she's just spending the night.

Q. So Crystal Davis is the mother of your daughter, Jaylah?

A. Yes.

Q. And Jaylah is three-years' old?

A. Yes.

Q. Today?

A. Yeah, she's three-years' old now.

Q. Yeah, I noticed that. Congratulations.

A. Thank you.

Q. That's your youngest daughter?

A. Yes.

Q. And so at what point in time did you and Crystal separate? Do you recall?

A. April the 2 of 2010.

Q. Okay. So let me get some dates in perspective here. Jaylah was born on March 26, 2010?

A. No. March the 16, 2010.

Q. Okay. For some reason I thought March 26 was her --

A. It's the 16th.

Q. Oh, it's the 16th. Okay. Well, today's

not her birthday.

MR. FLAXMAN: Is that a typo?

MR. BERSANI: Maybe it is. I don't know.

THE WITNESS: No, they don't have her age on here.

MR. BERSANI: I thought I saw that.

THE WITNESS: Oh, Question 23 it just has Crystal Davis, the mother of my child, Jaylah, who is now two years of age.

BY MR. BERSANI:

Q. Okay. So Jaylah's birthday is March 16, 2010, or that's her date of birth; correct?

A. Yes.

Q. And at that time were you and Crystal living together at the 530 South Fourth Street address?

A. Yes.

Q. Okay. And then did Crystal move out on April 2?

A. We had our difference. It was my apartment. We had our difference, and I wanted to separate.

Q. But did she move out of the apartment --

A. Yes.

Q. -- at 530 South Fourth Street?
A. Yes.
MR. FLAXMAN: Let him finish the question before you answer.
THE WITNESS: Yes.
MR. BERSANI: Even though you know what I am asking as I'm asking it, sometimes I'll sort of hesitate in the middle of my question. Try and put up with that until I'm finished. Okay?
THE WITNESS: Okay.
(A discussion was had that was off the record.)
BY MR. BERSANI:
Q. All right. All right. So Crystal moved out on April 2, 2010, and the incident that led to your arrest occurred on April 23, 2010; correct?
A. Correct.
Q. Okay. And then you were arrested on April 24, 2010; correct?
A. Correct.
Q. Okay. All right. So when Crystal moved out on April 2, 2010, did she take Jaylah with her or did Jaylah remain in your custody?
A. Remained with me.

Q. Okay. You and -- obviously, you and Crystal were not getting along on April 23, 2010; correct? Is that accurate?

A. Correct.

Q. Okay. There was a lot of fighting between the two of you?

A. No.

Q. There were arguments?

A. No.

Q. Why weren't you getting along? What was the -- you know, the reason in your mind?

A. Due to our separation.

Q. Okay.

A. I wanted to leave right after she just had my daughter.

Q. So you wanted to break up with her after Jaylah was born, and Crystal wanted to stay together; is that accurate?

A. Yes.

Q. Okay. Did you have any argument about who should have custody of Jaylah?

A. No.

Q. No?

So it was agreed that you would -- Jaylah would stay with you and Crystal would move out?

A. You can -- you can say that. We agreed that Jaylah would stay with me until Crystal get herself together, get her life together.

Q. What was going on in her life that you felt that she had to get it together?

A. Responsibility. Her being responsible, providing.

Q. Responsible for just herself personally or for her and Jaylah --

A. Provide for the kids.

Q. Hang on. Let me -- I know you knew what I was going to ask you; so let me finish.

Yeah, so responsible for her personally or -- and/or her child? What was --

A. The kids, her and the kids.

Q. Okay. So there's more than one kid that you had with Crystal?

A. No, I had one, but she has more than one.

Q. How many kids does Crystal have?

A. Three.

Q. Did she have three kids at the time of

the incident, April 23, 2010?

A. Yes.

Q. Okay.

MR. FLAXMAN: Could you clarify. Is that three plus Jaylah or --

BY MR. BERSANI:

Q. Yeah, is it three all together?

A. Yes.

Q. Okay. So Jaylah is her youngest, I assume?

A. Uh-hum.

Q. And she's got -- yes?

A. Yes.

Q. And she's got two other kids?

A. Yes.

Q. And who are her two other kids?

A. Justina Bell.

Q. Justina?

A. Yes.

Q. Okay.

A. And Jennifer Griffith.

Q. How -- and so Jaylah's three.

How old is Justina today, if you know.

A. Eleven.

Q. Okay. And Jennifer?

A. Six -- five.

Q. Five. Okay. And Jaylah is your biological daughter, but Justina and Jennifer are somebody else's biological daughter; correct?

A. Correct.

Q. All right. Do you have -- and you said you have other children besides Jaylah; correct?

A. Correct.

Q. And who are your other children?

A. Dareon.

Q. Spell it.

A. Dareon, D-A-R-E-O-N.

Q. Okay.

A. Zachary, Z-A-C-H-A-R-Y.

Q. Okay. How old is Dareon?

A. Thirteen.

Q. And Zachary?

A. No, that's -- that's his whole name.

Q. Oh, that's one person?

A. Yeah.

Q. Oh, I'm sorry.

A. Dareon Zachary is his whole name.

Q. All right. All right. And he's 13?
A. Yes.
Q. And do you have another child besides that?
A. Alena, A-L-E-N-A.
Q. Okay.
A. Fonder.
Q. Okay.
A. And she's 12.
Q. Twelve. Any other children?
A. No.
Q. Okay. So you had Jaylah, who's 3; Dareon who's 13; and Alena who's 12.
A. Yes.
Q. Okay. And you are the biological father of Dareon and Alena; correct?
A. Correct.
Q. And who is the mother of Dareon and Alena?
A. Ebony Zachary, E-B-O-N-Y.
Q. Zachary is the last name?
A. Yes.
Q. Got it. Okay.

So I'm sorry. Who currently has custody of Jaylah?

A. Crystal.

Q. Crystal does?

A. Yes.

Q. Okay. And does Ebony have custody of Dareon and Alena?

A. Yes.

Q. Okay. I assume you have visitation with all your kids?

A. Yes.

Q. Okay. So I notice in your Answers to Interrogatories that -- and this is No. 23 -- that you and Crystal are currently reconciled; is that right?

A. Yes.

Q. What does that mean to you, reconciled?

A. We get along now.

Q. Okay. And when did that happen?

A. During -- during the course of my -- my release in February of 2012.

Q. Okay. So at some point after you were discharged or released from jail, you and Crystal reconciled?

A. Yes.

Q. Okay. Did the two of you come to some sort of understanding as to how you were going to raise your child?

A. Yes.

Q. Okay. And did Jaylah remain in the custody of Crystal during the entire time you were incarcerated?

A. I don't know, because I was incarcerated.

Q. Okay. And can you tell me where does Crystal currently reside.

A. 220 Crest Lane Drive, Apartment 107.

Q. Kankakee?

A. Yes.

Q. 220 Crest, C-R-E-S-T, Lane, Drive, Apartment No. 107, Kankakee?

A. Yes.

Q. And who does she live there with?

A. Her and her children.

Q. Okay. All right. Now, are you currently employed?

A. Not at the time.

Q. Okay. If you can look at the Exhibit No. 2 with today's date on there at the top. It reads

Plaintiff's Answers to Interrogatories of Defendants City of Kankakee, Trudeau and Wagner. And it looks like this is a written, handwritten supplement to Exhibit No. 1; is that right?

A. Yes.

Q. All right. And is everything on this document accurate and true, to the best of your recollection and knowledge?

A. Yes.

Q. Okay. So you are currently unemployed; right?

A. Yes.

Q. When was the last time you were employed?

A. I have -- maybe rephrase that again.

Q. Sure. No problem.

It looks like if you look at Exhibit No. 2, the last time -- I don't know when you -- well, it looks like you completed this on November 24, 2012. So at that time you say that you were working for Select Remedy Del Monte?

A. Yes.

Q. Okay. And what were you doing for them in 2012?

A. I was a fruit and veggie processor.

Q. And is that the last time you were employed prior to today?
A. Yes.
MR. FLAXMAN: Wait. Object to the form of the question. That's the last job he had before today, but there's no date from when he stopped working there.
BY MR. BERSANI:
Q. Okay. Well, on November 24, 2012, you were employed by Select Remedy Del Monte; correct?
A. Yes.
Q. And what were you doing there?
A. A fruit and veggie processor.
Q. And at some point did you stop working there?
A. Yes.
Q. And when was that?
A. January the 1 of 2013.
Q. And tell me why.
A. Due to my hours, my hour cuts.
Q. What does that mean? I don't know what that means.
A. My hours. They lowered my hours for working.

Q. Okay. So were you working full time or part time for Del Monte in November of 2012?

A. Full time.

Q. Okay. So at some point they cut your hours to what? Part time?

A. Yes. Less than part time.

Q. Okay. So why did you stop completely working for Del Monte then?

A. To find -- have time to pursue a better job.

Q. Is that the reason why you left Del Monte?

A. No. The actual reason why I stopped working with Del Monte is because of the lower hour wages and I have that information to go to school. So I wanted to get the information together for me to go to school this coming August.

Q. Were you fired or suspended from Del Monte at all?

A. No.

Q. You left on your own?

A. Yes, I informed my supervisor that I no longer would like to work --

Q. Okay.
A. -- and I would like to resign.
Q. Had you been looking for any work since then?
A. Yes.
Q. Just been unsuccessful in finding it?
A. No. However, I did find a job and -- I did find a job. I have to wait until May to start there.
Q. Okay. Where is that at?
A. It's in Manteno. It's called Pactiv.
Q. Spell that for the court reporter.
A. P-A-C-T-I-V.
Q. P-A-C-T-I-V?
A. Yes.
Q. And in Manteno?
A. Yes, Illinois.
Q. Okay. And what is it that -- what job did you get there?
A. Machine operator.
Q. What type of machine?
A. We will work with plastic molding.
Q. Is that going to be a full-time job?
A. Yes.

Q. All right. Did you get that job on your own or through a temp agency?
A. Through a temp agency.
Q. And you expect that you'd start that job in May; correct?
A. Yes.
Q. Okay. And then do you have plans to go to school?
A. Yes.
Q. What are your plans to go to school?
A. August -- August I have plans to go to school in East Peoria at ICC for -- work for General Motors, to go to school for General Motors Cars.
Q. What is ICC?
A. Illinois Central College.
Q. Do you plan on going to ICC full time?
A. Yes.
Q. So you at some point are going to quit your job at Pactiv --
A. Yes.
Q. -- and go to school full time in East Peoria?
A. Yes.

Q. And I'm sorry. What -- are you going for a degree there or is it a certificate?

A. It's -- it would be a degree in -- I forgot. I don't recall what the degree would be. I know it was in something science, but I would go there to earn the degree to work for cars, work for General Motors.

Q. Okay. Is it an associate's degree? Do you know?

A. Yeah, it's associate's.

Q. Two-year associate's degree?

A. Yes, it's two years.

Q. Okay. Do you have any type of job lined up for General Motors following your schooling or is that something you intend on pursuing?

A. The school -- once -- once you complete the two-year program, the school automatic -- you work through the school to finish paying off your schooling and they will give you a job. The school will give you a job.

Q. So the school is going to place you in a job working for General Motors?

A. Yes.

Q. Upon completion of your associate's

degree?

A. Yes.

Q. Okay. All right. Darnell, I want to talk to you about what happened on April 23, 2010. Okay?

A. Okay.

Q. As I understand it -- I read all the police reports -- you were home that evening around 10 to 9:00 in the evening, p.m., and Crystal Davis came to your apartment; is that right?

A. Yes.

Q. Okay. And at that time Dominique -- what was her name?

A. Roth.

Q. R-O-T-H?

A. Yes.

Q. -- was your girlfriend?

A. Yes.

Q. And she was over at the apartment at that time?

A. Yes.

Q. And this is a second-floor apartment; correct?

A. Yes.
Q. At 530 South Fourth Street in Kankakee; correct?
A. Correct.
Q. And your daughter, Jaylah, was with you and Dominique at that time?
A. Yes.
Q. Okay. And -- and then Crystal Davis came over to the apartment; correct?
A. Correct.
Q. Okay. If I'm missing something, let me know if something happened prior to that, but I want you to tell me what happened that evening.
A. Okay. Prior to Crystal coming to my house when this incident occurred, Crystal picked me up from work. I was working at Burger King. She picked me up from Burger King with my daughter and dropped me and my daughter off at my house at 530 South Fourth.
Q. What time was that at?
A. I'm going to say about between 4:00 and 5:00 p.m., Friday the 23rd, April the 23.
Q. Okay. So Crystal had Jaylah while you were working --

A. Yeah.

Q. -- picked you up at work, brought you and Jaylah back to your apartment and then she left.

A. Yes.

Q. And so Jaylah stayed with you?

A. Yes.

Q. Okay. Was Dominique Roth with you at that time?

A. Yes.

Q. Was she with -- was she at your apartment when you got home from work or did she come later?

A. No, she was at my apartment when I got home from work.

Q. Okay. Did Crystal know that Dominique was in the apartment, if you know.

A. No, she didn't know at that time.

Q. Okay. Was Dominique living with you at that time?

A. No, she was just visiting frequently.

Q. Okay. And then is the next thing that happened was Crystal came back to the apartment later on?

A. Yes.

Q. Right before 9:00 o'clock?

A. Correct.

Q. Okay. What happened then?

A. Well, she called before she came.

Q. Okay.

A. And Dominique answered my phone. That was the reason why Crystal came over.

Q. Okay. And do you know what was said, if anything, between Crystal and Dominique when she called?

A. Dominique just -- I was standing there. Dominique just answered the phone and said hello, and I got the phone from Dominique; and Crystal told me that you shouldn't have did that. That was the wrong move to make, and she hung up.

About ten minutes later her -- her cousin, her cousin-in-law came over to my house.

Q. When she said you shouldn't have done that, that's the wrong move to make, did you know what she was referring to?

A. As far as Dominique answering my phone.

Q. Okay. So did it appear to you that Crystal was upset that Dominique was at your apartment?

A. Yes.

Q. With your daughter?
A. Yes.
Q. Did it appear to you that she was jealous of that situation?
A. Yes.
Q. Okay. All right. What happened next?
A. About ten minutes later Crystal called my phone from one of her cousin phone and was talking crazy.

And then next -- then I seen the police pull up in the front of the building. I start hearing a lot of banging downstairs at the bottom door.

My neighbor that stays -- that was staying in the basement at the time, he asked me what was that.

I told him don't -- she don't supposed to be in the building. Because I had already called my landlord previous to that and told her that Crystal no longer stayed with me; so she wasn't allowed in the building.
Q. Okay.
A. So --
Q. Before you get any further than that,

tell me the cousins. Who are they? What are their names?

A. Corrine and Tammy.

Q. Corrine Jackson and Tammy Lincoln --

A. Yes.

Q. -- is that right?

And these are cousins of Crystal; correct?

A. Yes.

Q. Okay. So before we get to someone banging on the door, Crystal called back from one of her cousins' phones and had a conversation with you?

A. Yeah.

Q. And you said she was talking crazy.

A. Yeah.

Q. What was she saying?

A. Basically hollering and cursing on the phone, crying.

Q. Okay. Well, I mean, could you understand what she was saying?

A. I don't recall exactly what she was saying at the moment, but I remember that she was -- just a lot of hollering and crying and

fussing.

Q. Okay. Do you know where she was when she called you?

A. She was outside of my apartment --

Q. Okay.

A. -- downstairs.

Q. So could you actually see her out the window standing there talking to you on the phone?

A. Yes, I could look out a window and see her, because she told me she was outside.

Q. So she was down -- was she on the street or the front porch or in the back? Where was she?

A. In the back.

Q. In the back of the apartment building?

A. Yeah.

Q. Outside behind the apartment building?

A. Yes.

Q. Okay. Is there some parking lot back there or is it just -- what's back there?

A. A grass. It's like a concrete slab.

Q. Okay. And is that an enclosed yard or is it open?

A. Open.

Q. Okay. And you had said that you had told

your landlord that Crystal was not to be on the premises?

A. No. I told my landlord that Crystal didn't stay with me anymore.

Q. Okay. Did you tell your landlord that she was not allowed on the premises?

A. No.

Q. Okay. All right. So Crystal's standing outside in the back. She's on a cell phone. She's talking to you, and she's hollering, cursing, and crying; correct?

A. Correct.

Q. And you're inside the apartment looking out the window; correct?

A. Correct.

Q. Okay. And Dominique and your daughter, Jaylah, are inside the apartment; correct?

A. Correct.

Q. Okay. All right. At some point did Crystal hang up with you?

A. Yes.

Q. Okay. And then what happened?

A. Well, Crystal hung up the phone from me. I believe that's when I heard the banging on the

door downstairs, and my neighbor in the basement came. I told him she not supposed to be in the building.

Q. Okay. When you say "your neighbor came," what does that mean?

Did he come up to your apartment or --

A. No. He opened his -- he opened his door.

Q. Okay. Is he on the same level as you or is he one below you?

A. No, he's two.

Q. Here's the same --

A. There's two levels.

Q. There two levels.

So is there -- you know, are there two apartments in the building?

A. Three.

Q. Three. Okay.

So tell me where the -- each apartment is.

A. I lived on the second floor; the top level; then you have the first floor; then there's an apartment, like, in the basement.

Q. Okay. All right. And did your neighbor

that opened -- that came over, was he in the basement or second level? You said the second level.

A. No, he was in the basement. He was two levels down.

Q. Two levels down. Okay.

What's his name?

A. Larry.

Q. Do you know his last name?

A. Paulus.

MR. FLAXMAN: Can you spell that.

THE WITNESS: P-A-U-L- -- I think it's U-S, if I'm mistaken at the end, Paulus.

BY MR. BERSANI:

Q. Do you know if Larry still lives there?

A. No.

Q. Do you know where he lives?

A. No.

Q. "No," you don't know he lives there or --

A. I don't know where he lives. I don't know if he still resides at that residence.

Q. Got it. Okay. Good. Do you have any contact information for Larry at all?

A. Other than the information about him

that's -- that was in my report.

Q. In the police report?

A. Yeah.

Q. Okay. But other than that, you don't know where he's at today? No way to contact him?

A. No.

Q. Okay. So -- I'm sorry. Larry -- you and Larry spoke when there was banging on the door?

A. Yes.

Q. Okay. And where did the two of you speak?

A. If I opened my back door -- if I opened my back door, I'm still inside of the building, but there is a stairwell, like stairs that go down to the main entrance in the back -- in the back to go out.

Q. Okay.

A. I can see him -- just being on my back porch, I can see him downstairs, because Crystal was in the back of the building; so I had to open my door to look out the window. That's how I saw her. When I heard the banging, I looked out the window. I saw her.

He was coming out. I told him that she don't supposed to be in the building because he was answering the door.

Q. So it was your belief that he was going to answer the banging on the door, and you told him don't answer the door because she doesn't belong there --

A. Yes.

Q. -- is that right? Okay. Got it.

And so what happened next?

A. While I was talking to him about her knocking on the door, I heard a radio. And when I looked out the window again, that's when I saw three officers downstairs.

Q. Okay. So did you remain upstairs in your apartment?

A. Yes.

Q. Did you ever come downstairs and answer the door?

A. No.

Q. Now, you know that Crystal reported to the police that you had come down, opened up the back door, and slapped her in the face; correct?

A. Correct.

Q. You deny that you did that?
A. Correct.
Q. But you don't dispute that that's what she told the police, do you?
A. Correct.
Q. Correct?
A. Yes.
Q. Okay. So to your knowledge, at some point the police arrived, and Crystal told the police that you had opened up the back door and slapped her in the face; correct?
A. Correct.
Q. Did you hear her say that to the police?
A. No. What I heard her say to the police when I was on the back part of my apartment was that she came to get my child and I refused to let her get our daughter.
Q. And how did you hear that? Did you have the door or window open to your apartment?
A. No, I didn't have the window open. They were directly where the window was at.
Q. Okay. So you could hear them through the window?
A. Yes.

Q. Okay. And so they were standing below you on the ground and you were up in your second-floor apartment; correct?

A. Yes.

Q. All right. And you can hear her talking to the police?

A. Yes.

Q. Okay. And she was telling the police that she was there to pick up Jaylah?

A. Yes.

Q. All right. What else did you hear her tell the police?

A. After that the officer -- the officer called my name. First they tried to gain entry into my apartment building. I heard the doorknob twist.

Q. Okay. Did you hear -- but my question, though, is did you hear anything else said between Crystal and the police before someone tried to gain entry, other than that she was there to pick up your child?

A. No.

Q. Okay. And so do you know the names of the police officers that arrived?

A. Hunt, Martinez, and Sheffler [verbatim].

Q. Had you had ever had any contact with either of these officers prior to that day?

A. Sheffler [verbatim].

Q. What kind of contact did you have with Officer Shreffler prior to that day?

A. He used to be a correctional officer at -- within the county jail.

Q. Okay. And so -- and you had been previously detained here at Jerome Combs while he was working as a correctional officer?

A. Yes.

Q. And so you had some contact with him here; correct?

A. Yes.

Q. So you knew him from that.

Did you know him as a city police officer at all?

A. Yes.

Q. You did. Did you have contact with him prior to April 23, 2010, in his capacity as a city officer?

A. Okay. I want to make sure I understand the question.

Q. Sure, yeah.

A. Because I want to reiterate. You asking me as far as any -- when you say "contact," as far as him stopping me for anything or just speaking?

Q. Stopping or any type of contact at all, yeah.

A. Yes.

Q. You have?

A. Yeah.

Q. Okay. And when prior to April 23 did you have any contact with Officer Shreffler?

A. Several times before then I used to see him all the time.

Q. Were these -- has he arrested you before April 23, 2010?

A. No.

Q. Okay. Were these contacts with him before that date -- were they negative or adverse in your mind?

A. Not that I recall.

Q. Okay. All right. And so you didn't know Sergeant Hunt or Officer Martinez prior to April 23, 2010, did you?

A. No.

Q. Okay. Were there any other officers that came to the scene other than those three?

A. Not that I know of.

Q. Okay. So I guess we are at the point where I think you said someone was trying to gain entry to the back of the house.

A. Yes.

Q. What did you observe?

A. I heard the doorknob fidgeting.

Q. Okay. Did anyone gain entry?

A. No.

Q. Okay. Did you see who was trying to turn the doorknob?

A. No.

Q. Okay. What happened next?

A. I heard one -- I don't know which officer it was. I heard one of the officers tell either Crystal or Tammy or Corrine that they can't do that, they not opposed to do that. They can't do that.

Q. Okay. So was it your understanding the police were trying to turn the handle to the back door?

A. No. I heard the -- one of officers tell

either --

Q. Oh, I'm sorry. I misunderstand.

A. -- Crystal, Corrine or Tammy that they not -- that they can't do that, they not supposed to do that. I guess one of those was trying to gain entry when the officers was there, and I heard one of the officers tell them that they can't do that.

Q. Got it. Okay. So it was your impression, even though you didn't observe it, that one of the girls were trying to gain entry to the back door and one of officers said you can't do that.

A. Yes.

Q. Okay. Got it. All right. So then what happened?

A. They left from the back. They walked down the side of the building on the walkway into the front of the building.

Q. Who is "they"?

A. Crystal, Tammy, Corrine, and the officers that was downstairs.

Q. Okay. They walked to the side of the building?

A. No, they all -- they walked along the side of the building to the front of the building.

Q. To the front. Got it. Okay. Okay.

What happened then?

A. When they walked to the front of the building, that's when I -- I looked out the window, and when I looked out the window, Officer Sheffler [verbatim] flashed his flashlight up to my apartment window.

And he told me -- he said, I see your face now. He told me when he see me, he was going to arrest me.

Q. So you must have come to the front of the building and looked out a front window?

A. Yes, I looked out the front window.

Q. Okay. Did you ever stick your head out the window?

A. No, I just opened -- I opened the window, but I was standing -- I never stuck my head completely out the window.

Q. Okay. Partially out the window?

A. No, I just opened the window --

Q. Just opened the --

A. -- like this.

Q. Okay. And stood at the window?

A. No, it was -- because the window was not tall. It's maybe -- if I'm on my knees, I could sit like this. On my knees at the window, if my knees at the window, I could sit like this exactly how I'm sitting now and I'm looking out the window.

Q. So right now you -- you've got your arms across your body on the table; right?

A. Yes.

Q. And so was that the ledge of the window?

A. That's the ledge of the window.

Q. Okay.

A. And directly in front of me is the window open and I was standing like this.

Q. So you were able to stand with your arms on the ledge of the window looking out the window and you saw the police officer shine the flashlight; correct?

A. Yes, he shined the light up to my apartment window.

Q. And he told you that he was going to arrest you?

A. Yes. He said, I see your face now.

Q. Okay. Did he say what he was going to arrest you for?
A. No.
Q. Did you have any understanding what he was going to arrest you for?
A. No.
Q. Did you have any understanding that -- Okay. Strike that.
And at that time Crystal and her two cousins were out in front?
A. Yes.
Q. And what about the other two officers? Were they out in front as well?
A. At this time it was only two officers outside.
Q. Which ones? Do you know?
A. It came to be Martinez and Sheffler [verbatim].
Q. Okay. What happened next?
A. After officer shined the light in my window, Crystal started doing a lot of hollering and cussing about Dominique being upstairs in my apartment, making verbal threats.

Officer Martinez told her to be quiet and move to -- to move over from the clearance of -- to clear being in front of my window so that -- I guess he was trying to talk to me in my window, but she was cutting him off while hollering, making threats about Dominique being at my apartment.

Q. When you say threats, what was she saying?

A. About as far as what she was going to -- not to me, but she was going to beat Dominique up, what she was going to do to Dominique.

Q. Okay. What happened next?

A. Officer Martinez informed her several times. He had -- he told her about six times to leave.

My mother then came. My mother came while Crystal and her cousins and Martinez and Sheffler [verbatim] was there.

And they -- when I say "they," Crystal and her cousins -- their body motion as if they were walking towards my mother like they was going to do something to her.

Martinez told my mother to go back into her car until he made Crystal and them leave.

Q. So did your mother arrive when everyone was still at the back of the building or when everyone was at the front of the building?

A. The front.

Q. All right. And did your mother go back to her car then?

A. Yes.

Q. Okay. And did the cousins -- was it just the cousins that made threats to your mother or Crystal too?

A. No. They -- I didn't near no verbal threats. I said they was walking towards my mother.

Q. So physically walking towards her if as they were --

A. As if they were going to do something to her. So Martinez intervened between them --

Q. Yeah.

A. -- and told Crystal to go back to the back of the building where her car was parked at.

Q. And did Crystal do that?

A. After, like, maybe the fifth or sixth

time he told her.

Q. Okay. What happened next?

A. The officers was downstairs talking to my mother.

I still refused to open my door even when my mother came.

After the officers left, my cousin -- my cousin came over there and we all -- we talked about what had happened.

And I went to take my daughter to Crystal that night. I went to take my daughter to Crystal that night because I wanted to leave. I wanted to leave out of Kankakee to keep -- to keep everything down, but the next -- I didn't leave nowhere. The next morning I left.

Q. Before you get to that, Darnell, while the officers are still at the scene, did any of them ask you to come outside at all?

A. Officer, I think, Martinez asked me to talk to him, and I told him I will talk to him through my window.

Q. Okay. So he asked you to come outside to talk to him, and you said, no, I'll talk to you through the window?

A. No. He asked me would you speak with me.
I said, yeah, through my window.
Q. Did he ask you to come outside?
A. No, he just asked me to come speak with him.
Q. And did you have a conversation with him?
A. Yes, through the window.
Q. Okay. And tell me what the two of you said to each other.
A. He was asking me what was going on. Like, how did it all come about, but I kept getting interrupted due to Crystal outbursts; so I never finished the conversation with Martinez because he had to assist with Crystal; so I never finished talking to him.
Q. Okay. So it was your impression that Officer Martinez was trying to get your side of the story --
A. Yes.
Q. -- as to what had happened?
A. Yes.
Q. Okay. Did you know at that point in time that Crystal had accused -- or had reported to the police that you had struck her?

A. No.
Q. When did you first learn that?
A. Reading my reports, when I got my reports.
Q. When was that, the first time that you learned that Crystal had reported to the police that you had struck her?
A. When I went -- when I was arrested April the 24, when I was arrested that day.
Q. Okay. So just going back to the 23rd again, I want to make sure I complete that event.
So Crystal and her cousins leave the premises; correct?
A. Yes.
Q. And then the police leave the premises; correct?
A. Yes.
Q. And then your mom -- you let your mom inside the apartment?
A. Yes.
Q. Okay. And then you said at that point you wanted to leave Kankakee?
A. Yes.
Q. Why?

A. Because due to all the issue that occurred just that little moment right there I didn't want to continue to go back and forth with her.

Q. With Crystal?

A. Yes.

Q. And so you wanted to return Jaylah to Crystal and then you wanted to leave Kankakee?

A. Yes.

Q. Did you feel like you did anything wrong?

A. No.

Q. Okay. So I'm not sure I understand why you would want to leave Kankakee if you felt like you did nothing wrong.

A. To keep confusion down with me and Crystal, because I know that it may become an ongoing thing with her. Because she didn't want -- she didn't want me to let her go.

So to keep things down between me and her, I wanted to leave Kankakee. So I figured if I'm not in her presence, there wouldn't be an issue between me and her if I'm not in her presence.

Q. How long did you plan on leaving Kankakee

for?

A. Just a few days.

Q. All right. Were you worried that you were going to be arrested?

A. No.

Q. That's not a reason why you wanted to leave Kankakee?

A. No.

Q. Did you leave Kankakee?

A. No.

Q. At any point in time still on the 23 of April did you ever say to the police officers that you wanted to sign a complaint yourself against Crystal?

A. No.

Q. Did you ever say to any of the police officers that you didn't want to come outside because you didn't want to be arrested and you didn't want to go to jail?

A. I believe I told Officer Martinez -- I believe I told Officer Martinez something of that nature. It wasn't -- I don't recall exactly what I said, but I think it was something of that nature.

Q. Tell me what you remember saying to him.

A. This was during -- this is before he asked me to come speak with him. He asked me why didn't I didn't want to come down.

And I said something of the nature, I don't -- I don't -- I don't want to go -- I said something of the nature as far as I don't want to go to jail or something like that and when he asked me why -- about coming to speaking with him.

Q. Okay. So he asked you why didn't you want to come down outside, and you said you didn't want to go to jail; is that right?

A. It was something of that nature.

Q. Why did you say that?

A. Due to by I have -- I have known as far as with officers, they go off with the first person called. That's -- that's the -- who they believe out here. And I didn't want to -- all I had so much going for myself at that time, I didn't want to get caught up into that.

Q. Well, did you have any understanding as to why they were called or who?

A. No.

Q. Did you have any understanding at that

time who called them?

A. No. Yes, I did.

Q. Okay. What did you understand at that time?

A. When I went to the window, that's when Officer Martinez told me that Crystal had called him when I went to the window.

Q. Is that the front window?

A. Yes.

Q. Okay. So Officer Martinez told you what?

A. That Crystal said that she wanted our daughter.

And I informed him, I said, she just brought me and my daughter home. This is not about our child. It's because I have someone else here.

And while we was talking, I told him, I said, if you listen to what she's saying, she's not saying nothing about our daughter. It's about another female. And that's pretty much where Martinez and I conversation ended because he now went back to Crystal.

Q. And so did you know at that time that Crystal had said to the police that you had struck

her?

A. No.

Q. And you didn't know that?

A. No, at that time none of the officers never mentioned nothing about me striking her.

Q. So then I'm not quite understanding, Darnell, why didn't you go outside and talk to the police if you had no information that Crystal had accused you of some crime.

A. I didn't have -- I didn't have no reason to go outside --

Q. Okay.

A. -- at all. Like, I didn't know the reason why the police was at my apartment, wanted to speak with me at all.

Q. Right. But you said that you didn't want to -- you told the officer you didn't want to go to jail and that's why you didn't want to come outside.

So if you didn't know that she accused you of striking her, I'm trying to understand why didn't you just go outside and speak with the police officers.

A. Because I didn't know what's the whole

reason for them being at my apartment in the first place, and I have been in a situation with officers out here -- the first person that calls, that's the story that they believe.

Q. Okay.

A. Despite whoever the caller is, that's -- that's what they relying on.

Q. So it was your impression that Crystal had given some story to the police and that's why they were there, and you didn't want to go outside because you thought that might get you arrested.

A. Correct.

Q. All right. So let's move on to the next day.

At any point in time -- Or strike that.

Did you have any more contact with the City of Kankakee Police that evening after they left?

A. On April the 23?

Q. Right.

A. No.

Q. Okay. So the next day -- tell me what happened the next day, because the next day you

got arrested; correct?

A. Correct.

Q. Okay. So tell me what happened starting in the morning that led to your arrest.

A. In the morning I woke up. I left with my mom. I left with my mom, took her, went somewhere with her. Dominique calls me and said that the police was knocking at my -- knocking on my door.

Q. So I take it Dominique stayed the evening?

A. Yes.

Q. And your mom stayed the evening?

A. No, my mom went home that night. She came over that morning.

Q. Came over that morning.

And what about Jaylah? Was she --

A. Jaylah was still there with me.

Q. Okay. Got it. So Dominique called you and said the police were there?

A. Yes.

Q. Do you know how is it that the police were called there or why they were there or who called them or anything?

A. No.

Q. Did you know what police officers were present?
A. No.
Q. What happened next?
A. I told Dominique that I was on my way home.
When I got home, there was no one there. I called the nonemergency number.
Q. Okay.
A. I requested to speak with Officer Walters.
Q. Why is that?
A. He's -- he was the only officer that I knew that was in the force that was, I would say, like, balanced. He didn't -- he didn't -- he wasn't biased, I could say that. He wasn't biased.
Q. Officer Walters African-American?
A. Yes.
Q. Okay. You felt you'd get a fair shake from him?
A. No. To find out how can I go about -- how can I say this? How can I go about resolving the issue that I am having with Crystal with the

police calling.

Q. So you were seeking counsel or advice from Officer Walters?

A. Right. Correct.

Q. You had known him previously?

A. I had spoke with him before.

Q. Okay. About Crystal?

A. Yes.

Q. Okay. Before April 23?

A. Yes.

Q. Okay. And did you speak with Officer Walters?

A. Yes.

Q. And what did the two of you say to each other?

A. Well, when he arrived, I came downstairs.

Q. Oh, he came --

A. He came to my apartment.

Q. Okay. I'm sorry. I misunderstood earlier.

So you called the nonemergency number and asked to speak to Officer Walters; correct?

A. No. I requested for Officer Walters to

come to my residence.

Q. Okay. All right. I thought you said that you wanted to speak to him; so I -- Strike that.

So you asked Officer Walters to come to your residence. You didn't actually have a conversation with him over the phone.

A. No.

Q. Okay. Did you have a conversation with anybody over the phone about anything that was happening at that time?

A. Yes, I don't -- I don't recall who the individual was that I spoke with.

Q. Okay. What did the two of you talk about?

A. I asked her is there some type of measures or procedures that -- that I can take as far as with an individual with harassment.

Q. Okay.

A. And she told me that I could go to the Kankakee city -- in the city department out here and I could file a report to them about it.

Q. Okay. Do you know the name of the officer you spoke to?

A. No, not over the phone.
Q. But it was a female officer?
A. Yes.
(Exit Mr. Michael W. Condon.)
BY MR. BERSANI:
Q. And so was it your -- you were asking these questions because you wanted to file some sort of complaint of harassment against Crystal?
A. Yes.
Q. About what? About what happened the previous day or in totality?
A. When you say "in totality," you mean, like, a period overall?
Q. Yeah, overall.
A. Yes.
Q. Okay. Not -- but including what happened the prior day.
A. Yes.
Q. Okay. And the officer said you'd go to City Hall?
A. Yes.
Q. Okay. Did you do that?
A. No. When I finished the conversation with the ma'am that I was on the phone with --

Q. I thought it was a female.

A. Right. The ma'am.

Q. Ma'am. I thought you said man. Sorry about that. Female. Got it.

A. Okay. When I finished the conversation with her, maybe five minutes later Officer Walters arrived at my apartment.

Q. Okay.

A. Officer Walters arrived at my apartment. I met him downstairs at the same door that Crystal, Corrine, Tammy, and the other officers was at that night before.

Q. The front door?

A. The back door.

Q. Back door.

A. The same downstairs door.

Q. Was Officer Walters alone?

A. Yes, at the time.

Q. Okay. And did he acknowledge that he was there because you had wanted to speak to him or was -- did he say anything to that effect at all?

A. No. He asked me -- he came due to I requested to speak with him --

Q. Okay.

A. -- on a nonemergency call.
Q. All right. And were there any other police officers present at that time?
A. No.
Q. Was anyone else present at that time?
A. No, we was just downstairs by ourself.
Q. So it was just you and Officer Walters?
A. Yes.
Q. Did you stay in the building or did you come outside?
A. No, I was outside.
Q. So in the backyard area there?
A. No. Just past the threshold of my back door.
Q. Okay. And so you and Officer Walters had a conversation. Tell me what you said to each other.
A. It was short. I asked him -- I asked him what measures can I take as far as with an individual harassing me. I told him it was my daughter mother, and I would like to get some type of custody of my daughter from her at that time.
And he was giving me information. He was giving me information and two more squad

cars pull up in the alley, and they came to be Wagner and Trudeau.

Q. Okay. Before you get to that, what information did Officer Walters give to you? In other words, what did he say to you? I want to know what the two of you said to each other before the other two officers arrived.

A. He told me that I could go to the courthouse. He told me some type of paper. I don't recall exactly what was the name of the paperwork, but he told me I could file something in the court.

Q. Order of Protection?

A. Was it an Order of Protection? Yes, he told me it was an Order of Protection.

Q. Okay.

A. Because I -- yeah, it was an Order of Protection he told me I could file, and he told me in an Order of Protection list exactly the reason why I'm filing an Order of Protection and list who all I would like to be added in there.

Q. Okay.

A. And before he could finish giving me any additional information, that's when the other

officers arrived.

Q. So before we get to the other officers arriving, did you tell Officer Walters that you wanted to -- Strike that.

Did you tell Officer Walters what happened the previous night?

A. Somewhat.

Q. Okay. So you alluded to the fact that Crystal had been over and had acted crazy or whatever?

A. Yeah, that's the purpose of me asking him what measures can I take to stop it.

Q. Sure. And did you know at that time that Crystal had lodged a complaint against you for striking her?

A. No.

Q. Okay. Did you tell Officer Walters that Crystal had come over the night before and had threatened to cause you bodily harm?

A. No. I told Officer Walters she had came over the night before and acted -- acted a fool. She called the police. She was -- she didn't threaten to do nothing to me. It was Dominique --

Q. Dominique.

A. -- that she was threatened.
Q. She threatened Dominique, but you told Officer Walters that?
A. Yes.
Q. And did you tell Officer Walters that you had told the police officers the night before that you didn't want to come outside because you didn't want to go to jail? Did you tell him that?
A. No.
Q. You don't recall that?
A. No.
Q. You don't recall or you definitely didn't tell him that?
A. No, I didn't tell him that.
Q. Okay. Okay. So then at some point Officer Wagner and Sergeant Trudeau arrived; correct?
A. Yes.
Q. Now, Sergeant Trudeau is an older gentleman?
A. Yes.
Q. And Officer Wagner is younger than -- younger looking than Sergeant Trudeau?
A. Yes.

Q. Okay. And both of those officers are white?

A. I believe so.

Q. All right. So then tell me what happened next once the other two officers arrived.

A. I asked Officer Walters -- I was, like, who is that?

He said he didn't know who they were. At the time they had pulled up before they enter -- before they exit out of their car, he said he didn't know who they were, but when they exit out of their vehicle, he told me both of the officers' names.

Q. Okay. Was it your impression that Sergeant Trudeau was Officer Walters' supervisor?

A. No.

Q. No? Okay.

Did you know that Sergeant Trudeau was a sergeant?

A. No.

Q. Did you learn that at any point in time?

A. Yes.

Q. When did you learn that?

A. When I saw him April the 24 for the first

time.

Q. When he first walked up?

A. Yeah.

Q. You saw that he had stripes or you knew him to be a sergeant when he walked up?

A. I knew he had some type of superiority in the police force.

Q. Okay. Okay. Based upon what? The clothes he was wearing or the patches or what? What made you believe that?

A. His stripes and the other little pins and stuff he had.

Q. Pins on his collar?

A. Yes.

Q. All right. Okay. So then what happened next?

A. Sergeant Trudy -- Trudeau, he told me I was being arrested due to I had a complaint filed against me.

And I told him what complaint?

And he grabbed my arm --

(Enter Mr. Michael W. Condon.)

THE WITNESS: -- put the handcuffs on me.

Officer Walters told him that he had taken me down. He will bring me to the Jerome Combs Detention Center.

While Officer -- I mean, while Sergeant Trudy was patting me down, Officer Walters went upstairs to my apartment, told Dominique that I was going to jail, and he told her I said to call my mother to come get my daughter.

BY MR. BERSANI:

Q. Okay. So let me go back over that real quickly.

Sergeant Trudeau walked up and told you that you were under arrest because there had been a complaint signed against you; correct?

A. Yes.

Q. Did he tell you that it was a complaint signed by Crystal Davis?

A. No, he just told me it was a complaint filed against me.

Q. So he didn't tell you who filed the complaint?

A. No. He just told Officer Walters -- he said he has a complaint filed against him. He's

going to jail.

Q. Oh, okay. So he said that to Officer Walters.

A. Yes.

Q. And you were standing there outside talking to Walters at the time that Sergeant Trudeau said that; correct?

A. Yes.

Q. All right. And did Officer Walters respond at all to Sergeant Trudeau?

A. He said all right.

Q. Okay.

A. And --

Q. And then at that point is when Sergeant Trudy went to grab your arm to place you under arrest; right?

A. Yes.

Q. Okay. And did you resist his efforts to do that?

A. No.

Q. Okay. Did you comply?

A. Yes.

Q. And you were handcuffed then?

A. Yes.

Q. Did Officer Trudeau pull out his taser at all at any point in time?

A. No.

Q. No, you don't recall that?

A. No.

Q. And then you were handcuffed and placed in Officer Walters' squad car?

A. Yes.

Q. And Officer Walters was the one that took you from the scene of your apartment to the Jerome Combs Detention Center; correct?

A. Correct.

Q. Okay. Let me go back to the conversation. So Sergeant Trudeau walked up and says to Walters he's got a complaint against him. He's under arrest. And Walters said okay, and you said what complaint; correct?

A. Yeah, I asked Officer Walters -- I never -- I never addressed anything to Sergeant Trudeau.

Q. Okay.

A. I asked Officer Walters, like, what's going on? I called you to talk to you about an issue that I am having with the individual and now

I'm going to jail.

Q. Okay. So did Sergeant Trudeau respond at all to that?

A. Yes.

Q. What did he say?

A. That's when he explained to me what was going on, that I did have a complaint. He told me that someone -- Crystal Davis had called and then a follow-up call.

Q. Had called who?

A. Had called the police station and did a follow-up call.

Q. Okay. That Crystal Davis called the police station and that they were following up on her phone call?

A. Yes.

Q. Okay. Do you know -- did he say to you what Crystal Davis had said when she called the police department?

A. No, he didn't tell.

Q. He didn't say that?

A. No.

Q. Okay. But so was it your impression, then, that Crystal Davis was the one that signed

the complaint?

A. At that --

Q. At that time?

A. At that moment, yes.

Q. Okay. All right.

A. That's something -- because he said there was a complaint filed against me.

And I asked him what complaint.

Q. Okay.

A. And Sergeant Trudy -- he explained to me what was going on. That's when Officer Walters told him to place me in his car and Officer Walters went to my apartment.

Q. Okay. And do you know -- and he went to your apartment. Do you know what he did in there?

A. He informed Dominique that I was going to jail, and he informed Dominique to call my mother to have my mother to come and get Jaylah.

Q. Okay. And that's something you must have learned from Dominique and your mom later on; right?

A. No, I asked Officer Walters to do that for me.

Q. Oh, you did. I get it now. So you asked

him to go inside and tell your mom and girlfriend what was happening.

A. Yes, I asked him to tell Dominique what was going on.

Q. Okay. Who put you in the squad car? Walters?

A. No. I think it was Sergeant Trudy.

Q. Trudeau?

A. Yes.

Q. Trudeau?

A. I think it was him.

Q. Okay. All right. Did Sergeant Trudeau have any paperwork with him?

A. No.

Q. Did any of the officers explain to you that they had to arrest you because there was a domestic battery complaint that had been signed by a victim?

A. He didn't -- Officer Trudy -- he didn't tell me what type of complaint, but when he walked up -- when he approached me, he told -- well, he informed Officer Walters that I do have a signed complaint against me that -- that's -- I have to go to jail because there's a signed complaint

against me.

Q. Okay. All right. Did you try and give your side of the story about what had happened?

A. No, I didn't have -- I didn't have a side because there wasn't an incident that took place. That's why I feel as though there wasn't no need to talk to the officers --

Q. Okay.

A. -- the night before because there wasn't an incident that occurred.

Q. Did the officers tell you that -- that, you know, you can have your own witnesses come to court and explain what happened, whatever the basis of the complaint was?

A. The what officers?

Q. Strike that. That's a badly-asked question.

Did any of the officers tell you that you could have your own witnesses come to court in your defense?

A. Any of the officers?

Q. Yeah.

A. When you say "any of the officers," you saying --

Q. Any of the three that were on the scene that evening -- that morning rather.

A. No.

Q. Okay. Did any of officers tell you that, you know, look, Darnell, you can fight this in court but now you have to go to jail.

A. No.

Q. Okay. Did -- now you said that -- Strike that.

You said that Officer Wagner was present during your arrest. Did he say or do anything -- Or strike that. Let me rephrase that question.

Did Officer Wagner say anything at all during the entire event of you being arrested?

A. I don't recall, not to me of that nature.

Q. Did Officer Wagner make any physical contact with you?

A. I don't recall. No.

Q. Did Officer Walters make any physical contact with you?

A. He helped me out the police car when I got to Jerome Combs. Other than that, that was it.

Q. Okay. Now, Officer Walters, Sergeant Trudeau, and Officer Wagner were not present the night before at your apartment; correct?

A. Correct.

Q. So it was your understanding that you were being arrested by Sergeant Trudeau on April 24 based upon a complaint that was signed by Crystal Davis; correct?

A. Say that -- repeat that again.

Q. Sure. It was your understanding that you were arrested on April 24, 2010, by Sergeant Trudeau based upon a complaint that had been signed by Crystal Davis; correct?

A. Yes.

Q. Okay. And you remained in custody until April 26 and then you were released; correct?

A. Correct.

Q. So you were in jail approximately a little less than two days; correct?

A. No. I was arrested -- I was in jail exactly two days.

Q. Okay. So I know that you provided that answer. Let me find that real quick.

Okay. Look at Interrogatory Answer No. 22. You were booked into the jail on April 24, 2010, at 3:07 p.m., and you were released on April 26 at 10:41 a.m.; correct?

A. No.

Q. That's not correct?

A. No, that's incorrect. I made it to Jerome Combs -- I made it here in the morning, because I had to go to work. I was working at Burger King.

Q. Okay.

A. And I came back with my mother in time to get dressed so that I can go to work. I had to be at work at 11:00.

Q. I see. Okay. So do you remember what time the police showed up at your house on April 24?

A. It was -- all I can remember that it was in the morning. It was in the morning time.

Q. Before noon?

A. Yes.

Q. Before 11:00 a.m.?

A. When I talked to Officer Walters, it was about 11:00; so --

Q. But what about when Sergeant Trudeau showed up? Do you know what time that was?

A. Well, this would be the first time or the second time they came to my house on April the 24?

Q. Second time.

A. It was after 11:00, because that's -- I was downstairs talking to Walters when they pulled up.

Q. So you were ready to get to work and right before 11:00 o'clock, and that's when Sergeant Trudeau showed up; right?

A. No. When I was -- I was leaving with my mother to come home to get ready when I called the nonemergency and was talking to Walters and that's when I found out everything that was going on.

Q. Okay.

A. And that's when Sergeant Trudeau and Wagner came while I was talking to Walters before I was going to go to work.

Q. But you were at your house.

A. Yes.

Q. Okay. That's what I wanted to understand. So that was right before 11:00 o'clock.

A. Yes.

Q. Okay. And then it didn't take long for him to arrest you, physically put handcuffs on you and put you in the squad car; right? Matter of a couple minutes?

A. It was about maybe 15 minutes because they sat outside and talked. About 15, 20 minutes before during the time of them talking to me and -- during the time of them talking to me and me getting in the squad car to leave.

Q. Okay. I guess what I am just -- in your answer you say that you were booked in the jail on April 24 at 3:07 p.m., and I can tell you that that coincides with the jail records, that that's when you were actually booked in. So is that an accurate answer?

MR. FLAXMAN: That's what the answer came from.

BY MR. BERSANI:

Q. I figured that your lawyer probably provided that, but I mean, this is your answers; so --

A. Now, I have one -- I have one question. When you say booked, that's when the time that I

was processed into their system.

Q. Let me ask you -- let me rephrase the question.

So at some point around 11:00 a.m. is when you were arrested physically at your apartment; correct?

A. Yes.

Q. Okay. And then you were taken from your apartment directly to Jerome Combs?

A. Yes.

Q. Okay. And how long did it take to get from your apartment to Jerome Combs, if you recall.

A. It didn't take long, but it took me a while to get booked into Jerome Combs. That's why I was saying that I was arrested at 11:00 something.

Q. Got it. Okay. So at some point you're taken directly from your apartment to Jerome Combs?

A. Yes.

Q. You sat in a holding area for a while and then you were processed, and so the time of 3:07 is when your -- you believe that's when your

booking was completed?

A. Yes.

Q. Okay. But you were at the jail that whole time period; correct?

A. Yes.

Q. All right. And then you were released on what would be Monday, April 26 at 10:41 a.m.; correct?

A. Yes.

Q. Okay. Okay. So that explains why you said that you were at Jerome Combs basically two days.

A. Yes.

Q. Okay. All right. Got it.

Now, since -- and you weren't prosecuted for any offenses related to the arrest, were you?

A. No.

Q. Okay. Do you know why?

A. No.

Q. Okay.

A. I take that back. When I did ask questions about the case, they told me that there wasn't -- when they released me that Monday, April

the 26, I asked them -- they told me pack my stuff.

I said, why am I being released?

You're being released on a PFI. You have no complaint against you.

That's why they released me, on the PFI.

Q. Who told you that?

A. Officer Briton.

Q. At Jerome Combs?

A. Yes.

Q. What's the last name again?

A. Briton. No.

Q. Officer Bright?

A. No, not Bright. Brickman. His name Brickman.

Q. Brickman, Brickman. Got it.

A. Brickman.

Q. And when did he tell you that? When you were being released?

A. Yes, when I was getting -- when I was signing, like, papers in booking to be released.

Q. Okay. What's PFI?

A. Pending further investigation.

Q. So he told you that there was no signed complaint?
A. Right. There was no complaint --
Q. No complaint?
A. -- against me. That's why they released me on a PFI.
Q. Okay. All right. At some point you learned that there was a signed complaint against you; correct?
A. In the course of -- no, actually, no. I do not know -- I haven't seen a signed complaint.
Q. You've never seen it?
A. No, none of my paperwork that I have that I have accumulated on this case.
Q. So you weren't aware that Crystal Davis signed a criminal complaint against you for battery?
A. I heard of it but never saw it.
Q. Okay. All right. Well, let's take a look at it. Exhibit No. 3.

(Fonder Deposition Exhibit No. 3 for Identification were so marked.)

MR. FLAXMAN: Take a break.

MR. BERSANI: Sure. Yeah, not a problem.

(A short recess was taken.)

(Fonder Deposition Exhibit Nos. 4 and 5 for Identification were so marked.)

BY MR. BERSANI:

Q. Darnell, I've handed you what we have marked as Deposition Exhibit No. 3. This is a criminal Complaint. People of the State of Illinois versus Darnell Fonder. Have you ever seen this document before today?

A. No.

Q. And do you see that there's a signature of a Crystal Davis on the document? Do you see that?

A. Yes.

Q. That is Crystal Davis's signature; correct?

A. Yes.

Q. You recognize her signature, and that's it; right?

A. Yes.

Q. Okay. Let me hand you what we have marked as Deposition Exhibit No. 4. Do you have

that in front of you?

A. Yes.

MR. BERSANI: Do you have a copy?

MR. FLAXMAN: Thank you.

BY MR. BERSANI:

Q. Deposition Exhibit No. 4 is a document called Domestic Violence Victim Fact Sheet, and it's a two-page document, and have you ever seen this document before?

A. No.

Q. If you look on the second page of the document, Darnell, it reads in the narrative there I, Crystal Davis, came to pick up my baby up -- to pick my baby up, and Darnell Fonder came downstairs and hit me in my face; and then there's a signature, Crystal Davis. Do you see that?

A. Yes.

Q. Do you recognize this to be Crystal Davis's handwriting and signature; correct?

A. Yes.

Q. Okay. So you don't dispute that she signed both of these documents and submitted them to the police; correct?

A. Correct.

Q. Okay.

MR. FLAXMAN: Do you have a date on either of these documents?

MR. BERSANI: I don't know.

MR. FLAXMAN: Okay.

BY MR. BERSANI:

Q. Okay. All right. And do you have Exhibit No. 5?

A. Yes.

Q. Okay. Yeah. Okay. Exhibit No. 5 with today's date is a Preliminary Citizen Complaint Fact Sheet. You recognize this document, don't you?

A. Yes.

Q. This is a document that you filled out. It contains your handwriting; correct?

A. Correct.

Q. Or your printing; correct?

A. Yes.

Q. And do you recall when you filled this out?

A. I remember -- I remember filling it out. I don't remember exactly what day it was.

Q. Okay. So at some point after your -- did

you fill this out after you were released from the Jerome Combs Detention Center?

A. Yes, on April the 26 when I was released.

Q. Okay. Did you go directly to the Kankakee Police Department?

A. Yes.

Q. That same day?

A. On the 26th, yes.

Q. Okay. And did you meet with somebody there?

A. Yes.

Q. Who did you meet with?

A. I talked to Sergeant Foster, Officer Walters. It was a lady that was working at the desk that I spoke with.

Sergeant Foster introduced me to another individual. I don't know his name. I don't know his name that I spoke with.

Q. That person -- he is the one that took the complaint from you? In other words, gave you the form and received the complaint from you?

A. No. I didn't -- Lieutenant Loman, several days later -- well, two or three days later, I think April the 29, is when I met

Lieutenant Loman.

Q. Let's concentrate on when you went to the city police department on April 26 after you got released. You said that you spoke with a Sergeant Foster?

A. Yes.

Q. Did you and Sergeant Walters at the same time or separately or Officer Walters?

A. They was there together, but I spoke with them different -- at different times.

Q. Who did you speak to first?

A. Sergeant Foster.

Q. What did you say to Sergeant Foster, and what did he say to you?

A. I asked him -- I came here to find out the reason why I was arrested and released on the 26th.

Q. So you were saying that you still didn't know at that point in time, even though you spent two days in jail, that you were arrested because Crystal Davis had reported to the police that you had struck her?

A. Yes, I didn't know.

Q. You didn't know that?

A. No.

Q. Okay. So what did Sergeant Foster say to you, if anything.

A. I had learned -- I had learned during the same day it was -- it was supposed to be an alleged complaint filed against me from Sergeant Trudy from April the 24. So I brung [verbatim] that to Sergeant Foster attention that it's supposed to have been a complaint filed against me, but I was released two days later why -- you know, I'm trying to figure out what was the complaint about and why was I arrested.

He --

Q. So you are talking about what Officer -- what Sergeant Trudeau told you the morning of the arrest that there was a complaint had been filed against you; correct?

A. Yes.

Q. Okay. So then you presented that with Sergeant Foster and asked him why, because you were released, and they told you when you were released that there was no complaint; correct?

A. Correct.

Q. So what did Sergeant Foster tell you?

A. Sergeant Foster told me about due to it was a weekend, there was no one there to process the paperwork over the weekend. It takes up to 48 hours before a complaint to enter into the system due to it was the weekend. He gave -- he gave me various excuses why there wasn't a complaint in the system.

Q. Okay. Well, so far I've just heard one, and that is that it takes sometimes 48 hours to get a complaint entered into the system.

Did he give you any other excuse besides that?

A. I don't recall.

Q. Okay.

A. Before you ask another question --

Q. Okay.

A. -- may I speak to my lawyer for a moment.

Q. Sure. Go ahead.

(There was a short interruption.)

MR. BERSANI: Are you ready?

THE WITNESS: Yes.

BY MR. BERSANI:

Q. Do you want to amend or change any answer

previously given?

A. No.

Q. Okay. Okay. So we were talking about your conversation with Sergeant Foster, and he told you that, well, sometimes it takes 48 hours to process a complaint into the system; correct?

A. Yes.

Q. Did he say anything to you at that time?

A. He gave -- he gave me a -- several excuses as to I don't recall per se what -- at that time what he said due to the time frame has been. He gave me a follow-up, to follow up with Lieutenant Loman.

Q. Okay.

A. And told me that Lieutenant Loman may be able to assist me with any additional information or help that I may need.

Q. So I take it that Sergeant Foster did not have any information for you as to why you were arrested then. He didn't tell you why or he didn't know why or what?

A. No. He was just -- no, he didn't have no conversation as to why I was arrested. He was just giving me -- he was just giving me

information as to the reason why there wasn't a complaint filed against me.

Q. Okay. And Officer Walters -- you spoke to him that same day?

A. Yes.

Q. And what did you say to him, and what did he say to you?

A. When I spoke to Officer Walters, I was asking Officer Walters the -- the -- why -- why there's not a complaint. They said there was a complaint. Why did they arrest me when there wasn't a complaint in the system against me.

And he was basically telling me just -- just be patient and, you know, calm down. Talk to Lieutenant Loman. Maybe Lieutenant Loman will give me additional information that may help me. He was just assisting me to pointing me in the direction of a different individual that may help me.

Q. Did Officer Walters explain to you? Did he give you any explanation rather as to why there was not a complaint?

A. Yes, he told me -- he didn't told me why there wasn't a complaint. He was actually the

officer told me there wasn't a complaint filed in the system against me.

Q. He told you that?

A. Yes.

Q. When did he tell you that?

A. That day, on the 26th, yes.

Q. On the 26th?

A. When I have -- I received a copy of, I think it was a summary report, incident report or something, and he informed me that there wasn't a complaint in the system against me.

Q. Okay.

A. And he directed me to talk to Sergeant Foster about the incident.

Q. Okay. So his explanation was there wasn't a complaint in the system, but not that there wasn't a complaint; correct?

A. No. He said there wasn't a complaint in the system. That's why I was released on the PFI that Monday morning because there wasn't a complaint.

Q. Okay. So then did you have a conversation with Lieutenant Loman --

A. Yes.

Q. -- that same day?

A. No, I came back.

Q. Okay. And was this at the police station you had a conversation with Lieutenant Loman?

A. Yes, at the -- yeah, at the city, city building.

Q. And when was that?

So if you were released on Monday April 26 --

A. I think it's the 20 -- the 29th, the 29th I spoke with him, which was a Thursday. I spoke with him on the 29th.

Q. Okay. At the police station?

A. No, I take that back. I came on the 29th to speak with him. He wasn't in.

I got a copy of some incident reports, and I came back -- I believe it was on this day -- and that's when I explained to him I filed this citizen complaint.

Q. Okay. And the copy of the incident report is what occurred on April 23?

A. Yes, the 23rd and the 24th.

Q. And in that incident report it said that Crystal Davis had verbally reported to the police

officers that you had struck her; correct?

A. I don't recall seeing that.

Q. Okay. Well, did you have an understanding at that point in time after reading the incident report that Crystal Davis had verbally told the police that you had struck her?

A. No. I had found out through one of the officers. It was either the complaint or one of the officers telling me that I had the complaint due to a domestic. They didn't tell me exactly what I supposed allegedly had done to her. It was just that it was for a domestic.

Q. Okay. And what officer told you that?

A. I think it was Walters said that the complaint supposed to have been a battery.

Q. And when did Walters say that to you?

A. I think this would be on the -- either the -- either the 26th or the 29th when I went to the city building.

Q. So Walters told you that a domestic battery complaint had been filed against you?

A. That's what -- that's what the complaint supposed to have been.

Q. Okay. Filed by Crystal Davis?

A. Yeah.
Q. Okay. Okay. So then did you come back and see Lieutenant Loman?
A. Yes.
Q. And when was that?
A. I think it would have been May the 5, the date that's on the citizen complaint.
Q. May the 5 or 2?
A. I mean May the 2, I mean. I apologize.
Q. Because that's the date on the bottom of Exhibit No. 5. That's why I said that.
A. Right.
Q. So you went back on May 2 and you spoke to Lieutenant Loman?
A. Yes.
Q. Okay. And is that when you filled out Exhibit No. 5?
A. Correct.
Q. And so did you and Lieutenant Loman have a conversation before you filled out this document?
A. Yes.
Q. Is that Lieutenant Loman's signature, to your knowledge, at the bottom of this document?

A. Yes.

Q. Okay. So he must have given you a form, and then you sat down at the police station and filled this out; correct?

A. Correct.

Q. And other than -- Or strike that.

Your signature -- Or strike that.

The information at the top here, name of complainant, address and so forth, is that your handwriting?

A. Yes.

Q. Police department employees involved: Martinez, Shreffler, Walters, Wagner, Sergeant Trudeau. Is that your handwriting?

A. Yes.

Q. And then the narrative after brief explanation of allegation. That's all your handwriting; correct?

A. Yes.

Q. And then your signature appears at the bottom; right?

A. Yes.

Q. And everything you put in here is true and correct, to the best of your knowledge; right?

A. Yes.

Q. All right. I want you to read this into the record, the narrative part starting on 4-23-10.

A. On 4-23-10 police were called for alleged battery. When Officer Martinez and Shreffler arrived there -- arrived there, there were three females standing in the back of 530 South Fourth Avenue. Crystal Davis, alleged victim in the situation, told the officer Darnell slapped her.

Q. Okay. Stop there. Now, you wrote that, right, that last sentence?

A. Yeah.

Q. And you wrote that on May 2, 2010; right?

A. Yes.

Q. And how did you know on May 2, 2010, that Crystal Davis, alleged victim in the situation, told the officers Darnell slapped her?

A. From gathering all of my paperwork, from getting incident reports and police reports from the police station. That's how I found out.

Q. Okay. Okay. Go on.

A. Officer Shreffler stated out of his mouth if you file a complaint, he, Darnell, will go to

jail. Victim claims suspect, Darnell, slapped her and refused to give victim their child. Officer Martinez and Shreffler both witnessed Crystal Davis make verbal threats to myself and Dominique Roth.

On 4-24-10 I called the nonemergency number to speak with an officer about the incident that took place the night before.

Officer Walters came, and Sergeant Trudeau and Officer Wagner accompanied him.

I was explaining to Officer Walters the incident that occurred, and Sergeant Trudeau stated -- stated -- told Officer Walters to arrest me due to I have a signed complaint against me.

After -- I mean, at that time and date -- I can't see that word due to it's not -- it's not in good.

Q. So wait a minute. At that time and date, and then there's a word there you can't read?

A. No, because of how it's not the original.

Q. Okay. Go ahead.

A. Hold on. Let me see.

MR. FLAXMAN: I would suggest it's there.

MR. BERSANI: There? Yeah, it looks like

it might be there.

THE WITNESS: Yeah, there wasn't a change --

BY MR. BERSANI:

Q. Charge?

A. There wasn't a charge or complaint filed against me.

On 4-26-10 Dominique Roth, my girlfriend, was trying to something --

Q. Find out?

A. -- find out information on how to file an Order of Protection on someone.

Officer Wagner, which was one of my arresting officers, spoke with her, and he informed the respondent of the Order of Protection that someone was filing against her.

Q. Okay. And there's no other document that you wrote on; right? This is it? Was there anything else you wrote? I just want to make sure there's nothing else that you wrote.

MR. FLAXMAN: You mean like is there a page 2?

MR. BERSANI: Yeah, like a page 2 or back side.

THE WITNESS: No, this is it.
BY MR. BERSANI:
Q. All right. Okay. So was it -- by filling out this document, was it your intent to file some sort of complaint against the police or against Crystal?
A. No. The complaint was against the officers.
Q. And why? What did they do wrong?
A. It was explained in here as far as when the officer came -- when the Officer Shreffler, Officer Martinez -- when they came to my apartment, they -- when they first got there, they spoke with Crystal. When they spoke with Crystal, they went to the front. They asked me -- I talked to Officer Martinez.
Q. And before you get there, it's your understanding that when -- now that when they spoke to Crystal, Crystal told them at the time on April 23 that you had struck her; right?
A. Yes.
Q. Okay. Go ahead.
A. So when -- I thought when I talked -- when Martinez and Sheffler [verbatim] -- no, I'm

wording this wrong. I'm wording this wrong.

I filed the report against Sheffler [verbatim] and Martinez due to they said that I had a report -- a complaint filed against me. They alleged there was a complaint filed against me.

Q. Against Shreffler and Martinez?

A. Yes.

Q. And Walters.

I'm sorry. Who did you say?

A. Well, Martinez and Sheffler [verbatim].

Q. Okay. All right.

A. I got them on unprofessional conduct.

Q. Okay.

A. Due to when they got there and I was -- when they talked to Crystal, when I tried to talk to Martinez, Martinez -- well, Sheffler [verbatim] the one that talked to Martinez was sidetracked with Crystal; so I never -- they never heard my story.

And when I come to find out there was a complaint against me and I was going to jail, so I filed an unprofessional conduct on Martinez and Sheffler [verbatim].

Q. Okay. Because they would not listen to your side of the story on April 23.

A. Yes.

Q. Okay. All right.

A. And I filed the complaint -- this came from what Walters, Wagner, and Sergeant Trudeau due to it supposed to have been alleged complaint filed against me, and there wasn't at the time that they arrested me on 4-24.

Q. Okay. But you learned there was afterward.

A. No. I learned -- I learned that there wasn't a complaint in the system, filed against me in the system.

Q. Okay.

A. I just found today that when you showed me today that there was actually a complaint.

Q. Right.

A. I never knew about -- I just heard. I never seen, got a copy or nothing until today.

Q. Okay. So now that you know that there was a signed complaint by Crystal you don't have a beef against Officer Walter [verbatim], Wagner or Trudeau; correct?

A. No, I had nothing personally against them at the time.

Q. Okay. So in your mind they didn't do anything wrong, because now you know they had a signed complaint.

A. No. You said in my mind that they didn't do anything wrong.

Q. Right.

A. What do you mean by that?

Q. Let me ask you this: What did Officer Walters do wrong in your mind?

A. He was part of the arresting officers that arrested me for alleged complaint --

Q. Okay.

A. -- that was in the system that wasn't.

Q. What about Officer Wagner [verbatim]? What did he do wrong?

A. The same. He assisted.

Q. Okay. And what about Sergeant Trudeau?

A. The same. He assisted the arrest. He was the one that actually put the handcuffs on me.

Q. So your belief that these three officers arrested you without an actual signed complaint in the system. That's your allegation?

A. Yeah, yeah.

Q. And that's it. Nothing more.

A. Yeah.

Q. Correct? You have to answer. Correct?

A. Oh, correct.

I'm sorry, ma'am.

Q. Few more questions, Darnell.

Look at your Answers to Interrogatories, if you could please. This is Exhibit No. 1, and I'm just going to go through a few Interrogatory answers here.

(Exit Mr. Michael W. Condon.)

BY MR. BERSANI:

Q. Starting with No. 13. Okay?

A. Okay.

Q. 13 asks whether you were claiming -- Or strike that.

13 asks to describe every injury claimed by you, and you write you do not claim any physical injuries; correct?

A. Correct.

Q. And that's still true today. You're not claiming that you were physically injured through any of the conduct by any of the officers;

correct?

A. Correct.

Q. And then you write I was deprived of my liberty and embarrassed and humiliated by the strip search which proceeded any judicial administration of probable cause.

Now, Officer -- or Sergeant Trudeau and Officer Wagner were not involved in the strip search; correct?

A. Correct.

Q. Okay. So that part is not -- does not relate to them; correct? That part of your answer where you say you were deprived of my liberty and embarrassed and humiliated by the strip search, that does not relate to Sergeant Trudeau and Office Wagner; correct?

A. No, it does.

Q. How does it relate to them?

A. Due to their arresting me, I would never have been strip searched and deprived of anything if they would never have arrested me saying that it was an alleged complaint filed against me.

Q. Okay. Okay. Anything else?

A. No.

Q. Okay. And you have never received -- I'm looking at Interrogatory Answer No. 15. You've never received any type of medical treatment for your injuries; correct?

A. Correct.

Q. Or any psychiatric treatment or counseling of any kind; correct?

A. Correct.

Q. You're not claiming -- No. 16 I'm looking at now. You're not claiming that you lost any wages or making any type of employment loss claim in this case; correct?

A. No. Wrong.

Q. That's wrong?

Okay. Well, here you say no; so -- and I've asked you before whether these are accurate. So now you're telling me that they're not?

A. Hold on for a second.

Q. All right. Take your time.

A. On Question 16 I did make an error.

Q. Okay.

A. I was working at the time that I was arrested on this date. I misunderstood that

question.

Q. Okay. So what answer do you want to provide now to that question?

A. I was working at the time.

(Enter Mr. Michael W. Condon.)

THE WITNESS: And due to my arrest on April the 24, it did cause me -- it cost me my job and also my apartment.

BY MR. BERSANI:

Q. Okay. And that's a claim you're making in this case?

A. Yes.

Q. Okay. So --

MR. FLAXMAN: Is there a question?

MR. BERSANI: I thought there was.

BY MR. BERSANI:

Q. You wanted to change your answer to No. 16; correct?

A. Correct.

Q. Okay. What do you want to change it to?

A. That I did suffer loss in a time of this -- this -- this case.

Q. Okay. So you're saying that you lost your job as a result of the arrest by

Sergeant Trudeau and Officer Wagner?

A. Yes, and I lost my apartment as well.

Q. Okay. Well, let's separate those out. Let's talk about your job.

At the time of your arrest on April 24, 2010, you were working at Burger King?

A. Yes.

Q. What did you do at Burger King?

A. I was a food processor.

Q. What does that mean? I can guess what it means, but you tell me what it means.

A. I made sandwiches.

Q. Okay.

A. I prepped the sandwiches that they serve.

Q. And how long had you worked at Burger King prior to April 24, 2010?

A. I had just started maybe a few weeks ago.

Q. What did you make? What was your -- did you make an hourly salary?

A. Yeah, 8 -- it's either 8.25 or 8.50.

Q. Okay. And was this a full time or part-time job?

A. Full.

Q. All right. So are you saying that you

did not -- Or strike that.

Did you go back to work after you were released from Jerome Combs on April 26?

A. I attempted to --

Q. Okay.

A. -- but due to no call, no-show.

Q. When did you attempt to go to back to work?

A. On the 26 of April.

Q. So right after you got released out of jail?

A. Yes, after I finished trying to find out the reason as to why I was incarcerated, then I went to talk to my supervisor.

Q. Okay. What's your supervisor's name?

A. I don't recall.

Q. Man or woman?

A. It was a man.

One of my supervisors, her name is Jennie, but she's, like -- she, like, the floor supervisor. I remember her name. Her name Jennie.

Q. Okay. But the person that you spoke to was a man?

A. Yes. I don't recall his name.
Q. So you went there physically to Burger King and talked to the male supervisor and he told you what?
A. I had to produce some type of documents to show that there wasn't a complaint, that I didn't get charged with the case --
Q. Okay.
A. -- to try to get my job back.
Q. Okay. That's what he told you?
A. Yes, to show -- because I told him that I wasn't -- that I did get arrested, but I wasn't charged with the crime.
Q. Okay.
A. So I had to produce some type of documents to show that I wasn't charged with the crime.
Q. Okay. And you couldn't do that?
A. Yes.
Q. Correct?
A. I did get my job back, but they released me due to I still had the incident with the officers.
Q. Okay. I got to go through this just a

few minutes here until I understand it.

You went there on the 26th. You spoke to your male supervisor. He said for you to provide him with some paperwork as to why you were arrested; correct?

A. Yes.

Q. You couldn't do that at that time, right, because you didn't have any; right?

A. No. Produce a document showing that I wasn't charged --

Q. Okay.

A. -- with the crime.

Q. And you -- were you able to do that at that time you spoke to him?

A. Yes, I had my release papers --

Q. Okay.

A. -- saying that I was released on a PFI.

Q. And was that good enough for him?

A. Yes, I got my job back --

Q. Oh, okay.

A. -- but one of the -- one of the supervisors at corporate said that they can't allow due to I had an incident issue with the police. I was arrested. I had to be fired.

Q. Okay. And when were you fired?
A. Few days later.
Q. Got it. Did you look for another job after that?
A. I attempt, but before I could find another job, I had gotten into another situation.
Q. I'm sorry. Did you say you did attempt to look for another job?
A. Yes, I did.
Q. Okay. But you couldn't find one?
A. Yes.
Q. Did you actually apply for jobs?
A. Yes.
Q. Okay. But then you got arrested on May 7, 2010; right?
A. Yes.
Q. And the arrest on May 7, 2010 -- one second -- what was that for?
A. My arrest on May 7, 2010?
Q. Right.
A. Aggravated battery on a peace officer, resisting arrest, and a complaint trespassing.
Q. Okay. And that was a situation where you had gone to Crystal Davis's house and she called

the police on you; correct?

A. Correct.

Q. And she wanted you arrested for criminal trespass to her property; correct?

A. Correct.

Q. And Officer Martinez was the arresting officer; correct?

A. No. Sheffler [verbatim] was.

Q. Well, I mean, the incident report from that incident show that Officer Martinez was the officer that arrested you.

Are you saying that's not true?

A. Yes. Because Officer Sheffler [verbatim] one put handcuffs on me and put me in a squad car and took me to the hospital, took me to Jerome Combs.

Sorry. Yes, ma'am.

Q. All right. Let me back up. It was Officer Sheffler [verbatim] and Martinez who were present at that time; correct?

A. Yes.

Q. And they both arrested you each essentially or was it Shreffler?

A. Sheffler [verbatim].

Q. And you were charged with criminal trespass to property, resisting arrest, and aggravated battery on Officer Martinez; correct?

A. Correct.

Q. And you were ultimately -- you went to a jury trial on that; right?

A. Yes.

Q. And you were found not guilty of the aggravated battery; correct?

A. Correct.

Q. But you were found guilty of resisting a police officer and criminal trespass to property; correct?

A. Correct.

Q. Okay. And that's what led to your incarceration through February of 2012; correct?

A. Correct.

Q. Okay. Are you currently looking for a job?

A. No, not at this time due to -- in May. I have a job coming up in May.

Q. Oh, that's right. I apologize. You did tell us that earlier. Okay. All right.

MR. FLAXMAN: Well, why don't we take a

break and eat.

MR. BERSANI: No, I'm almost done. Give me a minute, and I'll be able to be done here I think.

MR. FLAXMAN: I'm giving you.

MR. BERSANI: Yeah, thanks.

BY MR. BERSANI:

Q. Are you, Darnell, claiming any other -- any other injuries at all of any kind, either -- of any kind at all other than what you have told us here today?

MR. FLAXMAN: In this case against the officers?

BY MR. BERSANI:

Q. In this case against --

MR. BERSANI: Yeah, thank you.

BY MR. BERSANI:

Q. In this case just against Sergeant Trudeau who I represent and Officer Wagner who I represent.

A. You say any injuries?

Q. Yeah.

A. Physical injuries?

Q. Physical, mental, financial. Anything at

all other than what you have told us.

A. The financial aspect would be I lost my job and my apartment.

Q. Do you have a value on the loss of your job?

A. No, I don't have it at hand, but I have it at home.

Q. Okay. Well, if you have that, you provide to your lawyer, follow up with him, and he'll give us that information. Okay?

A. Okay.

Q. And you say you lost your apartment.

A. Yes.

Q. Tell me what happened with your apartment.

A. I have a policy -- the zero tolerance policy as far as if an officer -- any police get called to my -- to my residence and he goes back to my landlord, it's an automatic that I would have to be -- I have to move.

Q. Was it -- is it your understanding that the police were called to your apartment by Crystal Davis or her cousins? Is that your understanding today?

A. Yes.
Q. Okay. Did you have to pay any type of penalty or any other, you know, money damages to your landlord as a result of losing the apartment?
A. Yes. I didn't pay, but I owe her due to I got arrested. I have got arrested again before I could pay my rent out, then I have to pay utilities in my name at the 530 South Fourth at that time that I was unable to finish paying due to my incarceration.
Q. How much do you owe? Do you know?
A. No.
Q. You don't know how much you owe either in penalties or back rent or utilities?
A. I -- no, utilities they -- they send me -- last time I got something for utilities it was a little over $100.
My rent I owe -- she's charged me due to she found out I was incarcerated; so she only charged me for a few months of rent. I don't know.
Q. And what was your rent?
A. My rent was 550 a month. I don't know exactly. I have to look at the paperwork at home

to find out exactly how many months that she did charge me.

Q. Okay. Anything else related to your apartment?

A. My stuff was trashed. My stuff got thrown out.

Q. Okay. All right. Well, what I'd like you to do, then, just with your lawyer provide any more information as to what you are claiming related to your apartment, provide that information to him and then he'll get that to me. Okay?

A. Okay.

Q. Anything else you're claiming in this case by way of injuries, damages, financial, physical, emotional other than what you have told us?

A. No.

MR. BERSANI: All right. I have nothing further.

E X A M I N A T I O N

BY MR. FLAXMAN

Q. To clarify one point. You said in the

beginning that Crystal was having issues. Do you remember generally that -- those?

A. I say she was having issues? Oh, as far as with me moving on with -- with someone else?

Q. No. That -- that she -- you weren't getting along. I wanted to break up, and she was -- she was having some problems with her life.

Was Crystal having problems with her life?

A. Yeah, at the time -- when I say I wanted to keep my daughter -- keep my daughter with me, at the time what I said as far as her being responsible and had been on top of her stuff. She was going through a time in her life where she had started -- she was using drugs. So that was my main reason of our separation though.

MR. FLAXMAN: Okay. Great. Nothing further.

F U R T H E R E X A M I N A T I O N

BY MR. BERSANI

Q. Do you have any knowledge or information that the police knew that Crystal Davis was a drug user?

A. I don't know because she stayed out here before I moved out here; so I don't know what type of involvement she had with the police.

Q. So you don't have any knowledge or information that Sergeant Trudeau or Officer Wagner had any knowledge about her using drugs, do you?

A. No.

MR. BERSANI: Okay.

MR. FLAXMAN: Anything else?

MR. BERSANI: Nope. That's it.

MR. FLAXMAN: We'll waive signature.

(The following examination is in regards to Case No. 12 CV 2115.)

(Witness sworn.)

MR. CONDON: Darnell, my name is Mike Condon, and I represent the county and Sheriff Bukowski in a lawsuit that you have filed against them, which is Federal Case 12 CV 2115.

We have an agreement between counsel that the deposition that you gave, your testimony you gave earlier today in the lawsuit against the city will also be utilized and will be applicable in the lawsuit that you have filed against the

county and the sheriff.

Is that our agreement, Ken?

MR. FLAXMAN: Yes.

E X A M I N A T I O N

BY MR. CONDON

Q. I want to just follow up on a couple of things. Go back to Exhibit 1, which is the Answers to your Interrogatories that you gave in the case against the city. You've got them in front of you?

A. Yes.

Q. Okay. Go to page 3. Question 8 asks you if you have been convicted of a felony or misdemeanor, and you've listed several convictions there; correct?

A. Correct.

Q. Okay. In 2001 you were convicted for armed robbery and sentenced to six years in the Illinois Department of Corrections; is that correct?

A. Correct.

Q. Okay. How many years did you serve as a result of that conviction?

A. Two and a half.
Q. Okay. And did you serve those two-and-a-half years all at the same facility or were you in different facilities?
A. Different facilities.
Q. Do you remember which ones you were in?
A. Yes.
Q. What were they?
A. I did six months in the county jail in Kankakee.
Q. Uh-hum.
A. I did a year in Sheridan Correctional and I did another year in Danville Correctional.
Q. Okay. Okay. Then based on your answer, you were convicted in 2004 of burglary; is that correct?
A. Correct.
Q. And you were sentenced to seven years in the Illinois Department of Corrections; is that correct?
A. Correct.
Q. How many years did you serve on that conviction?
A. Three years and -- three years and three

months, I believe.

Q. Okay. Where did you serve your time?

A. At Mount Sterling.

Q. Was that for the whole three-plus years?

A. Yes.

Q. Okay. And when you were released from Mount Sterling, do you recall was that in 2007?

A. Yes.

Q. Okay. And then you were arrested in 2008 for retail theft; is that correct?

A. Yes.

Q. What police agency arrested you?

A. Bradley.

Q. Okay. And on the burglary arrest, which police agency arrested you?

A. Oh, Kankakee.

Q. City of --

A. The City.

Q. Okay. And on the armed robbery which agency arrested you?

A. I believe City.

Q. Okay. City of Kankakee?

A. Yes.

Q. Okay. And when you were arrested on the

retail theft charge, you were convicted; correct?

A. Yes.

Q. And you were sentenced to two years?

A. Yes.

Q. And how much time did you serve?

A. Nine months.

Q. And where did you serve your time?

A. At Vandalia Correctional.

Q. And then in 2010 you were convicted of aggravated -- Strike that.

In 2010 you were convicted of felony resisting; correct?

A. Yes.

Q. Which police agency arrested you on those charges?

A. City, Kankakee City.

Q. Okay. And you were sentenced to three years; is that correct?

A. Yes.

Q. And which -- Strike that.

Where did you serve your time on that conviction?

A. In Jerome Combs Detention Center.

Q. You were at Jerome Combs the whole time?

A. Yes.

Q. And you said that you were released from Jerome Combs on February 21 of 2012; correct?

A. No.

Q. Well, that's when you were -- Strike that.

What time did you serve? From when to when on the arrest for aggravated -- or for felony resisting?

A. That was from May the 10 -- I mean, May the 7, 2010, till February the 23, 2012.

Q. Okay. And then since February 23, 2012, have you been arrested for any reason?

A. Since --

Q. Since you were released from the Jerome Combs Detention Center on February 23, 2012, have you been arrested?

A. No.

Q. Okay. From 2001 when you were convicted for the armed robbery until your release from Jerome Combs Detention Center on February 23 of 2012, how -- how much time were you actually out on the street as opposed to being incarcerated?

A. Out of 11 years, maybe 4, about 4 years

out of 11 years. About four, three and a half, four.

Q. When you were arrested -- Or strike that.

When you were convicted on the armed robbery charge and you were sentenced to the six years, you said that you served time at Danville Correctional Center; correct?

A. Correct.

Q. When you went into that facility, were you subjected to a strip search?

A. No. When -- no. When I made it to Danville, we didn't get a strip search when we got off the bus. We didn't get a strip search not until we entered into the population.

Q. So when you entered into the general population in the Danville Correctional Center, you were subjected to the strip search; correct?

A. When you say subjected to one? Yeah, I eventually got strip searched eventually.

Q. And when you went to the Sheridan Correctional Center and you went into the general population there, were you given a strip search?

A. Yes.

Q. And when you served your time at Mount

Sterling and you were brought into that facility and went into the general population, were you given a strip search?

A. No, I didn't get -- I don't recall getting searched in Mount Sterling.

Q. So it's your testimony that you were allowed into the general population at Mount Sterling and you were never strip searched?

A. Yes, I don't recall being strip searched when I went to Mount Sterling.

Q. At any occasion when you were at the Mount Sterling Correctional Center in those three years, were you subjected to a strip search?

A. Yes.

Q. On numerous occasions?

A. No. I'd say maybe twice.

Q. Okay. And when you were at Danville and at Sheridan Correctional Center, apart from the time when you first went into the general population and you were strip searched, were there other occasions when you were subjected to a strip search?

A. No.

Q. Okay. You said you served time at the

Vandalia Correctional Center. Were you subjected to a strip search when you first went to Vandalia?

A. No. We -- they have, like -- it's not -- it's just a room, like a room like this, and we all go in there to change clothes, to take off clothes. Not no individually. Never do, like, individually, squat, cough, none of that. Everybody take off what they had and put the clothes what they had on.

Q. You would take off the clothes you were wearing and put on the inmate garb that they would give you?

A. Yes.

Q. And did this occur in front of numerous other inmates?

A. You'd be isolated. Like, it be a variety of us in one room, but there would be something in between each one of us.

Q. Where was this at? Did this occur?

A. This is at Vandalia.

Q. Okay. When you were serving time at the Danville Correctional Center, did you shower in front of other male inmates?

A. Yeah.

Q. Okay. And when you were at the Sheridan Correctional Center, did you shower in front of other inmates?

A. No, we had -- we went into the shower by ourself there.

Q. How about at Mount Sterling? Did you shower in front of other male inmates?

A. Yeah.

Q. And at Vandalia did you shower in front of other male inmates?

A. You could have went in the shower -- yeah, you could have.

Q. And you did; right?

A. No. I actually took a shower by myself due to where I went to school, my school schedule. So all of the other inmates was locked down while I took my shower.

Q. So for the nine months you were there, you never showered in front of other male inmates?

A. No.

MR. CONDON: Can you mark that.

(Fonder Deposition Exhibit No. 6 for Identification was so marked.)

BY MR. CONDON:
Q. Showing you what has been marked as Plaintiff's Exhibit 6. Are these your Answers to the County's Interrogatories?
A. Let me review them first, sir.
Q. Okay.
MR. FLAXMAN: Do you have a signed?
MR. CONDON: No. Do you?
MR. FLAXMAN: Have a signature page.
This is off the record.
(A discussion was had that was off the record.)
THE WITNESS: Okay.
BY MR. CONDON:
Q. Okay. Darnell, have you had a chance to review Plaintiff's Exhibit 6?
A. Yes.
Q. And are those your Answers to the County and the Sheriff's Interrogatories in the case?
A. Yes.
Q. And is all the information you've provided in there true and accurate?
MR. FLAXMAN: Let's -- may we confer?
MR. CONDON: Sure.

(A discussion was had that was off the record between counsel and the witness.)

MR. FLAXMAN: Are we back on?

Your question was is it true and correct?

MR. CONDON: Are his Answers to Interrogatories true and correct?

THE WITNESS: Yes.

BY MR. CONDON:

Q. Okay. If you would go to your Answer to Interrogatory No. 17, which is on the last page. It asks if you have applied for Social Security disability insurance, and you said yes, you applied in 2008 and your application was denied; is that correct?

A. Yes.

Q. For what reason did you apply for Social Security disability?

A. I had a stroke.

Q. When did you have the stroke?

A. The beginning -- about this time in '08. I think it was about this time in '08.

Q. So around March of 2008?

A. About April. Between March and May of 2008.

Q. Okay. And were you hospitalized as a result --

A. Yes.

Q. -- of the stroke?

A. Yes.

MR. FLAXMAN: Let him finish the question.

BY MR. CONDON:

Q. And where were you hospitalized?

A. There was a hospital in Chicago.

Q. How long were you in the hospital?

A. I don't recall how long. I have the paperwork at home.

Q. Well, were you in the hospital for a day? a week? a month?

A. No, I was -- it was a few weeks.

Q. And this hospital that you were in Chicago for about two weeks -- you don't remember the name of the hospital?

A. No, I don't want to get that incorrect name of the hospital. That's why I say I don't remember. I just give you a correct name. I just

give to my lawyer to give to you than to give you an incorrect name.

Q. All right. Well, I'd ask that you provide whatever information, documentation you have to your counsel --

A. Okay.

Q. -- regarding your hospitalization of the stroke.

So after you had the stroke in 2008, that's when you applied for Social Security disability?

A. Yes.

Q. Okay. And were you told why your application was denied?

A. No.

Q. How were you advised that your application was denied?

A. They informed my mother. I was unable to speak. I mean, I was unable to talk, barely move. So I really too much don't know everything that happened then from what hearsay, from what other people was telling me.

Q. Okay. After you were released from this hospital in Chicago, did you go for rehab

treatment?

A. I went to Aunt Martha's in Kankakee. I remember going there.

Q. What did you go to Aunt Martha's for?

A. They assist individuals that does not have, like, insurance benefits or don't have an insurance card. They pay for your medical for to help me for my therapy. I had to go to them to get assistance to pay for me to set up my therapy, my medication, things of that nature.

Q. How long were you treated at Aunt Martha's?

A. Until I was incarcerated in August of 2008.

Q. After the stroke for what period of time were you unable to speak?

A. It was -- I could speak, but it was a stutter-slur. I could talk, but it was like a stutter-slur type.

Q. Since your stroke in 2008, have you had any other major health issues?

A. No. Just, like, a pain on the side of -- like, a sharp pain that comes in and out in my -- on the left side of my brain.

Q. And have you been treated for this pain that you say you have in the left side of your head?

A. No, due to -- no.

Q. Looking quickly back at the interrogatory answer you gave to the City's Interrogatories to Question No. 8. It asks you about your convictions. There's a couple there I forgot to ask you about.

You were arrested for battery in 2008 by which police agency?

A. No, I wasn't -- I wasn't never arrested. October the 9 of 2008 I was incarcerated. I got incarcerated. I got incarcerated in August of 2008. I didn't come home till -- I didn't come home till May. I want to say May. Yeah, May of 2009.

Q. Okay. Were you arrested in May of 2008?

A. Was I arrested in May of 2008?

Q. For battery.

A. No.

Q. All right. Looking at your Interrogatory Answer, which is Exhibit No. 1, do you have listed --

A. Hold on.

MR. FLAXMAN: That's the one he's talking about.

BY MR. CONDON:

Q. The fifth in the box there to the Answer to Interrogatory No. 8 in the fifth box you have listed battery, that you were arrested for battery and you provide a case number, 08 CF 965.

A. Uh-hum.

Q. What was that arrest -- Strike that.

When was that arrest for battery?

A. I never was arrested. It was just a charge that was in my -- that was against me on my background. I never went to court. I was -- the 09 CM 1392, the 08 CF 965 I never went to court for neither one of those cases.

Q. I'm not asking if you went to court. I'm asking you about being arrested.

A. I never was arrested.

Q. Well, how did -- how did you provide a Case No. 08 CF 965 for the battery and 09 CM 1392 for domestic battery? Where did you get that information from?

A. My -- my lawyer had to look it up in the

system and see that these cases are pending, but I never was arrested on neither one of these dates. Well, I was never arrested on neither one of these cases at all. Like, well, Kankakee or a Bradley police officer put me in handcuffs, brung [verbatim] me to jail never.

MR. CONDON: Let's go off the record a minute.

(A discussion was had that was off the record.)

MR. CONDON: Back on the record.

You want to clarify your answer. Go ahead.

THE WITNESS: I actually wanted to be off the record to try to explain this to you.

MR. FLAXMAN: Why don't you explain your answer. Go ahead. She's writing down what you say. Speak clearly.

THE WITNESS: With this battery and this domestic for 10-9-08 and 2-21-12, I'm alleging that these are cases without my knowledge that was -- that was pending against me during the course of me fighting other cases. I never went to court for none of these. I remember this --

this domestic battery, this 09 CM 1392. I remember once I got found not guilty of the aggravated battery, that I got found guilty of the aggravated battery, I went before a judge and got a nolle process [verbatim] for this domestic battery. I remember that before I left and went home. That's why both of the dates are the same, 02-21-12.

BY MR. CONDON:

Q. To your knowledge, were charges brought against you for domestic battery -- were charges brought against you in 2009 because you allegedly struck Crystal Davis?

A. In 2009?

Q. Yeah.

A. No, not in 2009; not in 2009.

Q. Were you arrested in 2008 for allegedly striking Crystal Davis?

A. No.

MR. FLAXMAN: Go off the record for a minute.

(A discussion was had that was off the record.)

MR. FLAXMAN: What else?

Let's go back on the record.

Do you have other questions?

MR. CONDON: I do. I have many more.

BY MR. CONDON:

Q. Darnell, did you at any time grab Crystal Davis around the neck with your hands in May of 2009?

A. No.

Q. Did you ever strike her in the face with your hand in June of 2008?

A. No.

Q. And it's your testimony that you are not aware that there were charges brought against you as a result of those alleged incidents?

A. Correct.

Q. Okay.

(A discussion was had that was off the record between counsel and the witness.)

THE WITNESS: I would like to correct my last answer.

I am aware of the battery, the domestic battery case, but at the time that they saying these dates were on here -- well, for the

08 CF 965 case I was unaware of that. I have no recollections at all of this case. I never went to court for this case at all.

But the domestic battery case the 09 CM 1392, I do recall. I did go to court in front of Miss Elliott and got that case nolle processed [verbatim]. I remember that.

But this 08 case I have no idea about.

BY MR. CONDON:

Q. Is it your testimony that you have never committed a battery upon Crystal Davis?

A. Yes.

Q. You've never struck her?

A. Correct.

Q. Okay. Let's go to April 24 of 2010. After your arrest by the City of Kankakee police officers, you were brought to the Jerome Combs Detention Center; correct?

A. Correct.

Q. And it's your testimony that you have got to the -- we'll call it the J.C.D.C. at about 11:00 o'clock?

A. It was about 11:00ish, noonish. At this

time. It was about noonish.

Q. Okay. And who transported you to the facility?

A. Officer Walters.

Q. Was there anyone else in the vehicle with you and Officer Walters?

A. No.

Q. When you got to the J.C.D.C., where were you taken?

(Exit Mr. Michael D. Bersani.)

THE WITNESS: Their -- their booking area.

BY MR. CONDON:

Q. Before you went into the booking area, did you drive -- did Officer Walters pull into a sally port area?

A. Yes. That's the booking area I'm talking about.

Q. And did Officer Walters escort you from the sally port area to some other location?

A. Yes.

Q. And where did Officer Walters take you?

A. I went through a door. I went through a door inside of Jerome Combs.

Q. Okay. And once you went through the door, where did you go next?

A. Then they have, like, a waiting area where you could sit down, watch TV, talk to the phone. I sat there.

Q. Okay. And that waiting area -- that's contained within the booking area; right?

A. Yes.

Q. And the booking area is a large room --

A. Yes.

Q. -- correct?

Okay. Can you, to the best of your recollection -- Strike that.

You've been in the Jerome Combs Detention Center several times; right?

A. Yes.

Q. Okay. And you've been booked into the facility on a number of occasions; correct?

A. Yes.

Q. Okay. Can you describe for me the best you can the booking area.

A. Well, if you are on the sally port, there's a -- there's a door that someone in control opens. You open that door. You go

through a metal detector. It's a little area where they actually take -- you know what I am saying -- like, your jewelry and stuff off, all your money. Take everything out your pocket to -- so that they can take your possession basically.

And there is another metal detector in a door that you go through. They got -- there's a variety of cells up there. They have a desk with computers and everything hooked up for they communications to see here, and they have, like, maybe 15, 20 chairs with a TV that -- about 20 chairs that's facing the TV with about 3 or 4 phones on the side.

Q. And that's sort of a waiting area; correct?

A. I guess.

Q. Okay. Well, is that where you were initially taken --

A. Yes.

Q. -- when you were brought in?

A. Yes, I was told to sit over there.

Q. And did Officer Walters -- did he remove your handcuffs once you were brought into the facility?

A. Yes.
Q. Okay. And he told you to go sit in a chair in the waiting area; right?
A. No.
Q. What did he say to you?
A. When I went from the sally port through that first door that I entered, that's the last I seen Officer Walters because Jerome officers now have me.
Q. Okay. And when you say Jerome Combs officers now have you, how many officers?
A. Maybe two, three. I don't recall at the time how many it was that was right there. Sometimes it be two or three officers that might be right there do your -- supposed to take your property, to get your property from you, and they pat you down right there.
Q. Do you know the names of the officers that you first dealt with at the Jerome Combs Detention Center?
(Enter Mr. Michael D. Bersani.)
THE WITNESS: No, I don't recall. Not April the 24 when I got here I don't recall.

BY MR. CONDON:

Q. And you said you were patted down --

A. Yeah.

Q. -- is that correct?

Where within the booking area were you patted down?

A. The first door from the sally -- the first door you enter through from leaving the sally port. It's a little area where they pat you down and take your property.

Q. All right.

A. Like jewelry.

Q. And was it one officer who did the pat-down search of you?

A. I don't -- I don't recall how many officers it was at that time, who or how many officers it was at that time that patted me down when I first came in.

Q. All right. But that was a simple pat-down search on the outside of your clothing?

A. Yes.

Q. And after the pat-down search was done, then you went through a metal detector?

A. Yes.

Q. And then where were you taken next?

A. I was asked to sit down in where the chairs and the TV at and the phones.

Q. Okay. And we'll refer to that as the waiting area; is that fair enough?

A. Okay.

Q. Okay. And you said that there was also a desk area with computers and things; is that correct?

A. Correct.

Q. Okay. And were there a number of officers who were in that area where the desk and computers were?

A. At that time I remember -- I can remember two officers at that time.

Q. Okay. And who were the two officers?

A. I don't -- I don't recall. Oh, I know one of them -- he was a black guy. The other officer was Dyer, Officer Dyer.

Q. Do you know Officer Dyer's first name?

A. No, sir. He -- it's the male Dyer because there's several Dyers work here.

Q. And was Officer Dyer -- when you were first brought into the booking area, was he behind

sitting in one of those desks?

A. Yes.

Q. Okay. Was the black officer also at one of the desks?

A. Yes.

Q. Okay. And then a separate officer told you to go sit in the waiting area?

A. Whomever the officer was that patted me down and took, like, my wallet, my keys, my jewelry, that officer was the one that told me to sit down in a little waiting area.

Q. Okay.

A. Officer Dyer -- he's the one that did the processing, that processed me.

Q. Okay. And when you say that Officer Dyer was the officer who processed you, what do you mean?

A. Like, my information, asking me about my personal information, my name, where I stay at, address. I think he fingerprints -- yeah, he fingerprinted me and took my I.D. -- I mean, took my picture.

Q. Before we get to that, you told me that an officer did a pat-down search of you; correct?

A. Uh-hum.
Q. You have to answer out loud.
A. Yes.
Q. Okay. And then you went through a metal detector.
A. Yes.
Q. And then the officer told you to go sit down in the waiting area; right?
A. Yes.
Q. How long were you sitting in the waiting area before you next had any contact with a correctional officer?
A. I don't know. I'm not going to lie. I actually dozed off sitting there.
Q. So were you in the waiting area for half hour? Any approximation? Fifteen minutes? An hour?
A. No, I was in the waiting area for a couple of hours.
Q. And during that couple of hour period you're just sitting there; right?
A. Yeah, I was watching TV.
Q. And during the couple hours that you were in the waiting area, did you have any contact with

any correctional officer?

A. Yes.

Q. Okay. Who?

A. Dyer.

Q. Okay. And when did you first have contact with Dyer?

A. When I was -- I was told to go sit in the waiting area.

Q. Now, you're talking about when you were first brought in?

A. Yes. I asked him -- when I first brought in, I asked him could I use the phone.

Q. You asked Dyer that?

A. Yes.

Q. What did he say?

A. No.

Q. He told you to go sit in the waiting area?

A. Yes.

Q. And then -- and then you told me you sat in the waiting area for a couple hours; right?

A. Yes.

Q. During those couple of hours did you have any conversation with any correctional officers?

A. No.

Q. Okay. So when is the next contact you had then with a correctional officer?

A. When Officer Dyer called me to -- to get my information, to process me into they system.

Q. And did you leave the waiting area at that point?

A. Yes.

Q. Where did you go?

A. Maybe -- it was, like, maybe two feet from where I was sitting at.

Q. Okay. And to where?

A. To the desk with the officer was sitting at.

Q. Okay. And was that Dyer?

A. Yes.

Q. Okay. And is there, like, a counter there?

A. Yes.

Q. Okay. And Dyer was behind the counter; right?

A. Yes.

Q. And you went over to that area.

Is there a chair? Was there -- is a chair there for you to sit down?

A. Yes.

Q. And did you do that?

A. Yes.

Q. And is that when Dyer got your personal information?

A. Yes.

Q. Do you know Correctional Officer Emory?

A. Emory?

Q. Yeah.

A. Yeah, I recall that name.

Q. Okay.

A. Emory.

Q. Did you have any interaction with Correctional Officer Emory on April 24, 2010?

A. I think he was the correctional officer that was -- that was part of my pat down.

Q. Okay. Part of the pat down when you were first brought in?

A. Yeah.

Q. Okay.

A. He was one -- because I don't recall who the officer was, but I believe he was one of them.

Q. And do you know an Officer Smith?
A. I know a couple officer here named Smith.
Q. Okay. Do you know their first names?
A. No.
Q. No?
A. No.
Q. Okay. Did you have any interaction with an Officer Smith on April 24, 2010?
A. Don't recall.
Q. You said you were sitting at this desk giving personal information to Correctional Officer Dyer; correct?
A. Yes.
Q. How long did that process take place?
A. I don't know. Maybe 15, 20 minutes.
Q. And you had been through that process before; correct?
A. Correct.
Q. And after Correctional Officer Dyer got your personal information, what happened next?
A. I took a picture. I got fingerprinted. I was told to sit back down in the waiting room area.
Q. Did you get fingerprinted right after

speaking with Dyer or did you go sit down in the waiting area before you got fingerprinted?

A. I believe that after I gave him my information, I sat down, then got back up and got pictured and fingerprinted and sat back down.

Q. Okay. Which officer fingerprinted you?

A. I believe Dyer. I think it was Dyer, the one -- the same one that I gave my information to, he fingerprinted me.

Q. And which officer took your photograph?

A. It was the same officer that fingerprinted me.

Q. So Dyer?

A. Yes.

Q. When you were interacting with Correctional Officer Dyer when he was taking your personal information and then he took your fingerprints and your photograph, did you have any conversation with him about your arrest?

A. No.

Q. Okay. Did you have any conversation with him about Crystal Davis?

A. No.

Q. Did you know Correctional Officer Dyer on

April 24, 2010?
A. I don't know him, but I know of him.
Q. Okay.
A. From working here.
Q. So you had interacted with Correctional Officer Dyer before April 24, 2010?
A. No. From seeing him from coming to Jerome Combs. That's about it.
Q. And that's my question. You were in Jerome Combs Detention Center before April 24, 2010; right?
A. Yes.
Q. Okay. And you had interacted with Correctional Officer Dyer before April 24, 2010?
A. Yes.
Q. Okay. So when you came into the facility on April 24, 2010, and you see an officer behind a desk, you recognize, oh, that's Dyer. That's Correctional Officer Dyer; right?
A. I'm going to say that I say that that's Dyer. I come -- well, I knew, like, when I saw the guy, I was saying I come to believe that that was Dyer.
Q. Okay. After you are fingerprinted and

photographed, what did Dyer tell you to do then?
Tell you to --
A. Yeah, sit back down.
Q. -- go back and sit in the waiting area? In the waiting area?
A. Yes.
Q. Up to this point had you been in any cell?
A. No.
Q. And you earlier, when you described the booking area for me, you indicated that there were some cells in the booking area; correct?
A. Correct.
Q. Do you recall approximately how many cells in the booking area?
A. About six, eight.
Q. How long did you remain sitting in the waiting area before you were next interacting with a correctional officer?
A. I don't know. Some time had went by. I don't know exactly how long it was. I wasn't -- I wasn't paying attention. I was thinking about how am I going to get out of here. So I wasn't -- I don't know exactly how long the time went past.

Q. Was it a matter of minutes? Was it --
A. I don't -- I don't know.
Q. Okay. You told me that when you were first brought in from the sally port area that you went into a room where you were patted down; correct?
A. Yes.
Q. And then you went through a metal detector; right?
A. Yes.
Q. Do you recall is there another room just off to the area where you were subjected to the pat-down search?
A. I believe that's a room. I'm not for sure, but it's a window with a light on. You could see in there.
Q. Okay. Have you ever been in that room before?
A. No.
Q. Okay. Have you ever heard any correctional officer refer to a room in the booking area as the strip search room?
A. No. I -- no.
Q. Okay. All right. After you gave your

personal information to Dyer and he fingerprinted and photographed you, what's the next thing that happened next involving a correctional officer?

A. I was -- Officer Schultz that's when he, I guess -- he came to the front desk. I think spoke with Dyer, and my information was passed off into him. I went through a door. There's a small hallway, and it's rooms within this little small hallway.

Q. And so it's your testimony that Officer Schultz took you from the waiting area into a hallway where there's some rooms?

A. Yeah, yes.

Q. Okay. And then where did he take you?

A. One of the rooms to the -- I don't know how many doors from the actual door that I entered, but it's a room to the left. It's a door on the left-hand side that I was told to go into.

Q. And so you then went into this room?

A. Yes.

Q. And describe for me the room.

A. It's small. To your right there's a short -- to your right there's a short little wall. It has, I think, two showers, two showers

in there. I don't recall what's on this side, but it's another door straight ahead and in that room, I guess, that's property.

Q. Okay. So all right. You're brought into, as you said, a room. Okay. And in this room are there showers in the room?

A. Yes.

Q. Okay. And there's two showers; correct?

A. Yes.

Q. And when you were standing in this room and you're looking at the showers -- okay -- are you with me?

A. Uh-hum.

Q. -- what is to your right?

A. It would be the door -- it would be the door that I came in to get into the room.

Q. Okay. And then as you're standing looking at the showers, to your left is that where this property room is?

A. Yes.

Q. Okay. And when Officer Schultz -- Strike that.

What does Officer Schultz look like?

A. He tall, heavy set, Caucasian, wear

glasses.

Q. Could you approximate an age at all.

A. Maybe about 30. Around my age.

Q. And was it just Officer Schultz who escorted you from the waiting area to this room where the showers were?

A. Yes.

Q. Okay. And then when you got into this room where the showers were, did Officer Schultz say anything to you?

A. We have small talk, but I don't recall what it was about.

Q. Okay. Did you know Officer Schultz before April 24, 2010?

A. Yes.

Q. You had interacted with him before at the J.C.D.C.; right?

A. Yes.

Q. Well, once you get into the room where the showers are, did he tell you to do anything?

A. Yeah.

Q. What did he say?

A. That's when he asked me to take off -- to take off the clothes that I had on, my street

clothes.

Q. And tell me what clothes you were wearing.

A. I don't recall exactly everything. I know I had a shirt, a pair of pants on, and some shoes, socks, underwear, T-shirt.

Q. And Officer Schultz told you to remove your clothing?

A. Yes.

Q. And then to do what?

A. He told me I was about to be searched. Like, I removed my clothes and open my mouth; my ears; tongue; lift my testicles; oh, spread my butt cheeks; lift my feet up; move my feet around.

Q. All right. Let's go back a minute. You told me you get into the room where the showers are; right?

A. Uh-hum.

Q. It's just you and Officer Schultz in the room; correct?

A. No. Officer Senesac came -- came up. Once I was in the room, Officer Senesac came in.

Q. Okay.

A. He came to the doorway.

Q. And what does Officer Senesac look like?

A. He about 6-3, kind of heavy. He's young. He's about maybe 25ish. I think like a blond, low blond-type hair -- well, bald head right now. He had like a low blond hair.

Q. Caucasian?

A. Yes.

Q. When Officer Schultz told you to remove your clothing, was Officer Senesac present?

A. Yes.

Q. Okay. Were there any other inmates in this room when you were told to remove your clothing?

A. No.

Q. Okay. So it's just you and Officer Senesac and Schultz; correct?

A. Yes.

Q. Okay. When Officer Schultz told you to remove your clothing, did he provide you with a property bin?

A. Well, he told me to take off -- he -- yes, he provided me with a property bin.

In the process of me taking my clothes off, Schultz initially started my strip

search, but he left to go get my property as far as the Jerome Combs Detention Center clothes, and Senesac was still standing there at the door while Schultz was gone.

And when I came back, Schultz asked me to finished getting undressed while Schultz -- I mean, while Senesac was still standing in the doorway.

Q. All right. Let's break this down.

Officer Schultz initially tells you to take off your clothing; is that correct?

A. Yes.

Q. And you start to do that.

A. Yes.

Q. But then before you take all your clothes off, Schultz leaves?

A. Yes.

Q. Okay. Had any strip search been done of you up to that point?

A. No.

When you say has any strip search been done to me, I was in the process of being strip searched.

Q. You were in the process of taking your

clothes off; right?

A. Yes.

Q. And before you get all of your clothes off, Schultz leaves for a period of time; right?

A. Yes.

Q. Where did he go? Do you know?

A. In the property room to get my bin for the Jerome Combs Detention uniform and stuff.

Q. And that only took a matter of seconds; right?

A. Yeah, maybe a minute, if that.

Q. And during this minute or so, you're just standing there with Officer Senesac; right?

A. Yes.

Q. And then Schultz comes back; right?

A. Uh-hum.

Q. Yes?

A. Yes.

Q. Okay. And then did you take off all your clothes?

A. Yes.

Q. And did you put your clothing into the property bin?

A. Yes.

Q. Okay. So you take off all your clothes. You put them in the property bin; right?

A. Yes.

Q. Then what happens?

A. Well, while I was taking off my clothes before Schultz came back to bring me the property bin with the Jerome Combs Detention clothes -- when I was talking off my clothes, Senesac was in the doorway making ungestured slurs to me as far as about a black -- a male penis, a black male penis.

Q. Well, what comments do you recall Officer Senesac saying about a black male penis?

A. He asked me did I have a big, black dick; and he said all black people have big black dicks. Do you have one?

Excuse me, ma'am.

Q. Did you say anything back to Senesac?

A. Yeah.

Q. What did you say?

A. I believe I told him Senesac don't play with me like that.

Q. Okay. And when Senesac made this comment to you, you still had some clothing?

A. No, I was naked.

Q. Oh, at that point you were completely naked?

A. Yes.

Q. And that was before Schultz came back?

A. No. Schultz -- Schultz was back -- by the time I was fully undressed, Schultz was back. In the process -- I'm sorry.

Q. Okay. Well, when Senesac made these comments to you, was Officer Schultz present or was he in the property room?

MR. FLAXMAN: Object to -- he can't know. When you're in the property room, you can't know whether he's inside or outside. It's --

MR. CONDON: He already said he went into the property room, but I'll rephrase it.

BY MR. CONDON:

Q. When Officer Senesac made these comments to you, was Officer Schultz present in the room where the showers were?

A. I don't recall. I don't want to say yes or no.

Q. Anything else that was said between you and Senesac at this point?

A. No.

Q. Okay. And you told me that Officer Schultz then brought the property bin; right?

A. Uh-hum.

Q. Yes?

A. Correct.

Q. You put your clothing in the property bin.

A. Correct.

Q. Then what happened?

A. I was asked -- I was asked to take a shower. I had took a shower. I had to put on -- I refused to wear Jerome Combs Detention Center underwear due to they was used underwear due to I was going -- they were sending me, I believe, to K pod due to me I gave them a little issue as far as not -- wanting to wear my own boxers and I wouldn't wear their boxers they send me to E pod.

Q. Before you go to take a shower, did either -- Strike that.

You did take a shower before you went into the general population; correct?

A. No.

Q. You didn't take a shower?

A. No.

Q. Okay. After your clothing was removed and you put the clothes in the property bin, did Officer Schultz or Officer Senesac tell you to do anything?

A. They -- Officer Schultz -- that's when he was asking me -- like, I gave him my property. That's when he asked to strip search as far as lift up my tongue, my ears, move my hands, lift my testicles, raise my feet up after I was completely naked, then that's when I was asked -- once they did the strip search, that's when I was asked to take a shower.

Q. Okay. Let me stop there. You say that the strip search. I want to break it down as to what you were talking about.

You said that Officer Schultz told you to do something with your ears?

A. Yes. He told me, like, to move my ears, open my mouth, raise my tongue up to see inside of my mouth, raise my arms up to see under my armpits.

Q. All right. Let me slow you down. So did

you open up your mouth for Officer Schultz?

A. Yeah.

Q. Okay. And did you move your ears?

A. Yeah.

Q. And okay. And you said he told you to raise your arms?

A. Yes.

Q. Okay. Did you do that?

A. Yeah.

Q. Okay. Then what else did he tell you to do?

A. He told me to raise my testicles, squat, spread my butt cheeks.

Q. Let me stop you a minute. He said to raise your testicles. Is that your testimony?

A. Yes.

You said my testimony?

Q. No. Is that your testimony that Officer Schultz told you to raise your testicles?

A. Yes.

Q. And when Officer Schultz gave you this or told you to do this, was Officer Senesac standing there?

A. Yes.

Q. Okay. So when he told you to do that, did you comply?

A. No, I didn't raise my -- yeah, I raised my testicles, but I didn't spread my butt cheeks.

Q. So but you're positive you raised your testicles?

A. Yes.

Q. And it's your testimony that Schultz told you to spread your butt cheeks but you refused to do that?

A. Yes.

Q. Okay. And did he tell you to do anything else?

A. They asked me -- Schultz asked me to take a -- did I wanted to take a shower. I told him no, that I didn't.

Q. So it's your testimony that Officer Schultz, after he told you to do these things with respect to moving your ears, opening your mouth --

A. Um-um.

Q. -- raising your arms; right? Raising your testicles; right --

A. Yes.

Q. -- that he then asked you if you wanted to take a shower. Is that correct?

A. Yes.

Q. And what did you say to him?

A. No.

Q. Okay. And what did Schultz say when you said no?

A. Nothing.

Q. Okay. And then what happened next?

A. Him and Senesac was talking, and I was putting my clothes on, the Jerome Combs Detention Center clothes on.

Q. And who gave you the clothes to put on?

A. Schultz.

Q. Okay. And what was the clothing that you were given?

A. An orange jumpsuit, a T-shirt, and I believe a pair of socks and some -- some type of house shoes, slippers.

Q. And then what happened next?

A. I left -- I left there. I was told that I was going to -- at first I was told I was going to K pod, then I -- then I was informed as we was walking down the hallway, no, you going to E pod.

Q. Okay.
A. And I went to E pod. I went to E pod. I went to my cell. I came out and I started using the phone.
Q. Okay. And were you in Cell E-1 in E pod?
A. Yes.
Q. Okay. Now, just going back, I just want to make sure that I understand it correctly.
Going back to the point where Schultz is giving you these commands to do certain things while you had your clothes off there; right?
A. Uh-hum.
Q. You know what I am referring to?
A. Back when I was in the shower area?
Q. Yes. And he's telling you to move your ears and open your mouth.
A. Uh-huh.
Q. Do you recall that testimony --
A. Yes.
Q. -- you gave; right?
A. Yes, ma'am -- I mean, yes, sir.
Q. And when he told you to open your mouth, you did that on your own; right?

A. Yes, because he asked me.

Q. Right. And then he told you to lift your arms up and you did that on your -- by yourself; right?

A. Yes.

Q. In other words, he didn't grab your arms; right?

A. Correct.

Q. And then he told you to lift your testicles, and you did that by yourself when he told you to do it; right?

A. Yes.

Q. So Schultz never touched you; right?

A. No.

Q. When I say "right," I'm correct?

A. Yes.

Q. Okay. Thank you. All right.

MR. FLAXMAN: I mean, was your question did Schultz ever touch you?

BY MR. CONDON:

Q. Did Schultz ever touch you?

A. No.

Q. Okay. Go back to Interrogatories No. 6, Exhibit 6.

MR. FLAXMAN: Have you suffered any mental or emotional injuries?

MR. CONDON: No, no. Go to Question 9.

MR. FLAXMAN: Which -- which --

MR. CONDON: Exhibit 6, Question 9.

MR. FLAXMAN: All right.

BY MR. CONDON:

Q. Question 9 asks you to describe with specificity the strip search which you claim you were subjected to at the J.C.D.C.

And your answer was quote when you first go into a little room before the shower, you are ordered to take off all of your clothes. An officer inspected my arms, raised my arms, lifted my penis and testicles, squat and cough, and submitted the bottom of your feet to inspection. Comments from officers insulting. Two officers present.

That was your answer to Question No. 8; correct?

A. To 9, yes.

BY MR. CONDON:

Q. I mean, to 9; correct?

A. Yes.

Q. And you previously told me that was a true and accurate answer; correct?
A. Yes.
Q. Okay. You just told me a minute ago that Officer Schultz never raised your arms; correct?
MR. FLAXMAN: Object to the form of the question.
BY MR. CONDON:
Q. I asked you just a minute ago did Schultz ever touch you, and your answer was no; isn't that correct?
A. Correct.
Q. Okay. So he never lifted your arms; right?
A. He asked me.
Q. Right. But he never lifted your arms.
A. Okay.
Q. Is that correct?
A. Correct.
Q. Okay. And in your Answer to Interrogatory, you say an officer inspected my arm, raised my arms. Isn't that what your Answer to Interrogatory says? That's what the answer says; isn't that true, sir?

A. Okay. What you saying is you're asking me did an officer touch me.

Q. Well, sir, I'm asking you isn't this the answer you gave in response to Question No. 9. You answered that you were -- that an officer inspected your arm and raised your arms. Isn't that what you wrote in your answer?

(A discussion was had that was off the record between counsel and the witness.)

MR. CONDON: There's a question pending, sir.

MR. FLAXMAN: I'm going to object to the form of the question because there's no and in the Interrogatory Answer.

BY MR. CONDON:

Q. Sir, isn't that what your answer is to Question No. 9?

MR. FLAXMAN: We'll stipulate that it is what it is.

BY MR. CONDON:

Q. So is it your testimony now, sir, that your Answer to Interrogatory No. 9 is not accurate?

MR. FLAXMAN: Object to the form of the question now.

MR. CONDON: You can answer.

THE WITNESS: I don't know how to answer it. The --

MR. FLAXMAN: You can wait for a question.

THE WITNESS: Because I don't know how --

MR. FLAXMAN: You answered it.

BY MR. CONDON:

Q. Sir, go down to No. 13. In your answer to No. 13 you were asked if you were observed by any correctional officers while you were in the shower, and you answered I was observed during the shower.

Isn't that your Answer to Interrogatory No. 13?

A. Yes.

Q. But you never took a shower; right?

A. Correct.

Q. So were you lying when you gave this answer?

A. No. There was a misprint, in the shower. It was supposed to be in the shower area.

Q. Oh, so that's a misprint?

A. Yeah, that's a misprint.

Q. Did you tell your attorney that you wanted to correct that misprint?

MR. FLAXMAN: Objection to attorney-client communications.

BY MR. CONDON:

Q. These are Interrogatories that you signed; correct, Mr. Fonder?

A. Yes.

MR. FLAXMAN: Could we go off the record for a second.

MR. CONDON: Sure.

(A discussion was had that was off the record.)

MR. CONDON: Back on the record.

BY MR. CONDON:

Q. So Mr. Fonder, you stayed in E pod for two days, is that right, before you were released?

A. Yes.

Q. During the time that you were in the room where the showers are, how long were you in that room before you were taken to E pod?

A. Give or take maybe ten minutes.

Q. And from the time that you took off the clothes and put them into the bin before you put on the garb that they gave you, the inmate clothing, how long were you actually naked?

A. About --

Q. Thirty seconds or --

A. About a minute.

Q. Okay. And who escorted you from the room where the showers were to E pod?

A. Schultz.

Q. Was Senesac with you also?

A. No.

Q. Now, you told me that Officer Senesac made a comment to you about black penises; correct?

A. Correct.

Q. Did Officer Schultz make any comments to you?

A. No.

Q. Did you go to school with any correctional officers employed with J.C.D.C.?

A. No.

Q. You didn't go to high school with any of them?

A. No.

Q. And I think you testified earlier that you were told that you were going to be released pending further investigation; is that correct?

A. Correct.

Q. And that was on April 26?

A. Correct.

Q. Okay. Who told you that you were being released?

A. I don't know the officer name that came over the intercom in my cell that told me that.

Q. Which officer actually booked you out of the facility?

A. Officer Brickman.

Q. What does Officer Brickman look like?

A. Short, British, skinny guy with a very distinct accent, low -- low haircut.

MR. CONDON: All right. Let's take a couple minutes. I'm almost finished. Okay?

(A short recess was taken.)

BY MR. CONDON:

Q. Mr. Fonder, go back to Exhibit 6. Do you have that in front of you?

A. Yes.

Q. The Question No. 4. Go to that. It asks you to describe any injury that you suffered as a result of the allegations you're making in the Complaint, and can you read to me what your answer is.

A. I was embarrassed and humiliated by strip search which proceeded any prejudice, determination of probable cause -- I mean, any judicial determination of probable cause.

Q. Any other injuries that you are claiming you suffered other than this embarrassment and humiliation?

A. No.

Q. You didn't suffer any physical injuries as a result of this alleged search?

A. No.

Q. Okay. And you're not claiming any lost wages as a result of the alleged search, are you?

A. No.

Q. Okay. Did you make any complaints to anyone at the J.C.D.C. about this incident?

A. I talked to Ringo. There was an officer there by the name of Ringo, R-I-N-G-O.

Q. Is Officer Ringo a male or a female?

A. Female.
Q. What did you talk to Officer Ringo about?
A. That -- the day on the Monday the 26th before I was released -- before I was even informed that I was released I was in the day room and she came on our Pod.
Q. Did you say she came in the I pod?
A. Into E pod.
Q. Okay.
MR. FLAXMAN: He said our pod.
BY MR. CONDON:
Q. And what did you say to Officer Ringo?
A. I talked to her about the whole incident as far as me being locked up. I was asking could she find out, and I talked to her about what Senesac said, like what could be done as far as with him. That's not the first time I heard -- well, that's the first time he said something to me, but it wasn't the first time I heard him say something of a negative perspective. So I was asking her and right after that we had to lock up and then I was told I was leaving a little after that.
Q. So you spoke to Officer Ringo about

whether there was anything that could be done regarding the comments that Officer Senesac made to you; is that correct?

A. Yes.

Q. Did you complain to her about anything else other than the comments that he made to you?

A. No. I was asking as far as me being -- while I was locked up and what he was saying.

Q. Did you ever file any written complaints or grievance at the J.C.D.C. regarding this alleged search?

A. No. That's what I was trying to find the information from Ringo, but we was told we had to lock up.

Q. So you never filed any written complaint or grievance?

A. No. I was released right after that.

Q. Now, you -- after your release on April 26 of 2010, you were then arrested again and brought back to the Jerome Combs Detention Center in May of 2010; is that right?

A. Yes.

Q. And when you were brought into the facility in May of 2010, were you put in the

general population?

A. No. I was -- I was -- I was sent to E pod due to in May they said I had a behavior problem because of my case, the case -- the nature of the offense that I was in there on.

Q. Okay. So you were -- you were sent to E pod, and is it your belief that E pod is not part of general population?

A. I don't understand when you say E pod part of general population.

Q. You testified that you were arrested in May of 2010; correct?

A. Uh-hum. Correct.

Q. You were brought back to the Jerome Combs Detention Center; correct?

A. Correct.

Q. And in fact, you stayed there for well over a year; correct?

A. From May of 2010?

Q. Yeah. After you were arrested in May of 2010, you were brought back to Jerome Combs Detention Center. How long did you remain in the Jerome Combs Detention Center?

A. Twenty-one-and-a-half months.

Q. So a little over a year, then; right?
A. Yeah.
Q. And when you were brought in almost two years; right?
A. Correct.
Q. So when you were brought in in May of 2010, you were booked into the facility; right?
A. Yes.
Q. Your fingerprints and your photograph were taken?
A. Yes.
Q. Okay. Were you brought into the shower room?
A. Yes.
Q. Okay. And were you told to remove your clothing and put your clothing in a bin?
A. I didn't comply due to I was irritated because of the nature of my offense; so they just took me straight to E pod.
Q. When you say you were irritated due to the nature of your offense, what was your offense?
A. I was there for aggravated battery on a police officer. I had three stitches, I believe, in my eye; so I didn't want to -- I didn't want to

be bothered with no one.

Q. Okay. So it's your testimony that you were taken to E pod without going through the process of taking a shower; is that correct?

A. Yes.

Q. Okay. How did you get your inmate clothing?

A. I was given them. The officer that took me into the room where we allegedly took showers at, I didn't take a shower. I just received my clothing and they took me straight to E pod.

Q. Okay. Did you take off the clothes you had on and put on your inmate clothing before you went to E pod?

A. Yes.

Q. And so you took off all your clothing and put your clothing into a bin; right?

A. Yes.

Q. Okay. And then you were naked at that point; right?

A. No. Yes, yeah, I was completely naked, yes.

Q. And which officers were present when you were processed in in May of 2010?

A. Don't remember. I don't remember officers that was there.

Q. Okay. Then you put all your personal clothing into the bin and put on the inmate clothing; right?

A. Yes.

Q. And were you embarrassed at all by that incident where you had to take your clothes off, put them into the bin, and put on your inmate clothing?

A. Yes. The strip -- being strip searched in front of another male individual, yeah.

Q. And when you say you were strip searched in front of another male individual in May of 2010, what do you mean by that?

A. Have to become completely naked in front of another male individual -- well, it goes back to prior in April when -- the comments that -- that the officer had said.

So I didn't -- I didn't want to do nothing that revolves around me being -- having to go through that same process again. So that's why I refused the second time of not lifting my testicles, spreading my cheeks. You know, I

refused all of that, the shower, everything. I just put their clothes on that they gave me and the officer escorted me to E pod.

Q. Well, when you were there in May of 2010, did the officer tell you to lift your testicles and spread your cheeks?

A. Yeah, he asked me. I don't recall. Yes.

Q. You're sure about that?

A. Yes.

Q. And on the occasions, you know, during the seven-plus years that you were incarcerated in D.O.C. and you were at all these different facilities and you took showers in front of other male inmates, were you embarrassed and humiliated by that?

A. Yeah.

Q. Okay. And did you complain to anyone about having to take showers in front of other male individuals?

A. On my first incarceration I did because it was new to me.

Q. And who did you complain to?

A. I actually talked to Chief Downey when I was at the old county jail. When the old county

jail was up, I talked to him about that.

Q. I'm talking about when you were in Danville and Sheridan and Mount Sterling, did you complain to any of the correctional staff there about having to take showers in front of other male inmates?

A. No.

MR. CONDON: Okay. Those are all the questions I got.

(There was a short interruption.)

BY MR. CONDON:

Q. Mr. Fonder, I have one more for you.

When you were incarcerated for the 21 months or so after your arrest in May of 2010, did you at any point file a written grievance complaining about being strip searched?

A. No, I just talked to several individuals there about it.

Q. But you never filed a written grievance?

A. No.

MR. CONDON: Okay. Those are all the questions I got for you.

MR. BERSANI: I have nothing.

MR. FLAXMAN: Well, I have some.

MR. BERSANI: Okay.
MR. CONDON: Take your time.
MR. FLAXMAN: Thank you.

E X A M I N A T I O N
BY MR. FLAXMAN

Q. Let me direct your attention to the Interrogatory Answers which have been marked as Deposition Exhibit No. 6 where the Question No. 9 was describe with reasonable specificity the strip search to which you claim you were subjected at J.C.D.C. as alleged in the Amended Complaint, including where in J.C.D.C. the search took place, who was present, and how long the search took. And then your answer was -- starts out by saying when you first go into a little room.

And was that the little room you described today at your deposition?

A. Yes.

Q. And then the next clause is before the shower.

Is there an area in the room that's in front of the shower or does the shower take up the whole room?

A. No, it's an area before the -- in front of the shower.

Q. Okay. And were you ordered to take off all of your clothes?

A. Yes.

Q. Did an officer inspect your arm?

A. Yes.

MR. CONDON: I'm going to object now. You were reading his answer, and now you're just -- you've gone off of reading what his answer was and now you're just asking him different questions; so --

MR. FLAXMAN: What's the nature of your objection?

MR. CONDON: The form.

Are you still citing by quoting his answer or are you now --

MR. FLAXMAN: I think if you listen to the question, you'll understand.

MR. CONDON: I am listening and I do think I understand.

BY MR. FLAXMAN:

Q. Did an officer ask you to raise your arms?

A. Yes.

Q. Did an officer ask you to lift your penis and testicles?

A. Yes.

Q. Did -- in the Interrogatory Answer when you wrote -- when it is written raised by arms, did you mean that the officer told you to raise your arms?

MR. CONDON: I'm going to object to the form of the question, and the answer speaks for itself.

BY MR. FLAXMAN:

Q. Did you mean the officer told you to raise your arms?

A. Yes.

Q. Did the officer -- when you wrote lift my penis and testicles, did you mean that the officer told you to lift your penis and testicles?

A. Yes.

Q. And when you wrote squat and cough, did you mean that the officer told you to squat and cough?

A. Yes.

Q. Did the officer tell you to submit the

bottom of your feet to inspection?

A. Yes.

Q. Now, when -- the next time you were at the jail when you were there for 21-and-a-half months, did you go from the jail to court?

A. Yes.

Q. How many times did you do that?

A. Multiple times.

Q. More than -- more than ten?

A. About maybe ten.

Q. Okay. Would you get strip searched before you left the jail to go to court?

A. No.

Q. Would you get strip searched when you came back to the jail from court?

A. No.

Q. You were asked a lot of questions about being strip searched when you were in the facilities at the Illinois Department of Corrections.

How was the strip search on April 20 -- in April of 2010 different, if it was, from any of the strip searches that -- in the I.D.O.C.?

A. Well, I.D.O.C. you don't have officers

making racial slurs to you or comments to you about your private parts.

Q. And is that what happened to you back in April of 2010?

A. Yes.

Q. And you started saying that you weren't sent to general population. You were sent to E pod.

Is E pod different than general population?

A. Yes.

Q. How is it different?

A. E pod they behind a door and we are restricting to all activities or privileges that other pod or dorms within the facility has.

Q. When you got rearrested in 2010 and spent those 21-and-a-half months, did you get strip searched before they put you in E pod?

A. I refused most of the strip search due to the comment from April.

Q. In the April 2010 time at J.C.D.C. you told us about you didn't like the underwear they gave you.

What didn't you like about the underwear?

A. Because they was -- other people had worn them. The underwear that they provide -- they used, stained; so I refused.

Q. Did the officers allow you to wear your own underwear?

A. Certain officers will. Most wouldn't.

Q. Well, did you wear -- do you have underwear when you spent those almost two days at J.C.D.C. in 2010?

A. No.

MR. FLAXMAN: Nothing further.

F U R T H E R E X A M I N A T I O N

BY MR. CONDON

Q. Go back to your Answer to Interrogatory No. 9, Mr. Fonder. The sentence that starts -- the second sentence of your answer -- would you read it into the record.

A. Yeah, an officer inspected my arms, raised my arms, lift my penis and testicles, squat and cough and submitted the bottom of my feet to inspection.

Q. So in your answer that you have just read, you've stated that an officer raised your arms; correct?

A. An officer inspected my arms.

Q. Right. And then raised your arms. Isn't that what you have written here?

MR. FLAXMAN: Object to the form of the question. You're arguing with him.

BY MR. CONDON:

Q. Isn't that what you wrote here, sir?

A. I didn't type per se.

Q. Okay. But this was your answer; right?

A. Yes.

Q. You indicated that the search that was done on April 24 of 2010 was different than searches you were subjected to at the Illinois Department of Corrections because the search at J.C.D.C. -- there were some comments made to you; correct?

A. Correct.

Q. Other than the comments that were made to you, was there anything else that was different about the searches?

A. Other than the garments that they gave

2:12-cv-02115-MPM-DGB # 43 Page 254 of 270

DARNELL FONDER v. KANKAKEE POLICE OFFICERS

207

you in I.D.O.C. are brand new and the garments here are not. The officer comment. Other than that, no.

Q. Otherwise they're the same?

A. Yes.

MR. CONDON: Okay. Okay. That's all I have.

MR. FLAXMAN: We'll waive signature.

AND FURTHER DEPONENT SAITH NAUGHT.

ADVANTAGE REPORTING SERVICE
(800)-347-3124

Plaintiff's Exhibit 5 Page 207

**Exhibit 6**

2004 WL 1125922
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Javar CALVIN, William Virble Moore, and Charles Davis, Plaintiffs,
v.
SHERIFF OF WILL COUNTY and Will County, Illinois, Defendants.

No. 03 C 3086. | May 17, 2004.

**Attorneys and Law Firms**

Kenneth N. Flaxman, Kenneth N. Flaxman, P.C., Chicago, IL, for Plaintiffs.

Edward Joseph Leahy, Jeffrey S. Pavlovich, Daniel Robert Woods, Leahy, Eisenberg & Fraenkel, Chicago, IL, Shannon F. O'Shea, Kiesler & Berman, Joliet, IL, for Defendants.

**Opinion**

***MEMORANDUM OPINION AND ORDER***

GETTLEMAN, J.

***1** Plaintiffs Javar Calvin, William Moore and Charles Davis, individually and on behalf of all others similarly situated, filed this putative class action pursuant to 42 U.S.C. § 1983, alleging that they were unlawfully arrested and then strip searched while in the custody of defendant, the Sheriff of Will County. Plaintiffs seek monetary damages for the deprivation of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.

Plaintiffs have moved pursuant to Fed.R.Civ.P. 23 for certification of three subclasses defined any person "who, from May 8, 2001 (two years before filing this action) to the date of entry of judgment have been, is [sic], or will be:

> I. Arrested on an erroneous computer indication that a warrant has been issued for his (or her) arrest for failure to appear in court in a misdemeanor or traffic case and is held overnight at the Will County Jail;
>
> II. Arrested on a warrant issued for failure to appear in a misdemeanor or traffic case and, following arrival at the Will County Jail, is or was strip searched without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons.
>
> III. In the custody of the Sheriff of Will County of a traffic or misdemeanor charge (or on a warrant issued for failure to appear on a traffic or misdemeanor charge), taken to court from the Will County Jail, ordered released by the Court or became entitled to release because the charge on which he (or she) was being held was no longer pending or was dismissed at the hearing, was ordered released on his (or her) own recognizance, or had posted bail, was sentenced to time served, was acquitted or was otherwise entitled to release, was not the subject of any other pending case or cases which imposed any condition of release other than personal recognizance, was not the subject of any detainer or warrant, was returned in shackles to the Will County Jail to be processed out of the custody of the Sheriff of Will County, and Was [sic] strip searched without any individualized finding of reasonable suspicion that he (or she) was concealing contraband or weapons."

Defendants oppose certification, arguing that: (1) subclass I does not satisfy the numerosity requirements of Rule 23(a); (2) subclass II does not satisfy the typicality requirement of Rule 23(a); and subclasses II and III do not have a question of law or fact common to the class that predominates over individual questions of law or fact, thus failing to satisfy Rule 23(b)(3).

***FACTS***

According to plaintiffs' second amended complaint, each plaintiff was arrested because defendants maintained records that mistakenly indicated an outstanding arrest warrant when no such warrant actually existed. Upon arrival at the Will County Adult Detention Facility ("WCADF"),[1] each member was allegedly strip searched pursuant to the Sheriff's policy.

Plaintiffs Calvin and Moore repeatedly protested their arrests, insisting that they had no outstanding warrants. Within two days of each plaintiff's arrest, a judge concluded that each detention was in error and ordered each plaintiff released. After the release orders issued, WCADF personnel allegedly maintained each plaintiff in handcuffs and shackles and returned him to WCADF. At the WCADF, personnel allegedly strip searched each plaintiff, returning him to a

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

detention cell for several hours until his eventual release that day.

***2** Plaintiffs contend that defendants' failure to use a more accurate system caused incorrect warrants to issue unchecked, thus amounting to deliberate indifference and the unreasonable detention of subclass I plaintiffs. Plaintiffs also maintain that the Sheriff's policy that allowed strip searches without reasonable suspicion that the arrestee possessed concealed contraband or weapons deprived each subclass II plaintiff of his Fourth Amendment rights. Last, plaintiffs contend that the Sheriff's policy of shackling and strip searching persons who were entitled to immediate release deprived each subclass III plaintiff of his Fourth Amendment rights.

***DISCUSSION***

Fed.R.Civ.P. 23 requires a two step analysis to determine whether a class should be certified. First, Rule 23(a) requires plaintiffs to demonstrate: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir.1993). Second, one of Rule 23(b)'s conditions must be satisfied. *Cwiak v. Flint Ink Corp.,* 186 F.R.D. 494, 496 (N.D.Ill.1999). In the instant case, Rule 23(b)(3) requires plaintiffs to demonstrate that: "1) common questions must predominate over any questions affecting only individual members; and 2) class resolution must be superior to other methods for the fair and effective adjudication of the controversy." *Portis v. City of Chicago,* 2003 WL 22078279, *3 (N.D.Ill. Sept.8, 2003) (quoting *Joncek v. Local 714 International of Teamsters Health and Welfare Fund,* 1999 WL 755051, *7 (N.D.Ill. Sept.3, 1999)). Plaintiff have the burden of showing compliance with Rule 23. *Cwiak,* 186 F.R.D. at 496. Defendants challenge certification of each subclass on different grounds.

**1. Subclass I—The "Bad Warrant" Subclass**

Defendants oppose certification of subclass I, the "bad warrant" subclass, arguing that plaintiffs fail to demonstrate numerosity. A class may be certified only if the class is so numerous as to make joinder of all members impracticable. Fed.R.Civ.P. 23(a)(1); *Cwiak,* at 496. Defendants contend that discovery shows only a handful of potential class members, namely the specific plaintiffs and a few other possible, yet unnamed, members. Defendants point to Sergeant Vitek's deposition testimony that, in his opinion, over the past four years, the Sheriff's records probably show less than five instances of a quashed warrant arrest.

Plaintiffs contend that at least 75 people compose the first subclass, emphasizing the deposition testimony of Sergeant Brian Fink, who acknowledged that, perhaps as often as once a week, "a person [is] brought into the jail on a warrant and says that, 'That warrant was quashed; I shouldn't be here." ' Sergeant Fink added, however, that "everybody says that the warrant isn't any good." Plaintiffs also direct the court's attention to plaintiff Davis' deposition, in which he testified that the judge who ordered his release said he was "about the 201st person coming in here getting falsely arrested."

***3** The Fink and Davis deposition excerpts do not persuade the court that the first subclass is sufficiently numerous to merit class treatment. The Fink deposition testimony addresses only how many people *complain* that they have been brought in invalid warrants; his testimony does not address the number of warrants that actually were quashed. The only evidence before the court regarding the number of actual quashed warrant arrests, which was provided by defendant, indicates that there have been only five incidents. Plaintiffs concede that five incidents alone do not satisfy the numerosity requirement of Rule 23(a).

Although plaintiffs are not required to show the exact number of people included in the proposed class, *Cwiak,* 186 F.R.D. at 494, the impracticability of joinder must be established by more than mere speculation. *See id.* at 496 ("[I]mpracticability of joinder must be positively shown, and cannot be speculative.") (citations omitted). The court thus denies plaintiffs' motion to certify subclass I. If further discovery reveals a greater number of actual quashed warrant arrests that would satisfy the numerosity requirement, however, plaintiffs may renew their motion to certify subclass I.

**2. Subclass II—The "Post–Arrest Strip Search" Subclass**

Defendants oppose certification of subclass II, the "post-arrest strip search" subclass, arguing that plaintiffs fail to demonstrate, (1) typicality, and (2) a common question of law or fact that predominates over individual issues. The court addresses each of these arguments in turn below.

A class may be certified only if the claims of the representative parties are typical of the claims of the class. Fed.R.Civ.P. 23(a)(3); *De La Fuente v. Stokely–Van Camp,*

Plaintiff's Exhibit 6

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

*Inc.*, 713 F.2d 225, 232 (7th Cir.1983). Defendants argue that the class definition is overbroad and indefinite, thus making it too difficult for the court to "determine whether a particular individual is a member of the proposed class." *See Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D.Ill.1999). In arguing that the class is indefinite, defendants hypothesize a split in the class between those members who were strip searched and released on bond and those members who were strip searched and admitted as WCADF inmates.

The court fails to see how the interests of the named plaintiffs, who were strip searched prior to being admitted as inmates, are not aligned with the interests of those class members who were strip searched prior to posting bail. Plaintiffs are challenging the policy of strip searching each person arrested on a warrant for failure to appear in a misdemeanor or traffic case without first making an individualized finding of reasonable suspicion or probable cause that he or she was concealing contraband or weapons. According to plaintiffs, the strip searches allegedly occurred "upon arrival," and the challenged policy applied to every arrestee regardless of whether he was later released on bond or admitted as a WCADF inmate. As plaintiffs point out, every member of the "post-arrest strip search" subclass advances the same claim that the Sheriff's uniform strip search policy (specifically, to strip search *all* persons arrested on "failure to appear" warrants) is unconstitutional as applied to persons in custody on warrants issued in traffic and misdemeanor cases. The court thus concludes that plaintiffs have satisfied the typicality requirement.

***4** Defendants further argue that, even if sufficiently definite, certification of subclass II should be denied because it fails to satisfy Rule 23(b)(3)'s requirement that questions of law or fact common to the members of the class must predominate over any questions affecting only individual members. According to defendants, "Requiring this court to make an individualized determination of the constitutionality of the search conducted by WCADF personnel, as applied to each potential class member, renders the proposed second subclass unmanageable." In this vein, defendants argue that the determination of whether a person is a member of subclass II cannot be made without hearing evidence on the circumstances of each person's arrest and search, which would include an individualized inquiry into whether there was reasonable suspicion that each class member had some hidden drugs or weapons at the time of the search.

Defendants misconceive the way in which reasonable suspicion factors into the class. Plaintiffs allege that under the uniform strip search policy adopted by the Sheriff, jail personnel never undertook reasonable suspicion or probable cause inquiries. Thus, the ultimate legal question is not whether jail personnel made erroneous reasonable suspicion determinations regarding each individual, but whether the Sheriff's policy avoided all such inquiry, thus depriving those individuals of their Fourth and Fourteenth Amendment rights. The question of the validity of the Sheriff's policy thus predominates over any "individualized questions." *See Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 620 (W.D.Wis.2003) ("[T]he case law suggests that when the class is challenging a uniform policy, the validity of that policy predominates over individual issues and class certification is appropriate").[2] *See also Mack v. Suffolk County*, 191 F.R.D. 16, 24 (D.Mass.2000) ("To require plaintiff to prove that each individual search was unsupportable, as well as indiscriminate, would be unnecessary and unfair. Given that these [persons] were routinely strip searched, the burden rests on defendants to demonstrate that particular searches were reasonable.") (citing *Doe v. Calumet City, Ill.*, 754 F.Supp. 1211 (N.D.Ill.1990)).

For these reasons, the court certifies subclass II as:

Any person who, from May 8, 2001, to the date of entry of judgment has been, is, or will be:

> Arrested on a warrant issued for failure to appear in a misdemeanor or traffic case and, following arrival at the Will County Adult Detention Facility, is or was strip searched without any individualized finding of reasonable suspicion or probable cause that he or she was concealing contraband or weapons.

**3. Subclass III—The "Post–Release Strip Search" Subclass—Rule 23(b)(3)**

Defendants oppose certification of subclass III, the "post-release strip search" subclass, arguing that plaintiffs fail to demonstrate "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

***5** Plaintiffs claim deprivation of liberty, personal injuries and lost wages as damages in the instant case. Defendants argue that personal injuries and lost wages are individualized questions according to each proposed subclass member's particular circumstances. Defendants concede that certification of a class can be correct even if the class members are entitled to different levels of injury and damages. *De La Fuente,* 713 F.2d at 233; *Gary v. Sheahan,* 1999 WL 281347 (N.D.Ill. March 31, 1999). Nonetheless, defendants argue that certification in the instant case is improper because plaintiffs fail to present detailed evidence that each member's injuries would be of similar type and severity.

According to defendants, the level of psychological trauma inflicted on each class member varies depending on the individual's particular mental state prior to the strip search (pointing to the difference in the reaction of a first-time arrestee and that of one arrested on numerous prior occasions and familiar with the process). The fact that damages may vary based on each plaintiff's mental state is not, however, a sufficient reason to deny certification, because the court may bifurcate the lawsuit so that liability is determined first. If defendants are found liable, the court may then revisit the damages issue, including whether to certify another class or subclasses, or hold individual hearings, for the purpose of resolving damages. *Blihovde,* 219 F.R.D. at 621 (citing *Denberg v. United States R. Retirement Bd.,* 696 F.2d 1193, 1207 & n. 7 (7th Cir.1983)). *See also Portis v. City of Chicago,* 2003 WL 22078279, *3 (N.D.Ill.2003) ("[T]he possibility of individualized damage inquiries does not defeat class certification even if individual hearings ultimately may be required.") (quoting *Williams v. Rizza Chevrolet–Geo, Inc.,* 2000 WL 263731, at *3 (N.D.Ill.2000)).

Defendants' remaining argument for denying certification of subclass III challenges "the possibility that plaintiffs believe they should have been released directly from the courthouse" rather than being returned to the WCADF general population for processing, which entitles defendants to strip search the inmates for contraband. Defendants argue that the returning inmates cannot be held in a holding cell because they must be allowed to collect their personal belongings from their cells in general population. Plaintiffs respond that persons arrested on warrants are unlikely to have personal property to collect upon release because their property is "taken from [them] and held in the property room" rather than their cells. Because this factual dispute goes directly to the merits of plaintiffs' challenge of the Sheriff's policy of returning released inmates to general population (and thus subjecting all of them to strip searches), it is premature. "[A] court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits." *Loeb Industries, Inc. v. Sumitomo Corp.,* 306 F.3d 469, 480 (7th Cir.2002) (citing *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Accordingly, the court need not decide whether the Sheriff's policy passes muster before certifying subclass III.

***6** For these reasons, the court certifies subclass III [3] as:

Any person who, from May 8, 2001, to the date of entry of judgment has been, is, or will be:

> In the custody of the Sheriff of Will County on a traffic or misdemeanor charge (or on a warrant issued for failure to appear on a traffic or misdemeanor charge), taken to court from the Will County Adult Detention Facility, ordered released by the court, or otherwise became entitled to immediate release, was returned to the Will County Adult Detention Facility to be processed out of the custody of the Sheriff of Will County, and was strip searched without any individualized finding of reasonable suspicion that he or she was concealing contraband or weapons.

***CONCLUSION***

For the reasons stated above, plaintiffs' motion for class certification is granted with respect to subclasses II and III, and denied with respect to subclass I. This matter is set for a report on status on May 26, 2004, at 9:00 a.m.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Footnotes

1 Plaintiffs references to "Will County Jail" in the definition of their subclasses have been replaced with "Will County Adult Detention Facility," which defendants submit is the proper name of the facility to which plaintiffs were taken.

2 As plaintiffs point out, the proposed class definition excludes persons who were strip searched based on "reasonable suspicion." Accordingly, in the event that defendants believe that specific searches or classes of searches had a reasonable antecedent justification, defendants are not precluded from offering proof that the subjects of those searches should be excluded from the class. *See, e.g., Doe v. Calumet City, Ill.,* 754 F.Supp. 1211, 1220 (N.D.Ill.1990). Because Sheriff's Policy and Procedure § 5080 requires elaborate documentation of strip searches conducted on the basis of "reasonable belief" that the inmate is concealing contraband or weapons, identifying such individuals should not be overly burdensome or require extensive factfinding by the parties.

3 In the interest of clarity, the court, *sua sponte,* has simplified the definition of subclass III.

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit 7**

2013 WL 2302102
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

Debra BAGGETT, et al., Plaintiffs
v.
Michael J. ASHE, Jr., et al., Defendants.

C.A. No. 11–cv–30223–MAP. | May 23, 2013.

**Attorneys and Law Firms**

David Milton, Howard Friedman, Law Offices of Howard Friedman, P.C., Boston, MA, for Plaintiffs.

Edward J. McDonough, Jr., Thomas E. Day, Egan, Flanagan & Cohen, PC, Springfield, MA, for Defendants.

**Opinion**

***MEMORANDUM AND ORDER REGARDING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION* (Dkt. No. 41)**

PONSOR, District Judge.

***1** Plaintiff Debra Baggett was a prisoner at the Western Massachusetts Regional Women's Correctional Center ("WCC") from September 5 through 12, 2008, and again from October 2, 2008, through January 28, 2010. While in custody, Plaintiff was taken to the Segregation Unit and strip searched during the transfer, a process which, pursuant to WCC policy, is videotaped by a corrections officer. Plaintiff has brought this putative class action pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution, contending that Defendants' policy of permitting male correctional officers to videotape strip searches of the female inmates in non-emergency situations violated her constitutional rights.

Before the court now is Plaintiffs' Motion for Class Certification, seeking to certify a class of approximately 178 former and current WCC inmates who were videotaped by male correctional officers during strip searches.

The 178 potential class members satisfy the numerosity requirement of Fed.R.Civ.P. 23(a)(1). Plaintiff's claims raise questions of both law and fact common to the class, specifically (1) whether Defendants maintained a policy or custom of authorizing males to videotape strip searches of female prisoners in non-emergency situations and, if this occurred, (2) whether this policy violated the Fourth Amendment. Rule 23(a)(2). Plaintiff's claims and defenses, since she contends that she herself was a subject of the policy, are obviously typical of the claims and defenses of the class, as required by Rule 23(a)(3). Furthermore, Plaintiff as the representative party, along with her very well qualified attorneys, will adequately protect the interests of the class. Rule 23(a)(4).

Finally, as required by Rule 23(b)(3), a class action in this case is the superior method for resolving the common questions of law and fact that exist. Differences in the specific circumstances of individual class members may affect entitlement to damages, but do not affect the analysis of the propriety of as class action. *See Tyler v. Suffolk County,* 253 F.R.D. 8, 11 (D.Mass.2008) (certifying a class because the existence of divergent damages among class members is not an obstacle where a " 'sufficient constellation' of common questions predominates").

Defendants' opposition raises several arguments that may be pertinent to the ultimate resolution of the case on the merits, but are unpersuasive on the issue of class certification. Defendants assert that Plaintiff has failed to meet her burden under Rule 23(a), as established by the Supreme Court in *Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011), of affirmatively demonstrating the existence of the four elements for class certification. However, the Affidavit of David Milton (Dkt. No. 43) in support of Plaintiffs' motion offers sufficient proof of the fact that the four elements are met to satisfy the standard as articulated in *Wal–Mart.* Also, Defendants refute the existence of a commonality of issues because Defendants allege that they had several different policies in place for the transfer of prisoners into the Segregation Unit during the class period. However, the minor variations in the applicable policies do not make certification improper. According to Plaintiff, none of the polices limited videotaping of strip searches by male correctional officers to emergency situations alone; this is what she challenges.

***2** For the foregoing reasons, Plaintiffs' Motion for Class Certification (Dkt. No. 41) is hereby ALLOWED. The pretrial phase of the case will continue to unfold, under the supervision of Magistrate Judge Kenneth P. Neiman, in accordance with the revised scheduled order entered on

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

January 9, 2013 (Dkt. No. 36), as modified by the parties' joint motion (Dkt. No. 72), adopted by the court on April 30, 2013.

It is So Ordered.

End of Document

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 8

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 50087 | **DATE** | 6/10/2009 |
| **CASE TITLE** | Raymundo v. Winnebago County et al. | | |

**DOCKET ENTRY TEXT:**

Plaintiff's second motion for class certification [44] is granted.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

Plaintiff, Rosemary Raymundo, both individually and on behalf of individuals similarly situated, has filed a four-count, second-amended complaint against defendants, Winnebago County, the Winnebago County Sheriff's Office, Sheriff Richard A. Meyers, and Andrea Tack, the Superintendent of the Winnebago County Jail, alleging that, over a several-year period, Winnebago County and the Winnebago County Sheriff's Office had a written policy mandating strip searches of certain new detainees which violated the Fourth and Fourteenth Amendments of the United States Constitution. Plaintiff has filed a second motion for class certification.

### I. BACKGROUND

Although not cited in the complaint, plaintiff and defendants do not dispute that the policy at issue states:

> 1. Except as provided in the immediately following paragraph (I.2), all persons booked into the WCCF, who will be housed in the Facility in other than a temporary holding area, shall be strip searched prior to receiving the jail issued uniform and being placed into population.
>
> 2. No person arrested for a traffic, regulatory, or misdemeanor offense, except in cases involving weapons or a controlled substance, shall be strip searched unless there is a reasonable belief that the individual is concealing a weapon or controlled substance. (This prohibition against strip searching does not apply, however, when the arrestee is being taken into custody by or remanded to the Sheriff pursuant to a court order, i.e. bench warrant, mittimus, warrant).

Plaintiff admits that "[t]he crux of this case stems from the sentence in parentheses at the end of paragraph 2" pertaining to "strip search detainees brought in on court orders, i.e. bench warrant, mittimus, or warrant."

On November 6, 2008, this court denied plaintiff's previous motion for class certification finding that plaintiff had failed to properly narrow her proposed class, and as a result, her claims were not common to the class or typical of all potential class members. Specifically, the court found that the class, as it was proposed

**STATEMENT**

at the time, included members who had been subject to two distinct Jail policies which raised different legal issues, and more importantly, that because the class members were challenging two divergent policies, the court would have to make an individual review of each class member's claim. Plaintiff has now filed a second motion for class certification asking the court to certify the following class:

> All persons who were arrested for only non-felony offenses that did not involve weapons or a controlled substance, and for whom there was no finding of a reasonable belief that the individual was concealing a weapon or controlled substance, but who were nonetheless subjected to a strip and/or visual body cavity search as a new detainee at the Winnebago County Jail at any time on or after May 14, 2005.

Defendants have not filed any additional response.

II. DISCUSSION

District courts have broad discretion to determine whether certification of a class is appropriate under Federal Rule of Civil Procedure 23. Chavez v. Ill. State Police, 251 F.3d 612, 629 (7th Cir. 2001). To obtain class certification, a plaintiff must satisfy all four requirements of Federal Rule of Civil Procedure 23(a): (1) "the class is so numerous that joinder of all members is impracticable" (numerosity); (2) "there are questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and (4) "the representative parties will fairly and adequately protect the interests of the class" (adequacy of representation). Fed. R. Civ. P. 23(a); Oshana v. Coca-Cola Co., 472 F.3d 506, 513 (7th Cir. 2006).

Even if a plaintiff meets all of the Rule 23(a) requirements, he or she also must satisfy one of the requirements set forth in Rule 23(b). Fed. R. Civ. P. 23(b). In this case, plaintiff seeks certification pursuant to Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In its November 6, 2008 order, this court found that plaintiff had shown numerosity. The new class definition does not change this finding.

A. Commonality and Typicality

In its previous order, this court found that plaintiff's claims were not common to or typical of all members of the class. Plaintiff's new proposed class ameliorates these problems. The factors of commonality and typicality are closely related. Keele v. Wexler, 149 F.3d 589, 595 (7th Cir. 1998). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Keele, 149 F.3d at 594 (quotation marks omitted). A common set of operative facts is ordinarily present when the defendants are claimed to have engaged in "standardized conduct towards members of the proposed class." Id. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." Id. at 595 (quotation marks omitted).

Plaintiff's previous class definition included all persons charged only with non-felony offenses not involving weapons or controlled substances who were subjected to strip searches, not only those "for whom there was no finding of a reasonable belief that the individual was concealing a weapon or controlled substance." Plaintiff's proposed class is now limited to members who share the experience of being strip-searched without any finding of a reasonable belief that they had a weapon or controlled substance. The common issue is whether defendants' practices violate the Fourth and Fourteenth Amendments, and the common nucleus of operative fact is the common experience of being strip-searched, following an arrest for a non-felony offense, without any

**STATEMENT**

finding of a reasonable belief that the individual was concealing contraband. Thus, the common issue and common nucleus of operative fact support commonality. Plaintiff's claim also arises from similar experiences or practices applied to other class members, and as such, is typical of the potential claims of the other class members.

B. Adequacy of Representation

The final Rule 23(a) requirement for class certification is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining adequacy of class representation, the court considers (1) whether any conflicts of interest exist between the named plaintiffs and the class members, and (2) whether the named plaintiffs' counsel will adequately protect the interests of the class. Harper v. Sheriff of Cook County, No. 07 CV 2393, 2008 WL 4686148, at *3 (N.D. Ill. May 29, 2008); see also Retired Chi. Police Ass'n v. City of Chi., 7 F.3d 584, 598 (7th Cir. 1993).

1. Plaintiff

"A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (quotation marks omitted). "To be an adequate representative, a plaintiff must have a sufficient stake in the outcome to ensure zealous advocacy, and must not have antagonistic or conflicting claims with other class members." Rahim v. Sheahan, No. 99 C 0395, 2001 WL 1263493, at *15 (N.D. Ill. Oct. 19, 2001) (citing Retired Chi. Police Ass'n, 7 F.3d at 598).

In their original response, defendants argued that plaintiff's ability to represent the class is questionable because plaintiff's claim that officers touched her breasts during her strip-search would subject plaintiff to a different amount of damages than other class members not subject to such touching, and because plaintiff's recollection of the strip search is cloudy at best. The court did not need to address these arguments in its previous order, but will address them here.

The court finds defendants' first argument unpersuasive. "It is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 233 (7th Cir. 1983); see also Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004). In fact, "[i]n any class action for damages, no two parties will ever have exactly the same claim." Spoerle v. Kraft Foods Global, Inc., 253 F.R.D. 434, 439 (W.D. Wis. 2008); see also Blihovde v. St. Croix County, Wis., 219 F.R.D. 607, 621 (W.D. Wis. 2003) (holding that "the cases are legion in which courts have rejected arguments that differences in damages among the class members should preclude class certification"). Moreover, plaintiff's claims primarily arise from the officers' act of strip-searching her despite the circumstances of her offense and arrest, and not from the method of strip-searching. Because plaintiff and other class members share the common experience of being strip-searched without reasonable suspicion, the fact that plaintiff's breasts may have been touched during her particular strip search does not demonstrate that her interest differs in a significant way from other members of the class.

The court also rejects defendants' argument that plaintiff is a poor representative of the class because her memory is cloudy. "To be adequate, the class representative must maintain only an 'understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery.'" Quiroz v. Revenue Prod. Mgmt, Inc., 252 F.R.D. 438, 442

(N.D. Ill. 2008); Wahl v. Midland Credit Mgmt., Inc., 243 F.R.D. 291, 298 (N.D. Ill. 2007). The burden to establish this standard is not difficult. Wahl, 243 F.R.D. at 298. Defendants' claim that plaintiff's memory of the incident is cloudy derives from plaintiff's statements that the officers raised her breasts during the search. Plaintiff did not testify she did not remember the search, but rather defendants argue that plaintiff's recollection is inconsistent with the Jail's policy which "demands that officers not touch the body of the person being strip-

**STATEMENT**

searched." However, simply because plaintiff's recollection differs from the Jail's policy does not mean plaintiff does not recall the events supporting her claim. Moreover, defendants have not demonstrated that plaintiff lacks an understanding of the basic facts of the claim or that plaintiff lacks general knowledge of the claims. As such, defendants' second argument also fails. Accordingly, the court is satisfied that plaintiff will fairly and adequately protect the interests of the class.

2. Counsel

Class counsel is adequate if they are "experienced, competent, qualified and able to conduct the litigation vigorously." Redmon v. Uncle Julio's of Ill., Inc., 249 F.R.D. 290, 295 (N.D. Ill. 2008). Defendants do not dispute that plaintiff's counsel can adequately protect the interests of the class. Plaintiff's counsel has submitted a list of several cases in which they litigated both class and individual actions with similar issues. Thus, this court finds that counsel is adequate.

C. Rule 23(b)

Plaintiff has also satisfied the requirements of Rule 23(b)(3). Rule 23(b)(3) requires that questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other methods of adjudicating the class claims. Fed. R. Civ. P. 23(b)(3). The predominance criterion of Rule 23(b)(3) is "far more demanding" than Rule 23(a)(2) commonality. Amchem, 521 U.S. at 623-24. The need to make individual inquiries can indicate the predominance requirement has not been met. Foreman v. PRA III, LLC, No. 05 C 3372, 2007 WL 704478, at *13 (N.D. Ill. Mar. 5, 2007).

Usually, when a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue. Blihovde, 219 F.R.D. at 620. As the court pointed out in its previous order, in similar cases involving strip-search policies, courts have considered whether individualized inquiries into the legality of each search would predominate over the class challenge to the overall policy. In response to this issue, these courts have reasoned that where jail personnel never undertook any reasonable suspicion or probable cause inquiry "the ultimate legal question is not whether jail personnel made erroneous reasonable suspicion determinations regarding each individual, but whether the Sheriff's policy avoided all such inquiry . . . ." Calvin v. Sheriff of Will County, No. 03 C 3086, 2004 WL 1125922, at *4 (N.D. Ill. May 17, 2004); see also Young v. County of Cook, No. 06 C 552, 2007 WL 1238920, at *8 (N.D. Ill. Apr. 25, 2007). As such, these courts concluded that individualized inquiries into reasonable suspicion did not dominate the case. In accordance with these cases, because plaintiff's class includes only those for whom no finding of a reasonable belief was made, individual inquiries would not predominate over the common issue.

The court also finds that plaintiff has shown that a class action is the superior method for pursuing these claims. Plaintiff's constitutional challenge to the Jail's uniform policy of strip-searching those arrested on court orders is the primary legal issue in this case. The judicial economy from consolidation of the separate claims is large because plaintiff has shown that the class is most likely more than 100 people, and thus, even if only a modest portion of these potential claims were filed, the court would be forced to resolve the identical issue regarding the common policy multiple times. See Young, 2007 WL 1238920, at *8. Moreover, as the damages for each class member are likely to be relatively small, certifying this class allows for the vindication of the rights of people who individually would be without effective strength to bring a suit. See Blihovde, 219 F.R.D. at 622; see also Amchem, 521 U.S. at 617 (holding that in regard to Rule 23(b)(3) "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"). As such, plaintiff has satisfied the requirements of Rule 23(b)(3).

2:12-cv-02135-MPM-DGB # 43 Page 269 of 270

**STATEMENT**

III. CONCLUSION

For the foregoing reasons, plaintiff's second motion for class certification is granted.

07 C 50087 Raymundo v. Winnebago County et al. Page 5 of 5
Plaintiff's Exhibit 8 Page 5

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Michael W. Condon and Yordana Sawyer, all at HERVAS, CONDON & BERSANI, P.C., 333 W. Pierce Road, Suite 195, Itasca, IL 60143-3156  and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

/s/   Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC 830399
200 S Michigan Ave, Ste 1240
Chicago, Illinois 60604
(312) 427-3200
*an attorney for plaintiff*